**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **GLADYS CLAUDETTE SUTTON** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **C.A. No. 07:1197** |
| | : | **(JDB)** |
| **WASHINGTON METROPOLITAN AREA** | : | |
| **TRANSIT AUTHORITY (WMATA)** | : | |
| | : | |
| **Defendant.** | : | |

<u>**DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DR. KINLAN**</u>

_____This is a wrongful death and survival action brought by the personal

representative of the estate of Angel Walters and her next of kin, her six year old

daughter, Aubria Walters.  Ms. Walters died as a result of a collision with a WMATA

bus.   Aubria Walters was safely asleep in the back seat of the car at the time of the

accident and did not observe the happening of the accident. She did observe the her

mother's post-accident condition from a distance. There is no support in the record that

Aubria Walters was within the "zone of danger" so as to permit her to recover on her

own behalf.  <u>See, e.g.</u>, <u>Williams v. Baker</u>, 572 A.2d 1062, 1067 (D.C. 1990) (*en banc*)

("If the plaintiff was in the zone of physical danger and was caused by defendant's

negligence to fear for his or her own safety, the plaintiff may recover for negligent

infliction of serious emotional distress and any resultant physical injury, regardless of

whether plaintiff experienced a physical impact as a direct result of defendant's

negligence").  No allegation has been made in the complaint, in Plaintiff's discovery

responses, or in the depositions, that Aubria Walters was personally endangered by the

1

passing bus or the collision involving her mother.

This Motion relates to the damages available under the D.C. Wrongful Death Act, D.C. Code Ann. § 16-2701, to Aubria.  The plaintiffs have proffered an expert child psychiatrist, Dr. Joan Kinlan, to testify to "a reasonable degree of medical probability" concerning damages allegedly caused to Aubria Walters as a consequence of the accident and the loss of her mother.  Dr. Kinlan's report, Exhibit A hereto at 8.  Dr. Kinlan proposes to provide testimony to address three areas of recovery that are being sought by plaintiffs under the Wrongful Death Act: (1) Post Traumatic Stress Syndrome ("PTSD") allegedly suffered by Aubria Walters as a result of seeing the aftermath of the accident and losing her mother; (2) damages that Aubria Walters may suffer because of the possibility that custody may be awarded to her biological father by virtue of D.C.'s legal preference to award custody to a biological parent; and (3) loss of care, education, training, guidance and parental advice that the deceased parent could have been expected to give to Aubria Walters.

It is significant that Dr. Kinlan has no opinions regarding any calculation of financial loses the decedent would have provided to her child had the decedent lived  to raise and support her daughter.  See Kinlan deposition, Exhibit B hereto at 201-202. Dr. Kinlan testified as follows:

> Q.    Are you going to be testifying at trial  regarding anything to do with the value of financial  losses to either the Estate or  to Aubria Walters as a  result of her mother's death?

> A.    I don't know about the financial losses.  I don't see how I can testify to that.

> Q.    What about the value of gifts and contributions that Aubria might have lost as a result of her mother's death?

A.    I don't know anything about that.  I don't see how I can testify to that.

Q.    That about the earning capacity of the Decedent?  I assume the same?

A.    That is not my job.

Q.    What about probable life expectancy?  Same  answer?

A.    I haven't been asked to do that.  I think those are commonly known things, though, in the literature.

Q.    What about value of household services, have you been asked to address that at all?

A.    Well, it depends on what you mean by "value of household services."  If you mean a mother who is taking care of her child, cooking for her, clothing her, making the house look wonderful, that is very, very different, and that is certainly included.

Q.    Well, included in the sense that you would say they're valuable, but I'm talking about the financial value.  Would you put a monetary value that she has a loss of "X" amount of dollars?

A.    I don't know that it's possible that the attorneys may have a formula which says this is what the law says, yes, that's reasonable, but I have not been asked to do any of that.  I think usually someone else is asked to do that.

Exhibit B at 201-202.

WMATA submits that the first two elements of damages sought by plaintiffs are

expressly not available under D.C. law and the third does not require the medical

opinion of an expert child psychiatrist.

I.    Elements of Damages Under the D.C. Wrongful Death Act Do Not Include Grief or Loss of Parent-Child Consortium

The D.C. Wrongful Death Act must be strictly construed.  See Joy v. Bell

Helicopter, 999 F.2d 549, 565 (D.C. Cir. 1993).  The proper recovery is the amount of

financial loss suffered by the spouse and next of kin as a result of the decedent's death. Runyon v. District of Columbia, 463 F.2d 1319, 1322 (D.C. Cir. 1972). Accord Saunders v. Air Florida, Inc., 558 F. Supp. 1233, 1235 (D.D.C. 1983). In the District of Columbia, there is no recovery for grief or emotional distress arising from watching or later learning about the commission of an injury causing negligent act against a third party. Saunders, supra at 1235, Runyon supra at 1322 (A party may not recover for their grief.) Indeed, here it is clear that Aubria was out of harms way safely asleep in the backseat of the car and did not witness her mother being hit by the bus, but only saw her laying in the street afterwards. See 10/16/07 Dep. of Quintenette Ramseur: pages: 33-35, 44 ("... because Aubria was in the truck asleep when the impact occurred.") (Exhibit C hereto);11/14/07 Dep. of Latitia Kirkland:, pages  57, 77, 92-93 (Exhibit D hereto); 11/16/07 Dep. Garnisha Valentine: pages: 99, 115, 118-119,144, 152 (Exhibit E hereto).

The D.C. Court of Appeals has clearly distinguished the recovery for emotional distress available under Maryland law from that recoverable under District of Columbia law in Herbert v. District of Columbia, 808 A. 2d 776, 779, n.3 (D.C. 2002):

> The Maryland wrongful death statute provides that if a spouse or minor child dies, the recovery of damages is not limited to pecuniary losses, "but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection . . . ."

