**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GLADYS CLAUDETTE SUTTON** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :    **Case No. 07–1197 (JDB)** |
| | : |
| **WASHINGTON METROPOLITAN** | : |
| **AREA TRANSIT AUTHORITY** | : |
| | : |
| **Defendant.** | : |
| | : |

**DEFENDANT WMATA'S MOTION _IN LIMINE_ TO PRECLUDE PLAINTIFF FROM**
**PLAYING OR INTRODUCING THE 911 EMERGENCY COMMUNICATION TAPE**

Pursuant to LCvR 7, Fed. R. Civ. P. 6(b), Defendant WMATA moves the

Court to preclude Plaintiff from playing or introducing a transcript of the February

17, 2007, 911 emergency communication, recording the hysterical and highly

emotional conversation between the 911 emergency operator and decedent's friend

and witness to the tragic accident, Quintenette Ramseur. A complete copy of the

tape CD, which is approximately 10 minutes long, is being provided with this

motion to chambers for _in camera_ review.[1] See Def.'s exhibit 1.

---

[1]The conversation between Ms. Ramseur and the 911 operator is
approximately 7 minutes, 23 seconds long. The remaining conversations consist of
calls to 911 from different persons reporting the accident and conversations
between the 911 dispatcher and emergency medical personnel.

## MEMORANDUM OF POINTS AND AUTHORITIESD

### FACTS

On February 17, 2007, at approximately 11:09 p.m., decedent, 23- year old Angel C. Walters, was struck and killed by a WMATA bus.  Immediately after the accident, Ms. Ramseur used her cell phone to call the 911 emergency operator and request emergency medical assistance. Ms. Ramsuer was hysterical and in a highly emotional state. The 911 communication tape vividly displays Ms. Ramsuer's highly emotional reactions to a recent catastrophic accident. It also records the conversations between her and the 911operator regarding Ms. Ramseur's lay observations of decedent's injuries, indicia of possible life in response to the operator's questions, and the operator's instructions to her regarding the performance of Cardio Pulmonary Resuscitation (CPR) until the arrival of ambulance personnel. Under the District of Columbia Survival Act, D.C. Code §12-101 (1981), Plaintiff may recover damages for decedent's "conscious pain and suffering." WMATA's expert, forensic pathologist, John E. Adams, M.D., has considered the tape's contents in reaching his opinions on the issue of decedent's conscious pain and suffering.  Plaintiff has designated Carolyn H. Revercomb, M.D., from the District of Columbia Office of the Chief Medical Examiner as her expert on the issue of conscious pain and suffering. Plaintiff's expert opines decedent's conscious pain and suffering lasted approximately 3 minutes.  Defendant's expert opines decedent suffered no more than 2-3 seconds of conscious pain and suffering.

## ARGUMENT

Plaintiff contends that the 911 communications tape is admissible as a "present sense impression" and/or "excited utterance" under Fed. R. Evid. 803(1) and (2). She also asserts the tape is admissible under Fed. R. Evid. 702, "Testimony by Experts" because WMATA's expert, John E. Adams, M.D. considered the tape in reaching his expert opinions. She further contends the tape is admissible as a prior consistent statement under Fed. R. Evid. 801(d)(1)(B).[2]

Assuming _arguendo_ that the conversations between Ms. Ramseur and the 911 operator constitute a "present sense impression" and/or "excited utterance" exception to the hearsay rule, and conceding that Defendant's expert has reviewed the tape in considering his opinions, the tape should be excluded as unfairly prejudicial and unduly inflammatory with a likelihood to provoke the jury to consider imposition of punitive damages. Fed. Rule of Evid. 403, "Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time," states:

> Although relevant, evidence may be excluded if its
> probative value is substantially outweighed by the danger
> of unfair prejudice, confusion of the issues, or misleading

---

[2] Fed. R. Evid. 701 permits opinion evidence by lay witnesses in limited circumstances. For example, a lay witness may testify regarding such matters as appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, and distance. See Fed. R. Evid. 701, 2000 Amendment Committee Notes. It does not allow a lay witness like Ms. Ramseur to express an opinion on whether or not decedent suffered any conscious pain and suffering or other opinions which require specialized, technical, or scientific knowledge. Those type opinions are governed by the expert witness standards of Fed. R. Evidence 702. Id. and Lightfoot v. Rosskopf, 377 F.Supp.2d 31, 33 (D.D.C. 2005).

the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

As the Advisory Committee Notes state:

> The case law recognizes that certain circumstances call for the exclusion of evidence which is of unquestioned relevance. These circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme.  Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission.
>
> Exclusion for risk of unfair prejudice, confusion of issues, misleading the jury, or waste of time, all find ample support in the authorities.  'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

In  United States v. Johnson, 2006 U.S. Dist. LEXIS 19111,

6-7 (D. La. 2006),  the district court denied admission of that portion of a  911

tape recording the conversation between a witness and medical personnel.