(Citations omitted). By contrast, the D.C. Court of Appeals explicitly outlined what is recoverable under District of Colombia law:

> Recoverable damages under this Act include: (1) pecuniary losses resulting from the loss of financial support the decedent could have been expected to provide the next of

4

kin had he lived; and (2) the value of lost services (e.g.,
care, education, training, and personal advice).

Id. (citing Doe v. Binker, 492 A.2d 857, 863 (D.C. 1985)). The Court of Appeals

specifically noted that "loss of parent-child consortium is not a basis for damages in the

District of Columbia." Id. n.3. Accord Joy, 999 F.2d at 567 (loss of marital consortium

is not recoverable under the D.C. Wrongful Death Act). Loss of services refers to those

services that the decedent would have provided a beneficiary under the circumstances

of both individuals continuing life together.  No provision is made under the Wrongful

Death Act for consequential damages such as the expert psychological treatment

required by the loss of a parent and post-traumatic stress disorder (PTSD).

The D.C. Standard Civil Jury Instruction is equally clear:

> The Wrongful Death Act does not permit you to, and you
> must not, award the beneficiaries any amount for the sorrow,
> mental distress or grief, or for the loss of love and affection
> that they may have suffered because of [the deceased's]
> death.

D.C. Civil Jury Instruction 14.05.

Dr. Kinlan's report diagnoses PTSD as a result of Aubria Walters seeing her

mother laying in the road after the accident and opines extensively about a medical

diagnosis caused by the loss of the child's mother.  See Kinlan Report at page 8 ("This

report is based on my best medical opinion").  She identifies post traumatic stress

disorder as a  "mental illness." Kinlan Deposition at 201.  WMATA submits that, if grief

and emotional distress are not recoverable items of damages under the District of

Columbia  Wrongful Death Act, a fiortiori a mental illness resulting therefrom is not.

There is no question that the law of the District of Columbia governs this case.  Herbert

at 780-81.

II.    The Impact of Possible Placement of Aubria Walters with Her Biological
Father is Not a Permissible Item of Recovery, nor is Dr. Kinlan Qualified to
Opine Thereon.

Dr. Kinlan goes on to delve into the possible emotional harm to Aubria from the possible legal consequences of Ms. Walter's death by opining that, under District of Columbia law, the biological father, who she presumes is inappropriate to have custody of Aubria Walters, may receive custody. See Kinlan Report, Exhibit A at 8; Exhibit B, deposition at 203-04.  If true, this is another emotional consequence of the aftermath of the mother's death which damages are not recoverable under the District of Columbia Wrongful Death statute.

First, these damages are speculative, arising out of a brief incident in which the parental grandmother obtained a custody order for part of one day. That court order was promptly vacated.  No such further custody battles have been reported.  Dr. Kinlan's speculation that the father may seek custody when he gets out of prison. Even if he eventually petitions for custody, his fitness as a parent is doubtful considering his criminal record.  Dr. Kinlan is not a lawyer, much less one qualified to opine as to District of Columbia child custody law or to predict an opinion of a Superior Court judge at some unknown future time.  She is far afield of her area of medical expertise and should not be permitted to opine on legal consequences.  Indeed, she states in her report that this opinion is  "based on my best medical opinion."  Her deposition confirmed this: "Q: And your report is based solely on a medical opinion, not an opinion in any other field than medical? A: Yes."  Exhibit B at 202.  The outcome of a custody

dispute by a judge applying legal principles are not medical matters.  Moreover, experts generally are not permitted to testify as to legal conclusions, as opposed to factual issues, See Burkhart v. WMATA, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997) ("an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied"); and Halcomb v. WMATA, 526 F. Supp. 2d 24 (D.D.C. 2007).

Such consequential damages are clearly not contemplated by the District of Columbia  Wrongful Death Act.  If emotional distress, grief and loss of parent-child consortium are not recoverable, a fiortiori, the possible damages as a possible result of a possible custody battle are not permitted.  See Joy 999 F.2d at 568 (district court has discretion to exclude expert testimony when it would be "rampant speculation").

III.    Dr. Kinlan Possesses No Special Expertise to Assist the Jury in Evaluating the Financial Value of Lost Services, Such As  Care, Education, Training, and Personal Advice

It does not require a psychiatrist, a medical professional, who evaluated Aubria Walters for a total of six hours to provide "expert" testimony to the jury on the value of lost services to Aubria from her mother.  Rule 702 requires that the expert provide "scientific, technical or other specialized knowledge. . . to assist the trier of fact to understand the evidence or to determine a fact in issue . . ."  Fed. R. Evid. 702.  A jury is  capable of determining the value of the lost services to Aubria from her mother's death by the testimony of her grandmother, great grandmother, aunts, uncles and close friends, all of whom have been identified as witnesses and deposed by WMATA.  Such first-hand testimony is far superior to the testimony of persons familiar with Aubria Walters for her entire life is more probative than the testimony of a psychiatrist who only

interviewed Aubria for six hours.  More importantly, such testimony would not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  Under the "requirement of [Rule 702] that expert testimony assist, . . . [the expert] testimony should ordinarily not extend to matters within the knowledge of laymen," Dr. Kinlan's testimony does not meet Rule 702's requirement.   United States v. Boney, 977 F.2d 624, 628 (D.C. Cir. 1992).  In other words, "where the jury is just as capable of drawing correct conclusions as the witness possessed with special training, expert testimony is unnecessary." United States v. Fadayini, 28 F.3d 1236, 1241 (D.C. Cir. 1994).

The loss of care, education and training is not a matter of psychiatric or medical expertise.  It is well within the ken of the average juror, and Dr. Kinlan should not be permitted to opine thereon.

IV.    Conclusion

Dr. Kinlan's testimony provides no admissible evidence under the District of Columbia Wrongful Death Act.  Her testimony relates to matters not permitted by District of Columbia  law or which are within the ken of the common juror.  Accordingly her testimony should be precluded.  Furthermore, Plaintiff's witnesses should be precluded  from referring to Aubria's grief or emotional distress or grief as the result of the loss of her mother, or to refer to  the possible consequences of custody by the biological father, but confine their testimony to loss of care, education, training, and personal advice.