The district court observed:

> The second portion of J.O.'s statement begins when she is connected to the emergency medical personnel. In contrast to the first part of her statement, this particular conversation lacks any intelligible descriptive elements. Rather, the entirety of this portion of J.O.'s statement consists of the medical personnel trying to calm J.O., who is crying and hyperventilating.
>
> J.O. continues to be audibly terrified but says nothing that adds support to any element of the government's case. On the other side of the equation, this part of the tape is prejudicial. J.O. is expressing raw emotion that has an undeniable emotional impact. Its only potential influence on the jury is in an emotional capacity.

4

> The danger of unfair prejudice of this portion of the tape substantially outweighs its negligible probative value and it is therefore excluded.

Id.

Plaintiff will call Ms. Ramseur at trial. She likely will testify under oath to her personal observations regarding the accident, decedent's post-accident physical condition and injuries, what she believes were indicia of life, and the emergency measures she took such as CPR under the direction of the 911 operator.[3] Without playing or introducing the tape, Plaintiff will be able to present the same evidence she would otherwise by admitting and playing it for the jury, without causing "needless presentation of cumulative evidence," the "danger of unfair prejudice," "confusion of the issues," or "misleading the jury" which will inescapably result from the jury listening and reacting to the highly emotional unnecessarily inflammatory hysterical responses of Ms. Ramseur. For that reason it should be excluded under Fed. R. Evid. 403. To the extent Plaintiff is attempting to utilize the tape to admit the opinions of the lay witnesses that the decedent was exhibiting signs of conscious pain and suffering, such testimony is inadmissible under Fed. R. of Evid. 701 because such opinions are based upon scientific,

---

[3] Two other witnesses, Garnisha Valentine and Latitia Kirkland, were close friends of the decedent and witnessed part of the accident. Like Ms. Ramseur, they will be called by Plaintiff to testify about the accident and their lay observations regarding decedent's post-collision physical condition. See Nov.16, 2007, Deposition of Garnisha Valentine, at 147-151, Defendant's exhibit 2, and November 14, 2007 Deposition of Latitia Kirkland, at 83-88, Defendant's exhibit 3.

technical, or other specialized knowledge and governed by Fed. R. Evid. 702

"Testimony of Experts."

The advisory committee notes to Rule 403 state that in reaching a decision

whether to exclude on grounds of unfair prejudice "the availability of other means

of proof may also be an appropriate factor." See:  Old Chief v. United States, 519

U.S. 172, 184 (1997); ("'The probative worth of any particular bit of evidence is

obviously affected by the scarcity or abundance of other evidence on the same

point.'" Id. at 185; Carter v. District of Columbia, 795 116, 126 (D.C. Cir. 1986

("there were certainly other ways the evidence could have been admitted so that

the relevant aspects were retained and the prejudicial aspects minimized"); Federal

Rules of Evidence Manual, vol. 1, Rules 101-404, Saltzburg, Martin, and Capra,

Lexis/Nexis (2006), §403.02 [5], p.403-11-12 ("A Court  should be more willing to

exclude evidence when there are less prejudicial alternative means to prove the fact

in issue."    Additionally, Plaintiff should be precluded from playing the 911 tape

under Fed. R. Evid. 801(d)(1)(B), which states:

> Statements which are not hearsay. A statement is not
> hearsay if – (1) Prior statement by witness.  The
> declarant testifies at trial or hearing and is subject to
> cross-examination concerning the statement, and the
> statement is (B) consistent with the declarant's testimony
> and is offered to rebut an express or implied charge
> against the declarant of recent fabrication or improper
> influence, or motive.

[emphasis added].

Ms. Ramsuer will testify under oath at trial consistent with her

6

prior sworn deposition testimony, and it will be unnecessary for Defendant

to impeach her by a prior inconsistent statement. However, even if that

unlikely scenario occurred, there would be no need to play the inflammatory tape as

the content could be offered without the inflammatory emotion.  Plaintiff could not

simply attempt to use her prior consistent 911 tape statements to rehabilitate or

bolster her in-court testimony. Fed. R. Evid 801(d)(1)(B) is limited in its application

and specifically requires the party seeking the admission of a prior consistent

statement to demonstrate it is being offered "to rebut an express or implied charge

against the declarant of recent fabrication or improper influence, or motive." The

statement is only accorded this "non-hearsay" status, if the Plaintiff meets

this burden. See Tome v.United States, 513 U.S.150, (1995). Plaintiff probably

 would be unable to do so.