Respectfully submitted,

**WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY**


_____/s/_____
**Frederic H. Schuster #385326
Associate General Counsel**

_____/s/_____
**David J. Shaffer #413484
Assistant General Counsel
600 Fifth Street, N.W.
Washington, D.C.  20001
(202) 962-2820
Attorneys for Defendant WMATA**

## Certificate of Service

I hereby certify that a true copy of the foregoing was served electronically on this 21st day of April, 2008.


_____/s/_____
**Fredric H. Schuster**

**Joan Evelyn Kinlan, M.D.**
**3843 Massachusetts Avenue, N.W.**
**Washington, DC  20016**

### Psychiatric Evaluation of Aubria Walters

**Identifying Information:**  Aubria Walters (d.o.b. 12/28/01) is a 5 ¾ year old child who lives with her maternal grandmother, Mrs. Gladys Sutton, three nieces ages 6, 8 and 9, a nephew aged 11 and a 15 year old cousin.  She has been living with them since her mother, Angel Walters (d.o.b. 4/28/85), died on February 17, 2007, after being hit by a Metrobus.

**Reason for the Evaluation:**  The evaluation was done to assist in determining the damage under the Wrongful Death Act to this young child in having to grow up without her mother.  This death deprived her of her mother's nurture and care as well as the physical, moral and intellectual training that could be provided by her mother. This loss has deprived Aubria of her mother's income and most importantly her constant presence in her life. It is critical to consider that Aubria's mother, Angel Walters, provided for all of the above as a single mother.

### Sources of Information:

1) Interviews with Mrs. Gladys Sutton on April 19, 2007; April 27, 2007; May 10, 2007; May 1, 2007; and October 11, 2007 for a total of 8.75 hours.

2) Interviews with Aubria Walters on May 15, 2007; May 23, 2007; July 13, 2007; September 22, 2007; and October 13, 2007 for a total of 6 hours.

3) Attendance at Kindergarten Graduation and Reception for Aubria Walter's class on June 22, 2007, for a total of 3 hours.

4) Interview of Mrs. Sutton with three of her siblings on October 18, 2007, for 2 hours.

5) Review of Records including Wrongful Death Act and Westlaw Cases regarding this Act and *Washington Post* article stating "Southeast Woman is Struck, Killed by Metrobus."

**History of Present Illness:**  After Ms. Walters was killed by a Metrobus, Aubria stayed temporarily with her godmother and then returned to live full time with her grandmother and four of her children and her 15 year old granddaughter.

After February 17, 2007, Aubria was noted to be a markedly different child.  She cried frequently and repeatedly asked for her mother.  She was told she was dead and in heaven and Aubria wanted to get the key and go and visit her.  She repeatedly asks to see her to


DEFENDANT'S EXHIBIT
A
tabbies

Aubria Walters
Page Two

this day.  She asks where her mother is and when can she come back.  She is terrified when her grandmother leaves her and for the first few months after her mother died she did not want to leave her grandmother's side.  She suffered from many nightmares on a daily basis.  She would only tolerate being in school for a few hours and insisted on sleeping with her grandmother.

Her nieces and nephew found Aubria to be a very different child.  Before her mother's death, she had been friendly and happy and loved playing with them.  After February 15, 2007 when her mother was killed, she was highly irritable and cried at the most minor provocations as not liking the clothes she has to wear, or wanting a toy someone else is playing with, or being teased, or being corrected either at home or in school.  If anyone mentioned her mother, she would become hysterical and require a long time to calm down.

Because of these serious symptoms, she has had significant problems coping at school and she is currently having problems learning.

There was a worsening of all of her symptoms around the time her paternal grandmother came on May16, 2007 with an order that she could have custody of the child.  These symptoms lessened considerably when the Court allowed Aubria to be returned to the home of her maternal grandmother and she has been weaned from the grandmother's bed and now sleeps with one of her nieces.  She still has some nightmares and is having marked difficulty coping in all areas of her life.

**Developmental History:**  Aubria is the only child born to her mother, Angel Walters.  Angel was 16 at the time she conceived and was a high school student at Coolidge High School.  Her pregnancy was free of any difficulties and she attended regular prenatal care visits.  She continued going to school, got excellent grades and worked part time at CVS and summer youth jobs.

Aubria was a full term baby and weighed a little more than five pounds.  She was healthy and able to come home with her mother in two days.  She was described as a happy, contented, easy-to-manage child.  All who knew her were charmed by her sunny and happy disposition.

All of the developmental milestones including speech, motor and emotional development were within normal limits.  Aubria was described as having a close relationship with her mother who frequently took her to the playground and who was her primary caretaker.

It is important to note that her mother, Angel Walters, completed high school, obtaining training as a nursing assistant and at the time of her death was enrolled in nursing school

Aubria Walters
Page Three

at the University of the District of Columbia and was working in security.  She was in the process of moving to her own apartment with Aubria at the time of her death.

**Social History:**  When Aubria was born she was a well loved and nurtured baby who lived with her mother, Angel Walters, and grandmother, Mrs. Gladys Sutton, Mr. Sutton, and their four children in the maternal great grandmother's house.  There were many people to love and care for her so her mother was easily able to finish high school, obtain nursing assistant's training and work as a nursing assistant.  Grandmother and great grandmother were home during the day and Angel cared for Aubria evenings and weekends.  All lived together for the first three years of Aubria's life and then the grandmother and her children moved to a separate home. There was a brief period of a time when Aubria was an infant when Aubria and her mother shared an apartment with Aubrey Canarte, Aubria's father. This was an attempt to see if the family could live together and it failed. Mr. Canarte did not spend any time caring for his daughter and did not seem interested in her or in being a father. He did not show much interest in her mother and dated other women during this time and Ms. Walters moved out.