    WMATA submits that the contents of the tape is unreasonably prejudicial

and inflammatory, and should be excluded.  However, if the Court considers

admitting any part of the tape it should order that the tape be transcribed by a

certified court reporter and allow only an edited version without playing the tape

 itself. This would eliminate or limit some of the emotion and inflammatory

elements of the recording which will inevitably result from the jury audibly hearing

the emotionally charged contents of the tape.

**Respectfully submitted,**

_____**/s/**_____
**Fredric H. Schuster, #385326**
**Associate General Counsel**

7

_____/s/_____
**David J. Shaffer, #413484**
**Assistant General Counsel**
**202-962-2820**
**600 Fifth St., N.W.**
**Washington, D.C. 20001**
**Attorneys for Defendant  WMATA**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served electronically upon

counsel for Plaintiff this 21st day of April, 2008.

_____/s/_____
**Fredric H. Schuster**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

**GLADYS CLAUDETTE SUTTON**          :
                                     :
          **Plaintiff,**             :
                                     :
          **v.**                     :          **Case No. 07-01197 (JDB)**
                                     :
**WASHINGTON METROPOLITAN**          :
**AREA TRANSIT AUTHORITY**           :
                                     :
          **Defendant.**             :
_____:

**ORDER**

Upon Defendant's WMATA's Motion *in Limine* to Exclude the 911

communications tape, Plaintiff's opposition, and Defendant's reply memoranda, and

for good cause shown, it is this _____ day of _____, 2008, ordered that the

motion is Granted and Plaintiff shall be precluded from playing and introducing the

911 communications tape at trial.


                                     _____
                                     John D. Bates, United
                                     States District Court, D.C.


cc: Counsel of record

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————— :
                                              :
**GLADYS CLAUDETTE SUTTON**      :
                                              :
              **Plaintiff,**                   :
                                              :
      **v.**                                  :        **Case No. 07–1197 (JDB)**
                                              :
**WASHINGTON METROPOLITAN**     :
**AREA TRANSIT AUTHORITY**        :
                                              :
              **Defendant.**                  :
—————————————————————— :


       Defendant's Exhibit 1, the 2/17/07  911 Communications Tape, referenced

in WMATA's Motion *In Limine* to Exclude the 911 Communications Tape filed

on April 21, 2008 is being delivered to Judge's Chambers for *in camera* review.

Plaintiff has previously been provided a copy of the tape.

                                   **Respectfully submitted,**

                                   _____/s/_____
                                   **Fredric H. Schuster, #385326**
                                   **600 Fifth St., N.W.**
                                   **Washington, D.C. 20001**
                                   **(202)-962-2560**
                                   **Counsel for Defendant  WMATA**

## Capital Reporting Company

Page 1

IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

--------------------------------------+

GLADYS CLAUDETTE SUTTON,            :

          Plaintiff,            :

                        : CASE NO.

vs.                                 : 07:1197

                        :

WASHINGTON METROPOLITAN AREA TRANSIT :

AUTHORITY,                          :

          Defendant.            :

--------------------------------------+

                    Washington, D.C.

               Friday, November 16, 2007

Deposition of:

           GARNISHA VALENTINE

called for oral examination by counsel for Defendant,

pursuant to notice at Carr Maloney, PC, 1615 L Street,

Northwest, Suite 500, Washington, D.C., 20036, before

Janie Arriaga of Capital Reporting Company, a Notary

Public in and for the District of Columbia, beginning at

5:30 p.m., when were present on behalf of the respective

parties:

DEFENDANT'S
EXHIBIT
_2_

**Capital Reporting Company**

Page 147

1    point, I was probably either in the house or -- I was on

2    the phone.  I remember I was on the phone talking to her

3    mother.  I can remember them -- I saw them running to

4    her and then I saw them riding off with her, but I

5    didn't pay attention when they got there, because I was

6    talking to her mother.

7         Q    You were the one that informed her mother?

8         A    Yes.

9         Q    When you got to the -- when Ms. Ramsor and

10   Ms. Kirkland was with Angel, were they doing anything

11   with her?  You know CPR or any kind of life saving

12   measures?

13        A    No, because by the time -- she was still alive

14   when I was looking at her.  I walked away from her.  So

15   after that, I couldn't tell you what they was doing.  I

16   know they was right there by her, right there with her.

17   I couldn't tell you what they did with her.  I know that

18   I walked away because I couldn't see her like that.

19        Q    And when you were there, you said she was

20   still alive.  What makes you say that?