 Angel Walters and her daughter, Aubria, remained in the great grandmother's home until December of 2006 when the great grandmother sold her home and moved to Texas. During all of these years, Aubria and her mother continued to have close relationships with the Suttons as well as many extended relatives and their church which they attended regularly.

When the great grandmother sold her house, Angel Walters and her daughter moved into Mrs. Sutton's home. The home was small and Ms. Walters rented an apartment where she planned to move in late February.  As before, all in the family had excellent relationships and Aubria was thriving as she continued at the Capps Kindergarten class.  Angel and her daughter, along with friends, were in the process of moving accessories into the new apartment when Ms. Walters was hit by a Metrobus.

**Medical History:**  Aubria was a healthy full term baby and has been well with the exception of frequent colds while she was in day care and asthma since the age of one. She requires frequent treatments and has had to go to Children's Hospital at times for Emergency visits and she misses some school days because of asthma attacks. Her mother Angel Walters was the main person caring for her during this time and would sleep with her in the hospital overnight when she required treatments there. Her father was never involved in any treatment for her asthma. Currently her maternal grandmother cares for Aubria when she has asthma and picks her up from school and administers treatments.

Aubria Walters
Page Four

**School History:**  Aubria started day care a little before the age of one along with her niece, Joy, who was a year older.  This was an excellent day care center and was located next to their home.

At age four, Aubria started the Capps Charter School. This is an excellent school and was hand selected by her mother.  Aubria did well there and frequently attended before and after school care until her mother could come and pick her up.

After her mother died on February 17, 2007, Aubria continued at Capps Charter School.  There was a marked change in her behavior and Aubria was disturbed and crying much of the day so she only stayed at school for part of the morning until the end of April when she resumed a full day of school.  She received counseling weekly and had time outs when she became very distressed during the school day.  During this time her behavior became hyperactive and she was unable to focus and learn. These behaviors are a direct result of the loss of her mother's care.

In September, 2007, Aubria was transferred to Langdon Elementary School where her nieces attend school and she continues to have problems focusing and is also noted to be an irritable child.  She has continued to have severe tantrums.

All of the behaviors described above with crying, irritable mood, hyperactivity and difficulty focusing began after her mother's death in February, 2007.

**Interviews with Aubria:**  Aubria is a petite, pretty, well groomed and attractively dressed girl.  She was able to easily separate from her grandmother when she came for the first interview on May 15, 2007.

She was eager to explore the playroom and immediately saw the alphabet calendar and began to state the ABC's and spontaneously began to talk about her school which was called Capps and said she had a bad teacher who put her in time out a lot and she does not like that.  She stated that she used to like school but now it was a lot of work and it was hard to do.  She prefers being at home with her grandmother who does not put her in time out and who "takes care of me – good care and I like her."

Aubria moved to the dollhouse and explored it and showed me how she sleeps with her grandma and wondered if I knew any of her sisters.  (In reality, they are her nieces.)  She began to completely redecorate the dollhouse and this was a theme in each session as was play with the doctor kit and a full physical examination of this doctor.  These themes reflected concerns about where she was living and who she lived with as she was no longer with her mother.  It also reflected great concern about health – both the health of her mother who had died after she was bleeding as well as her own concerns about

Aubria Walters
Page Five

having asthma and needing special medical treatments as well as a wish to be sure all were healthy around her.

The second session was held on May 23, 2007. During this session Aubria was hyperactive and very anxious, talking about how Monica Canarte, her paternal grandmother, came to take her away on May 16, 2007. Her sister was crying as she didn't want Aubria to go and her grandmother, Mrs. Sutton, was mad at Monica who said she couldn't stay at Mrs. Sutton's home. Monica kept saying, "I want her back." Aubria stated she had never spent time with Monica – just her real grandmother. Aubria became very anxious while talking about this event of Monica coming to take her away and had to rush to the bathroom.

She returned to the playroom and moved everything around in the dollhouse. When I mentioned that she didn't seem to want Monica coming over to her house, Aubria shook her head and said "no" in a very sad voice. She kept rearranging everything in the bedrooms and kitchen and said it was time to eat and she would cook some bacon and eggs. She was delighted to find a frying pan, "I was looking for that. I need it for my food. Now we'll make tea."

She suddenly shifted focus and took a small girl and put her in a large playpen under the stairs and covered her with a blanket so no one could take her. She asked for large blankets to cover the house so it would be safe and placed several large pieces of felt over the house so "no one can come in and take me away." Only then could we end the session as Aubria was again happy and felt safe.

This session showed the intense anxiety Aubria felt when she was told she could be taken away to live with her paternal grandmother whom she didn't know.

Before the third session on July 13, 2007, Aubria's kindergarten graduation had been attended. Aubria was noted to be a very proud graduate who was able to stand before the whole audience and state that her dream was to be a policewoman. She repeated this at the beginning of the third session as she remembered I was at her program. She stated again her dream and added shyly, I want to be a Mom or Mommy as she spelled it.

When asked if she ever thought about her mommy, she said, "She was a special mother. She was nice. I loved her. You loved her." I indicated I had never met her and Aubria stated you're special so I thought you met my special mommy. She remembered living with her mommy and doing lots of things with her and going out sometimes and having fun. While talking about her mother she was drawing a picture which she said was her and then added a picture of me and put it on construction paper. She was very pleased with her drawing and added a sun when speaking of her mother and how special she was. She then drew a picture of a tree and a house. All were well constructed and showed age

Aubria Walters
Page Six

appropriate developmental levels. She was able to finish the incomplete sentences blanks for children and was clearly proud of herself. Themes were primarily about her relationships with her family and negative feelings towards men.