21        A    Because her eyes was rolling, like she didn't

22   know what just happened.

Page 148

1    Q    She was rolling her eyes?

2    A    Her eyes.  Her mouth was open.

3    Q    Her mouth?

4    A    Uh-huh.

5    Q    Was she moving in any way?

6    A    No, she couldn't.  She couldn't move.  She

7    just was moving her eyes.  That was the only thing she

8    could move.

9    Q    How close did you get to her?  For instance,

10   did you get on your knees or were you standing up?

11   A    I stood up and I put my coat over her.

12   Q    Is that the black coat that we see in the

13   street there?

14   A    I don't know.

15   Q    Do you see in this picture a black coat?  Do

16   you have a black coat?

17   A    Both of us did.

18   Q    "Both of us" being who?

19   A    Both of us had a black coat on.

20   Q    You both had black coats on?

21   A    Yes.

22   Q    She was wearing a black coat that night and

**Capital Reporting Company**

Page 149

1    you were?

2         A    Yes.

3         Q    You said you took your black coat and covered

4    Angel's body with it?

5         A    Yes.

6         Q    Did you not take her pulse or anything?

7         A    I didn't even touch her.

8         Q    You didn't test her breathing or put your ear

9    to her nose?

10        A    I know she was moving her eyes.  She was still

11   alive because her eyes -- she was still alive.

12        Q    Did she say anything?

13        A    No, she could not.

14        Q    What period of time do you think you were

15   there observing her?

16        A    Long enough to take my coat off.  My only

17   reason for going over there was to see if I could do CPR

18   on her, but she was still alive.  So I couldn't stand to

19   sit right there with her, and I walked away.

20        Q    The ambulance got there pretty quick?

21        A    Uh-huh.

22        Q    Did you have any conversation with the

**Capital Reporting Company**

Page 150

1   ambulance personnel?

2       A    No.

3       Q    When you were standing there, where was

4   Ms. Kirkland and Ms. Ramsor?  Were they standing right

5   next to you?

6       A    When I was standing by her?

7       Q    Yes.

8       A    I can remember Quintinette was on the ground

9   with her.  Both of them was right -- they were both

10  right there.

11      Q    Were they on the phone with anyone like

12  emergency personnel; you know, sometimes when you call

13  in and you're --

14      A    I'm not sure.

15      Q    -- with someone, they are guiding you until

16  the ambulance comes?

17      A    I'm not sure, because I know I was on the

18  phone, too.  There was a lot going on.  I think she was

19  on the ground with Angel.

20      Q    Do you remember whether she was on the phone,

21  though, the cell phone being coached or talked through

22  like life-saving procedures, like CPR or whatever the

**Capital Reporting Company**

Page 151

1  case may be?  Do you know whether she was on the phone

2  with any kind of emergency personnel telling her what to

3  do?

4       A    I wasn't paying her no mind.  She could have

5  been, but I only stayed right there just to take my coat

6  off.  I saw her still breathing and I walked away.  I

7  saw her eyes moving, so I knew she was still alive.  I

8  took my coat off and put it on her.  I know they was

9  right there by her.  I couldn't say if they were on the

10  phone or not, but I know they were both right there.

11       Q    Once she was transported by ambulance, how

12  long did you stay at the scene?

13       A    Long enough to see what hospital she was going

14  to.

15       Q    That would have been Washington Hospital?

16       A    Yes.

17       Q    Did you go to the Washington Hospital Med

18  Star?

19       A    Yes.

20       Q    By the time you got there, she was pronounced

21  dead?

22       A    I didn't know.

Page 1

IN THE SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA


------------------------------------:
GLADYS CLAUDETTE SUTTON,            :
                                    :
          Plaintiff                 :
                                    :
     vs.                            :    07:1197 (JBD)
                                    :
WMATA,                              :    ORIGINAL
                                    :
                                    :
          Defendant                 :
------------------------------------:

                          Washington, D.C.

               Wednesday, November 14, 2007


Deposition of:

          LATITIA KIRKLAND

called for oral examination by counsel for

Defendant, pursuant to notice, at 1615 L Street,

N.W., Suite 500, transcribed by Monica A.

Voorhees, of Capital Reporting, RPR/CSR, a Notary

Public in and for the District of Columbia,

beginning at 10:02 a.m., when were present on behalf

of the respective parties:

DEFENDANT'S
EXHIBIT
3

**Capital Reporting Company**

Page 83

1      Q.      Okay.  Who was the first person to get

2   to Angel?

3      A.      I believe I was.

4      Q.      You were, okay.

5              And what was the first thing, other than

6   being in shock, I grant you that, what did you do?