The fourth and fifth sessions were held on September 22, 2007, and October 13, 2007. There was much discussion about her new school and missing the routine of her old school and the opportunities to play a lot. She talked about all the work you have to do in first grade. She showed a lot of anxiety in talking about it and had to go to the bathroom. She talked a lot about her mother and missing her but likes her grandmother and would like to call her mommy but "my sisters tell me she's their mommy and not my mommy." She wishes she was with her mom and have her own room and toys and not have to share everything with "her sisters." The rest of the time she tried to demonstrate how she knew the ABC's but was struggling and showed some clear difficulties which hadn't been present previously. She also indicated it was hard to pay attention in class and she missed her mom and having her mom pick her up after school.

During the last session Aubria drew a picture of a girl but this was much smaller and inferior to her previous drawing. It showed how she was more troubled and felt more insecure and she described how it was much harder to make friends in her new school. She felt friendly towards her "sisters" but also saw them as mean. She showed her distress in her play by moving around all the furniture in the playroom and liked the opportunity to be in charge. Towards the end of the session she began to talk about her mother being in heaven and how she wanted to visit her and how she cried as she wouldn't be able to see her for a long time.

On mental status examination, Aubria Walters was noted to be a well developed, well groomed, attractive girl who looked and acted her stated age of 5 ¾. She was very cooperative and related well to the interviewer with direct eye contact. She showed no evidence of abnormal motor movements or specific mannerisms.

Her speech was excellent and well modulated. Her mood was mildly depressed and she cried when talking about missing her mother. She was also quite irritable especially in discussing her nieces whom she called sisters and whom she sees as mean and bossy.

There were not abnormal thought patterns and no evidence of delusions, hallucinations or ideas of reference. She showed no evidence of obsessions, phobias or suicidal or homicidal ideation. She did show excessive concern about her own health and those of people she loved.
Aubria was an alert and fully oriented girl. She showed no evidence of memory problems with respect to immediate recall. She did, however, show evidence of problems

Aubria Walters
Page Seven

P with remote recall and could not remember the ABC's or do some simple math that she could previously do. Her fund of information was average and her judgment and insight were appropriate for her age. Her attitude toward the interview was positive.

**Discussion:** Aubria Walters is a 5 ¾ year old girl who has had significant emotional, physical and cognitive symptoms since witnessing the traumatic death of her mother by a Metrobus. It is critical to note that this child was well adjusted and highly functioning when in the care of her mother. Although she is currently in the care of her very nurturing and quite young and healthy grandmother and her children and grandchildren, Aubria is in great distress concerning the loss of her mother. This has caused her to suffer from Posttraumatic Stress Disorder due to the tremendous loss of the nurturing, care and counsel of a very concerned and involved single patent. This is compounded by the fact that she lost her mother at the very young age of five when a child has a poor sense of time and is cognitively incapable of understanding the permanence of death. Her suffering is observed by all who see her whether at home, school, church or family gatherings. She is surrounded by family, her godmother and friends of her mother who love her deeply and who are trying to help her heal. The school has also been aware of her suffering and has tried to help her cope by making significant adjustments and providing counseling. She is, however, still struggling to attend to her work at school as she is flooded with thoughts of her mother dying and a desperate attempt to find her. It is critical that she continue to stay in the home of her maternal grandmother and that she receive individual therapy to help her deal with the trauma of her mother's death. There should also be family therapy and school counseling so that this youngster can function better in all areas of her life. Without such help, she will be permanently damaged.

It is important for the Court to consider that Aubria was the only child of a very intelligent and highly functioning mother who was in the process of obtaining her nursing degree from The University of the District of Columbia. No one can replace her in the mind of this child. Had her mother lived, Aubria's life would have been filled with loving care, discipline and great educational opportunities. The loss of her mother has caused great pain to this young child. She may never recover sufficiently to achieve her full potential.

It is critical that Aubria continue to live with her maternal grandmother with whom she has lived for four of the first five years of life. This is a nurturing, caring home that produced a wonderful mother, Angel Walters. It is a home where Aubria can develop to become a loving and competent adult.
It has been brought to my attention that her alleged father who has of this date not had DNA testing is in jail and that he wishes to have Aubria live with him and his fiancé in

Aubria Walters
Page Eight

Southern Virginia when he is released from jail next year.  Aubria has no emotional relationship with him and has not had any contact with him or even a birthday card for many years.  She was brought to see him once for a couple of hours when she was a baby and he was in detention at Oak Hill.  Should Aubria be removed from the loving home of her grandmother whom she wants to call mommy and be placed with strangers who will have great difficulty coping with this greatly disturbed child who is suffering post-traumatic stress disorder, Aubria will be unable to recover from the trauma of her mother's death.  She will be re-traumatized by being removed from a second "mother" and will likely suffer lifelong damage.

It is critical to note that were her mother alive and caring for her, Aubria would be coping well and relating to peers and nieces without any difficulty as she had previously. She would also be able to function and learn in school. She would not need therapy at a substantial cost.

This report is based on my best medical opinion. None of the problems that Aubria is experiencing would be present but for the death of Angel Walters. It is with a reasonable degree of medical probability to conclude that Aubria would not be facing these issues in her life had she not lost her mother. There may be further supplementation to this report as more individuals are interviewed and further documents are reviewed.

Respectfully submitted,

Joan Evelyn Kinlan, M.D.
Board Certified Child, Adolescent
    And Adult Psychiatrist

October 30, 2007

**Capital Reporting Company**

Page 1

IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

------------------------------------+

GLADYS CLAUDETTE SUTTON,                :

          Plaintiff,                :

                       : CASE NO.

vs.                                     : 07:1197

                       :

WASHINGTON METROPOLITAN AREA TRANSIT :      ORIGINAL

AUTHORITY,                              :

          Defendant.                :

------------------------------------+

                    Washington, D.C.