7      A.      I felt for a pulse and a heart beat.

8      Q.      And how did you go about feeling for a

9   pulse?

10     A.      I checked her neck.

11     Q.      Okay.  And did you feel a pulse?

12     A.      Yes.

13     Q.      Okay.  Did you also feel a pulse on her

14  wrist?

15     A.      No.

16     Q.      Okay.  What else did you check for?

17     A.      A heart beat.

18     Q.      And how did you go about doing that?

19     A.      Touched her chest.

20     Q.      You touched her chest?

21     A.      Her chest.

22     Q.      Okay.  And what was the result of that?

Page 84

1    A.    She had a heart beat and her pulse was

2  weak.

3    Q.    Pulse was weak, okay.  And what about

4  breathing?

5    A.    She was still breathing.

6    Q.    And how did you determine that?

7    A.    Because her eyes and stuff was moving

8  around.

9    Q.    Her what?

10   A.    Her eyes were like rolling around.

11   Q.    Rolling around?

12   A.    So I'm just assuming she was still

13  breathing.

14   Q.    So you were assuming that she was

15  breathing --

16   A.    Yes.

17   Q.    -- from her eyes rolling around?

18   A.    Yes.

19   Q.    You didn't actually feel a breath by

20  putting your hand under her nose or on her mouth or

21  getting on your knees and getting that close to

22  where you could feel or hear any, a breathing sound?

**Capital Reporting Company**

Page 85

```
 1      A.      No.

 2      Q.      Why do you associate breathing with

 3  rolling of the eyes?

 4      A.      I just assumed if your eyes still

 5  moving, you still breathing.

 6      Q.      Okay.  And how were they moving, were

 7  her eyes completely white, in other words, did her

 8  pupils, were they all the way back in her head?

 9      A.      No.

10      Q.      Did she say anything, did she talk?

11      A.      Not that I know of.

12      Q.      And who was the second person to come?

13      A.      I believe it was Quinette.

14      Q.      Quinette, okay.

15              Now at the time Quinette came, had

16  anyone called the police or, you know, either the

17  police or the ambulance or emergency, you know,

18  response?

19      A.      Garnisha and Quinette.

20      Q.      Both of them?

21      A.      Yes.

22      Q.      At the same time?
```

**Capital Reporting Company**

1    A.    I believe so.

2    Q.    And when they made those calls, were

3    they both together?

4    A.    No.

5    Q.    Were they both standing next to you with

6    Angel's body at that point?

7    A.    Quinette was.

8    Q.    Okay.  So you were the first person

9    there with Angel, then Quinette was the second

10   person?

11   A.    Yes.

12   Q.    And did Quinette, while you were there,

13   was Quinette speaking to any emergency personnel on

14   the phone?

15   A.    Yes.

16   Q.    Okay.  And was that person, that is on

17   the other end from the emergency, you know, medical

18   services, EMS, fire department, whatever, were they

19   asking her questions?

20   A.    Yes.

21   Q.    Okay.  Could you actually hear the

22   conversation?

**Capital Reporting Company**

Page 87

1       A.      I could just hear Quinette's response.

2       Q.      Okay.  But from those responses you

3    could pretty much figure out what the questions

4    were, right?

5       A.      Yes.

6       Q.      Or at least in a general way?

7       A.      Yes.

8       Q.      What kind of questions were being asked?

9       A.      I don't know what questions were being

10   asked.

11      Q.      Okay.  What kind of responses were you

12   hearing?

13      A.      Her eyes are moving, she has a pulse and

14   I don't know what else.

15      Q.      Now did she report that based upon what

16   you had reported to her?

17      A.      No.

18      Q.      Okay.  Did she make her own assessment?

19      A.      Yes.

20      Q.      By taking a pulse?

21      A.      Yes.

22      Q.      And from what part of the body did she

**Capital Reporting Company**

Page 88

1    take the pulse?

2        A.      I don't know.

3        Q.      Did she make any other comments; that

4    is, Quinette?

5        A.      She might have.  I'm not sure.

6        Q.      And then what about Ms. Valentine, where

7    was she?

8        A.      All over the place.  She, she was

9    ranting around.

10       Q.      Did you ever see or speak to the bus

11   operator?

12       A.      I saw him, I spoke with him.  I said

13   something to him, but I didn't speak to him.  I said

14   something to him.

15       Q.      How far away from him were you when you

16   had the conversation?

17       A.      It was outside of the bus.

18       Q.      Okay, and what was his frame of mind?

19           MS. LIPPINCOTT:  Objection.  You may

20   answer if you can.

21           BY MR. SCHUSTER:

22       Q.      From your observation, I mean did he