              Thursday, January 3, 2008

Deposition of:

        JOAN EVELYN KINLAN, M.D.

called for oral examination by counsel for Defendant,

pursuant to notice at Carr Maloney, PC, 1615 L Street,

Northwest, Suite 500, Washington, D.C., 20036, before

Janie Arriaga of Capital Reporting Company, a Notary

Public in and for the District of Columbia, beginning at

10:00 a.m., when were present on behalf of the

respective parties:

DEFENDANT'S EXHIBIT
B

**Capital Reporting Company**

Page 201

1      Q     Is Post Traumatic Stress Disorder a mental

2   illness?

3      A     It is.

4      Q     Are you going to be testifying at trial

5   regarding anything to do with the value of financial

6   losses to either the Estate or to Aubria Walters as a

7   result of her mother's death?

8      A     I don't know about the financial losses.  I

9   don't see how I can testify to that.

10      Q     What about the value of gifts and

11   contributions that Aubria might have lost as a result of

12   her mother's death?

13      A     I don't know anything about that.  I don't see

14   how I can testify to that.

15      Q     What about the earning capacity of the

16   Decedent?  I assume the same?

17      A     That is not my job.

18      Q     What about probable life expectancy?  Same

19   answer?

20      A     I haven't been asked to do that.  I think

21   those are commonly known things, though, in the

22   literature.

**Capital Reporting Company**

Page 202

1      Q     What about value of household services, have

2    you been asked to address that at all?

3      A     Well, it depends on what you mean by "value of

4    household services."  If you mean a mother who is taking

5    care of her child, cooking for her, clothing her, making

6    the house look wonderful, that is very, very different,

7    and that is certainly included.

8      Q     Well, included in the sense that you would say

9    they're valuable, but I'm talking about the financial

10   value.  Would you put a monetary value that she has a

11   loss of "X" amount of dollars?

12     A     I don't know that it's possible that the

13   attorneys may have a formula which says this is what the

14   law says, yes, that's reasonable, but I have not been

15   asked to do any of that.  I think usually someone else

16   is asked to do that.

17     Q     For instance an economist?

18     A     That's a possibility.

19     Q     And your report is based merely on a medical

20   opinion, correct, not an opinion in any other field

21   other than a medical opinion; correct?

22     A     Yes.

**Capital Reporting Company**

Page 203

1              MR. SCHUSTER:  Sorry to say this, we're done.

2              EXAMINATION BY COUNSEL FOR PLAINTIFF:

3    BY MR. MALONEY:

4         Q    Doctor, I have just very few questions.

5              First of all, I would ask that you assume,

6    hypothetically, for purposes of this question, that

7    Aubria Walters was in the car and was asleep in the back

8    of the car at the time her mother was struck by a Metro

9    bus on February 17th, 2007.  I would ask you further to

10   assume she was then awakened by the noise that took

11   place on the street, and that she then went to the

12   sidewalk and saw her mother lying on the street with

13   blood on her and that she -- if not witnessing her die,

14   certainly saw her on the street immediately prior to her

15   death.  And then she was then escorted across the street

16   into safety in the apartment across the street.  Let me

17   ask you to assume that she cried out, mommy, mommy, as

18   she saw her mother lying on the street that night.

19   Would that lead you to conclude, as you so testified to

20   here today, would that form a basis of opinion as to

21   whether she suffered Post Traumatic Stress Disorder?

22        A    Yes.

**Capital Reporting Company**

Page 204

1    Q    Is that the type of traumatic event that would

2    normally lead to that type of finding?

3    A    Yes.

4    Q    Let me ask you further to assume, for purposes

5    of this deposition and your testimony at trial, that

6    Aubrey Canarte had fathered another child and that he

7    had another girlfriend after Aubria was born.  I believe

8    you testified to that already.  Let me ask you further

9    to assume that Aubrey Canarte has not supported the

10   other child or has asked for custody of that other

11   child.  Let me ask you further to assume that within

12   three days of Angel Walters being killed by a Metro bus

13   on February 17, 2007, that Aubrey Canarte, from jail,

14   moved for custody of Aubria.

15        Does that lead you to conclude, Dr. Kinlan,

16   that the motivation for Mr. Canarte to do so is

17   financial in nature and not related to any desire to

18   have Aubria live with him?

19   A    Yes, it does.

20        MR. SCHUSTER:  Objection, only to the extent

21   that she's opining what the paternal father might be

22   thinking or guessing or what his motivation is.  That

1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF COLUMBIA
3
4  _____
   )
5  GLADYS CLAUDETTE SUTTON,          )    Civil Action
   Individually and as Personal  )
6  Representative of the Estate  )    No. 07-01197 (JDB)
   and Next of Kin of ANGEL      )
7  CLAUDETTE WALTERS, Deceased,  )
   )
8      Plaintiff,                )
   )
9  vs.                           )
   )
10 WASHINGTON METROPOLITAN AREA  )
   TRANSIT AUTHORITY,            )
11 )
       Defendant.               )
12 _____)
13
14
15              DEPOSITION OF
16         QUINTENETTE RAMSEUR
17           Washington, D.C.
18       Tuesday, October 16, 2007
19              3:00 p.m.
20
21 Job No.:  114495
   Pages 1 through 61
22 Reported by:  John L. Harmonson, RPR

DEFENDANT'S EXHIBIT
C



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

33

1    vehicle.

2        Q.    Uh-huh.

3        A.    Garnesha Valentine was sitting on the

4    front passenger seat.

5        Q.    Uh-huh.

6        A.    Angel Walters was sitting behind

7    Latitia Kirkland.  Aubria was sitting in the

8    middle.  And I was sitting behind Garnesha

9    Valentine.  Actually, Aubria was sleeping on my

10   shoulder in the middle.

11       Q.    Okay.  Now, when you pulled up and

12   parked, did you sit there in the car for a few

13   minutes or a few seconds?

14       A.    We could have.  I'm not certain.  I

15   know that we -- Garnesha Valentine was making

16   arrangements for her daughter to get dressed so

17   that she could pick her up, so she was on her cell

18   phone.  And I was trying to position Aubria

19   because she was asleep on me, and I didn't want to

20   just get out of the vehicle and for her to fall.

21   So me and Angel propped her up.  So we probably

22   sat there for a minute before we got out, just

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

34

1    trying to get her situated.  And we made

2    arrangements for Latitia to stay in the vehicle

3    while we unloaded the packages because Aubria was

4    sleeping.

5         Q.    Okay.  Now, did you get out of the car

6    first or did Angel get out of the car first?

7         A.    If my memory serves me correct, Angel

8    got out of the car first.

9         Q.    And she got out on the left rear

10   passenger side; is that correct?

11        A.    That is correct.

12        Q.    Okay.  And then did you get out of the

13   car?

14        A.    That is correct, yes.

15        Q.    Okay.  Did one or the both of you then

16   go around to the rear of the car?

17        A.    Yes, we were both at the rear of the

18   car.  And then Garnesha exited the vehicle and

19   came and joined us and was in the middle, and we

20   were pulling items out.  It was a lot of stuff, so

21   we were pulling bags through the hatch of the

22   vehicle.  The hatch was raised.

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

35

1    Q.    So all three of you were behind the

2  car?

3    A.    That is correct, yes.

4    Q.    And Angel's daughter was still asleep

5  in the car?

6    A.    That is correct.

7    Q.    With Ms. Kirkland?

8    A.    That is correct, yes.

9    Q.    Okay.  Now, can you describe what

10  happened next?

11    A.    We proceeded to unload packages out of

12  the vehicle.  Me being bigger than they were --

13  they are, I decided for myself that I was going to

14  get the heavier bags, the bigger packages, because

15  I know I can carry a lot of stuff.  And so I

16  grabbed a trashcan, the trashcan that she had

17  purchased, and I had that in my left arm.  I

18  grabbed a couple of bags and pulled them, looking

19  for heavy bags, and pulled them to the rear of the

20  vehicle.  And then I proceeded to pull a comforter

21  over as well.  So I got the bags in my hand, and I

22  was holding the trashcan, and I was attempting to

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

44

1    I remember looking up and I remember

2  seeing Aubria standing there between the cars and

3  the sidewalk.  She's screaming, "My mother, my

4  mother."  She's hollering and screaming.

5    Latitia, her immediate reaction when

6  she turned around and saw Aubria -- because Aubria

7  was in the truck asleep when the impact occurred,

8  so I'm thinking all the commotion, the screaming

9  and everything, must have awakened her.  When

10  Latitia saw Aubria she ran to her and grabbed her

11  and took her into one of the girl's house that

12  Garnesha's daughter was staying at so that she

13  wouldn't see like, you know, everything that's

14  going on.

15    I knew that Latitia had Aubria, so I'm

16  tending to Angel.  The operator told me that I had

17  to perform CPR on her.  She told me to pinch her

18  nose and gently blow in her mouth, just like of

19  strong bursts of air, and she is instructing me on

20  what to do.  And so she told me to do that a few

21  times.

22    And so I told her, "I'm doing it and

## Capital Reporting Company

Page 1

IN THE SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA

```
-----------------------------------:
GLADYS CLAUDETTE SUTTON,           :
                                   :
            Plaintiff              :
                                   :
      vs.                          :   07:1197 (JBD)
                                   :
WMATA,                             :
                                   :
                                   :
            Defendant              :
-----------------------------------:
```

Washington, D.C.

Wednesday, November 14, 2007

Deposition of:

LATITIA KIRKLAND

called for oral examination by counsel for

Defendant, pursuant to notice, at 1615 L Street,

N.W., Suite 500, transcribed by Monica A.

Voorhees, of Capital Reporting, RPR/CSR, a Notary

Public in and for the District of Columbia,

beginning at 10:02 a.m., when were present on behalf

of the respective parties:

DEFENDANT'S
EXHIBIT
D

**Capital Reporting Company**

Page 57

1  of you in the back seat, right?

2       A.    Yes.

3       Q.    And Ms. Ramser was in back of

4  Ms. Valentine?

5       A.    Yes.

6       Q.    And then Aubria, the five year old, the

7  baby was probably seated in the back seat between

8  the two adults, right?

9       A.    Yes.

10      Q.    Angel and Ms. Ramser?

11      A.    Yes.

12      Q.    Okay.  And was Aubria sleeping?

13      A.    By the time we got to Quinette's house,

14  yes.

15      Q.    Okay.  And how long had she been

16  sleeping at that point?

17      A.    I'm not sure.

18      Q.    Okay.  Where had Quinette's packages

19  been placed in your car?

20            You went from Uno's to her house to

21  leave these packages off, where did she retrieve

22  them from, were they in the front seat, were they in

**Capital Reporting Company**

Page 77

1      Q.      -- as opposed to on one's wrist?

2      A.      Right.

3      Q.      Okay.  And what shoulder did Angel

4  typically hold, hold this shoulder bag over?

5      A.      I'm not sure.

6      Q.      Okay.  Do you know whether she was a

7  right handed-person or left-handed person?

8      A.      I'm not sure.

9      Q.      Okay.  At this time was Aubria still

10 sleeping?

11     A.      Yes.

12     Q.      Did there come a time after that initial

13 citing I guess of Angel that you did not see Angel

14 again?

15     A.      After the, after the bus hit her, then I

16 didn't see her anymore.

17     Q.      Okay, you didn't actually see the bus

18 hit her, though, did you?

19     A.      No.

20     Q.      For a split second you saw her either in

21 the back of the car or near the side of the car and

22 my sense from your, some of your statements is that

**Capital Reporting Company**

Page 1

IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

--------------------------------------+

GLADYS CLAUDETTE SUTTON,            :    ORIGINAL

      Plaintiff,            :

                              : CASE NO.

vs.                                 : 07:1197

                              :

WASHINGTON METROPOLITAN AREA TRANSIT :

AUTHORITY,                          :

      Defendant.            :

--------------------------------------+

Washington, D.C.

Friday, November 16, 2007

Deposition of:

GARNISHA VALENTINE

called for oral examination by counsel for Defendant,
pursuant to notice at Carr Maloney, PC, 1615 L Street,
Northwest, Suite 500, Washington, D.C., 20036, before
Janie Arriaga of Capital Reporting Company, a Notary
Public in and for the District of Columbia, beginning at
5:30 p.m., when were present on behalf of the respective
parties:

DEFENDANT'S
EXHIBIT
_E_
tabbies

**Capital Reporting Company**

Page 99

1    apartment.

2        Q    Which is where?

3        A    Around the corner from Angel.

4        Q    Around the corner from Angel?

5        A    Uh-huh.

6        Q    How long did you stay at Quintinette's house?

7        A    Two minutes.  Five minutes at the most.

8        Q    Did you all go in?

9        A    No, just me, Angel, and Quintinette.

10       Q    Where was Ms. Kirkland and Aubria?

11       A    In the car.

12       Q    Any reason they stayed in the car?

13       A    Because Aubria was sleeping.

14       Q    How long had Aubria been asleep?

15       A    I cannot recall when she fell asleep, but I

16   know it was after Lowe's.

17       Q    After Lowe's?

18       A    From the ride, she went to sleep.  She was

19   tired.

20       Q    It was a long day?

21       A    Yeah.

22       Q    And Quintinette's apartment was fairly close

**Capital Reporting Company**

Page 115

1    the radio in the car on?

2         A    I don't recall it being on.  I'm not sure.

3         Q    The car has a radio?  I mean, it's a Cadillac,

4    CD or radio?

5         A    I know at one point she didn't have a radio in

6    there.  So I don't know.  I don't remember no music.

7    She might not have even had a radio in there.

8         Q    Tape deck or anything like that?

9         A    I don't remember no music.  At one point her

10   radio got stolen.  I don't remember no music being

11   played.  I can't recall no music being played.

12        Q    When you pulled up to that parking spot,

13   Aubria was sleeping?

14        A    Yes.

15        Q    How long had she been sleeping?  At least an

16   hour?

17        A    No, not that long.

18        Q    From the time you left Lowe's?

19        A    From the time we left Lowe's.

20        Q    Okay.  How long did the vehicle remain

21   stopped?  The car was parked; correct?

22        A    Yes.

**Capital Reporting Company**

Page 118

1    you -- other than drinking had any of you used drugs?

2        A    No.

3        Q    Smoked marijuana, a joint or anything like

4    that?

5        A    No.

6        Q    Either before shopping or after shopping?

7        A    We did not do none that day.  That was the

8    plan.

9        Q    So how long is the car sitting there before

10   the first person gets out of the car?  For instance, are

11   you sitting shooting the bull, chitchatting about the

12   things people talk about?

13       A    The only thing I'm remembering was that

14   somebody had to stay with Aubria while she was sleeping

15   so they would not have to wake her up to go in the

16   house.  That's about it.  I know they was out of the car

17   before I was.  Then after I got off the phone, I got out

18   of the car.

19       Q    Was there someone assigned to stay in the

20   car -- to stay in the car with Aubria?

21       A    Yes, my cousin said she would stay in the car.

22       Q    What is your recollection of the first person

**Capital Reporting Company**

1    to get out of the car?  Would that have been Angel or

2    Ms. Ramsor?

3         A    I don't know.  I cannot say who got out first,

4    but I know both of them were out of the car before I got

5    out.  I can't say who got out first because I know both

6    of them were outside of the car.

7         Q    During the entire time Ms. Kirkland parked the

8    car up until the time of the accident, Ms. Kirkland

9    remained in the car?

10        A    Yes.

11        Q    Right?

12        A    Yes.

13        Q    And purportedly, to be there with Aubria, who

14   was sleeping in the back seat?

15        A    Yes.

16        Q    Of the three others who got out of the car at

17   some point, Ms. Ramsor and Angel -- although you can't

18   remember which one got out first; that's correct, right?

19        A    Yes.

20        Q    You were the last one that got out?

21        A    Yes.

22        Q    So when you got out, how long had you been

**Capital Reporting Company**

Page 144

1        Q    When Ms. Kirkland left the car, I assume

2    Aubria was still in the back seat sleeping?

3        A    Yes.

4        Q    Or presumably sleeping?

5        A    Yes.

6        Q    So they went to her.  Did any of you call the

7    police, the police or the ambulance or the fire

8    department or whatever the case may be?

9        A    I know I did.

10       Q    You called 911 or something like that?

11       A    I called 111, then I clicked, and then I

12    called 911.

13       Q    And you reported what happened.  They asked

14    you the location, et cetera, and basically, you said

15    your friend had been hit by a bus?

16       A    Yes.

17       Q    And I assume they said they were going to send

18    an ambulance over or stuff like that?

19       A    She was trying to calm me down.

20       Q    Did Ms. Ramsor or Ms. Kirkland also call?

21       A    I think Ms. Ramsor was calling, too.  I think

22    she was calling.  I'm not sure.  I think she was

**Capital Reporting Company**

Page 152

1       Q      You did not know?

2       A      We did not know.

3       Q      They would not tell you?

4       A      No.

5       Q      Did you go to the hospital, Ms. Kirkland and

6    Ms. Ramsor and you?

7       A      Yes.

8       Q      Did Aubria go to the hospital?

9       A      No.

10       Q      Aubria was sleeping in the back seat of the

11    car; correct?

12       A      Yes.

13       Q      Did she continue to sleep in the back of the

14    car until all of this was over?

15       A      No.

16       Q      Was that a "no"?

17       A      No, she was not.

18       Q      At what point did she wake up, if you know, or

19    was she woken up?

20       A      I think she probably woke up once when I

21    screamed.  Once I screamed, I think she woke up, because

22    I know she heard me scream because the hatch was open.