UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLADYS CLAUDETTE SUTTON,                    :
Individually and as Personal                :
Representative of the Estate and Next of Kin of  :
ANGEL CLAUDETTE WALTERS, Deceased           :
                                            :
                    Plaintiff,              :        Civil Action No.:07- 01197 (JDB)
                                            :
        v.                                  :
                                            :
WASHINGTON METROPOLITAN AREA                :
TRANSIT AUTHORITY,                          :
                                            :
                    Defendant.              :

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE*
TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERTS JOSEPH H.
ROSE AND DR. GERALD STALLER**

Plaintiff, by counsel, in Opposition to Defendant Washington Metropolitan Area Transit

Authority's ("WMATA") Motion *in Limine* to Exclude the Testimony of Plaintiff's Experts Joseph

H. Rose and Dr. Jerome M. Staller[1] respectfully requests that this Honorable Court deny the

Defendant's Motion.  In support of her Opposition, Plaintiff states as follows:

***Angel Walters' Future as a Registered Nurse***

In determining whether there is sufficient evidence to sustain a lost future earnings claim,

"we must view the evidence in the light most favorable to [plaintiff]." *Croley v. Republican National*

*Committee*, 759 A.2d 682, 690 (D.C. 2000) (quoting *Estate of Underwood v. National Credit Union*,

---

[1] Defendant refers to Plaintiff's expert as Dr. Gerald Staller, but his proper name is Jerome M.
Staller, Ph.D.

1

665 A.2d 621, 642 (D.C. 1995).   Expert testimony that is "'based on mere speculation or guesswork,' or that '[is not] based upon evidence in the record, can[not] provide a rational basis for the jury's determination of an individual's future earnings....'"   *Croley v. Republican National Committee*, 759 A.2d 682, 690 (D.C. 2000) (citations omitted).   Plaintiff's vocational rehabilitation expert, Joseph Rose, did not engage in mere speculation or guesswork.   He reviewed the same facts and information that Defendant's vocational rehabilitation expert, Kathleen Sampeck, reviewed and came to different conclusions.   In fact, Mr. Rose reviewed many more factors than Ms. Sampeck in an effort to understand Angel Walters as a complete person.   Mr. Rose reviewed her educational and work history, interviewed several of her family members, met with Dr. Connie M. Webster, chairperson of the University of the District of Columbia's ("UDC") Department of Nursing and Allied Health, and spoke with her supervisor at Admiral Security, George Filsinger, Jr.   Based on all of this and other information that he reviewed, Mr. Rose concluded that Ms. Walters would have achieved her goal of becoming a nurse.   *See*, Report of Joseph Rose, dated October 30, 2007, attached hereto as Exhibit A.

The courts have reviewed cases in which the expert testimony regarding lost future earnings is claimed to be too speculative.   In *Athridge v. Iglesias*, 950 F.Supp. 1187 (1996), this Court upheld an award of $1.4 million for lost future earnings of a 15-year-old high school student based on the education of his family, the deceased's expression of interest in becoming a lawyer, and statistics from the U.S. Department of Commerce, Bureau of Census.   Based on this information about a teenager who had not yet graduated from high school, the Court found that, but for the accident, the deceased would have obtained at least a college degree and that there was a significant probability that he would have obtained a professional degree.   *Id.* at 1193.   The Court recognized the speculative nature of predicting lost future earnings.   *Id.* at 1194.   In the case at bar, Ms. Walters had

already graduated from high school and was enrolled at the University of the District of Columbia. Nevertheless, Defendant argues that it is too speculative to state that Ms. Walters would have graduated.

In a case involving a person who has not yet chosen their livelihood, "future lost earnings must be determined on the basis of potential rather than demonstrated earning capacity. That potential must be extrapolated from individual characteristics, such as age, sex, socio-economic status, educational attainment, intelligence and dexterity." *Hughes v. Pender*, 391 A.2d 259, 263 (1978). In this case, Mr. Rose looked at those as well as several other factors and characteristics specific to Ms. Walters to conclude that she would have successfully completed a degree at UDC.

In *Washington Metropolitan Area Transit Authority v. Davis*, 606 A.2d 165, 177 (D.C. 1991),[2] the deceased was a C-average student, her father, an electrician, was only a high school graduate, her mother only completed the 12th grade and one year of another school, and that her older brother had expressed an interest in a military career. The court determined that there was not a proper foundation for the expert's conclusion that the nine-year-old decedent would have become a professional, a lawyer, doctor, or engineer, had she lived. *Id.* at 178-79. Unlike the decedent in *Davis*, Ms. Walters had already completed high school and was enrolled in courses at UDC. She was clearly on the path towards obtaining her degree.

Ms. Walters was a young woman who was taking affirmative steps towards her academic and professional goals. She had enrolled at UDC. It is a school that offers open enrollment, a flexible class schedule that was manageable with her work schedule and child care needs, and offers academic support for students who are coming from the D.C. public school system. She enrolled in

---

[2] The plaintiffs in *Davis* designated Joseph Rose as an expert.

UDC in order to pursue a nursing degree.  She met with Dr. Connie M. Webster, the chairperson of the Nursing and Allied Health Department at UDC, approximately three times to assist her with registration.  *See*, Deposition Transcript of Dr. Connie M. Webster, January 14, 2008 ("Webster Deposition"), attached hereto as Exhibit B, p. 55, ln. 5 through p. 56, ln. 10.  When they met, they discussed nursing in general and Ms. Walter's desire to become a nurse.  *Id.*  As required, based upon her scores on the placement exams, she was enrolled in remedial courses in English, writing, and mathematics.  *Id.* at p. 16, lns. 5-10.  After Ms. Walter's successfully completed the remedial coursework, she would have been eligible to enroll in college-level courses.  *Id.* at p. 22, 9-20.  Unfortunately, Ms. Walters never had the opportunity to complete that coursework, because she was struck and killed by a Metrobus.  At the time of her death, Ms. Walters had taken all of the steps she could take towards her goal of becoming a nurse.

Defendant argues that simply because Ms. Walters was enrolled at UDC does not mean that she would have obtained a degree.  Defendant focuses solely on Ms. Walters' educational and work history as a teenager.  It does not want to consider anything that Ms. Walters has accomplished in her brief adulthood.  Mr. Rose recognizes the fact that Ms. Walters was a young woman who was still undergoing a maturation process.  *See*, Deposition Transcript of Joseph H. Rose, February 19, 2008 ("Rose Deposition"), attached hereto as Exhibit C, p. 8, lns. 4-12.  The fact that she was enrolled at UDC, had expressed an interest in the nursing program, met with the chairperson of the UDC's Department of Nursing and Allied Health, was working full-time, and was taking all the necessary steps towards achieving her goal of becoming a nurse clearly demonstrates that Ms. Walters was maturing into a responsible and determined woman.  Therefore, it is not speculative to conclude that she would have achieved her goal of obtaining a degree from UDC.  *See*, *Athridge v.*

*Iglesias*, *supra* (upholding award of $1.4 million in lost future earning of a 15-year-old high school student).

In *Estate of Michael Truppin v. Korean Air Lines Co., Ltd.*, 954 F.Supp. 4, 8 (D.D.C. 1996), this Court found that the factual assumption that the deceased would have expanded his medical practice relied upon by the plaintiff's economist were not speculative as a matter of law.  This Court recognized that any prediction of possible future events is speculative in nature, but found that there were a number of facts from which to infer that the deceased would have expanded his practice.  *Id.*  Although the deceased's practice had not yet reached the level of prosperity that plaintiff's expert predicted, the deceased had taken several steps towards achieving such a level of prosperity.  This Court decided that it could not say as a matter of law that the plaintiff's expert's assumptions were so unreasonable so as to constitute "rampant speculation" that should not be heard and evaluated by the jury.  *Id.*  This is the same as the case of Ms. Walters.  She had taken several steps towards becoming a nurse, and therefore, Mr. Rose's opinion that she would have achieved her goal does not constitute "rampant speculation."  The jury should have the opportunity to hear and evaluate Mr. Rose's conclusions.

Defendant wants to ignore all of the progress that Ms. Walters was making in her life.  Ms. Walters had adversity to overcome.  She was born to a working-class family and she was pregnant at 16-years-old, but she did not want those obstacles to prevent her from providing for her daughter.  Defendant disregards her motivation and determination, and instead tries to focus only on her behavior when she was a teenager.  Defendant's vocational rehabilitationist, Kathleen Sampeck, also ignores any of the positive steps that Ms. Walters took in the last year of her life.  Even though Ms. Walters had been employed full-time at Admiral Security for approximately six (6) months prior to her death and was a punctual and reliable employee, Ms. Sampeck refuses to recognize this as a

positive indicator for Ms. Walters' future. *See*, Deposition Transcript of Kathleen M. Sampeck, M.A., March 12, 2008 ("Sampeck Deposition"), attached here to as Exhibit D, p. 25, ln. 17 through p. 26, ln. 6.

Ms. Sampeck concludes that Ms. Walters would not have been able to complete a degree at UDC and would have had difficulty passing the remedial courses in which she was enrolled at the time of her death based, in part, on Ms. Walters' scores on the placement exams she took upon enrolling at UDC. *See*, Sampeck Deposition, attached hereto as Exhibit D, p. 43, lns. 8-19. Ms. Sampeck's logic is fundamentally flawed, as Ms. Walters would not have been required to complete the remedial courses before begin college-level courses had it not been for her scores on the placement exams. *See*, Webster Deposition, attached hereto as Exhibit B, p. 14, ln. 19 through p. 16, ln. 16. As Mr. Rose recognizes, remedial courses are part of the open enrollment process at UDC, as they are at other colleges. *See*, Rose Deposition, attached hereto as Exhibit C, p. 35, lns. 2-7. Just because an individual begins in remedial courses does not mean that they are not going to be successful. *Id.* at p. 34, ln. 16 through p. 35, ln. 16. Many students who come out of the D.C. public school system require additional preparation before they can begin college-level coursework. *Id.*

Mr. Rose looked at studies on teen pregnancy and found that Ms. Walters was not the norm. *Id.* at p. 38, ln. 6 through p. 39, ln. 20. She was in a very small percentile of pregnant teenagers who had completed high school. *Id.* Mr. Rose attributed her success to her family's strong work ethic, the fact that she did not want to be dependent on the welfare system, and that she wanted to provide her child with educational opportunities and support. *Id.* Ms. Walters was in the top 20 percent of young women who get pregnant in high school and get their high school diplomas. *Id.* at p. 72, ln. 11 through p. 76, ln. 2. Mr. Rose testified at his deposition that it was speculative to conclude that after just three weeks of courses at UDC that Ms. Walters would not have successfully completed a

degree. *Id.* Mr. Rose finds it significant that Ms. Walters, despite being pregnant at 16-years-old, completed high school without dropping out. *Id.* He sees this as a strong indication of her motivation and her ability to do school work while caring for her child, which is motivation that will carry her through a degree at UDC. *Id.*

Another one of Defendant's expert, Lee H. Haller, M.D., a forensic psychiatrist, testified at his deposition that the fact that Ms. Walters had enrolled in classes at UDC to begin the path towards a nursing degree demonstrated determination and a desire to better herself. *See*, Deposition Transcript of Lee H. Haller, M.D., March 20, 2008 ("Haller Deposition"), attached hereto as Exhibit E, p. 31, ln. 13 through p. 32, ln. 4.

Ms. Walters made the greatest amount of progress towards her goals in the last year of her life, but Defendant does not want to consider any of those steps. Ms. Walters' progress was tragically cut short due to the carelessness of WMATA's bus operator. Ms. Sampeck wants to only focus on the fact that Ms. Walters was a pregnant teenager who had poor job performance evaluations when she was a teenager. Mr. Rose, on the other hand, views the fact that Ms. Walters completed high school despite the fact that she was pregnant at 16-years-old as a sign of great determination and motivation on the part of Ms. Walters. Her job performance demonstrated to Mr. Rose that she had a strong work ethic at a very young age and was in the maturation process. *See*, Rose Deposition, attached hereto as Exhibit C, p. 8, lns. 4-12. Ms. Walters was excelling in her position at Admiral Security, which was the last job she held prior to her death. *See*, Deposition Transcript of George Filsinger, Jr., March 19, 2008 ("Filsinger Deposition"), attached hereto as Exhibit F, p. 19, lns. 13-19. This further demonstrates that Ms. Walters was maturing into a responsible young woman who had the capacity to be successful. Therefore, there is sufficient

factual basis to support Mr. Rose's opinion that Ms. Walters would have successfully completed her degree from UDC, and so, his opinions should be heard and evaluated by the jury.

***Angel Walters' Future at Admiral Security***

In the six months that Ms. Walters worked for Admiral Security as a security guard prior to her death, her supervisor was very pleased with her performance. Her supervisor, George Filsinger, Jr., testified at his deposition that Ms. Walters was "very dependable, reliable, always sharp in uniform," and that "the tenants of the building absolutely loved her." *See*, Filsinger Deposition, attached hereto as Exhibit F, p. 19, lns. 13-19. Ms. Walters had expressed to Mr. Filsinger her aspirations of becoming a nurse, and he was willing to adjust her work schedule to accommodate her school schedule. *Id.* at p. 20, ln. 6 through p. 21, ln. 2. Mr. Filsinger had also discussed with her a career in security and had scheduled her for CPR and first-aid certification classes, which many of his clients now require. *Id.* Mr. Filsinger believed that Ms. Walters had a future in security at Admiral. *Id.* at p. 22, lns. 4-12. Therefore, even if Ms. Walters had not obtained a degree from UDC, she still had other options available to her other than to simply be a high school graduate obtaining the average salary as calculated by Ms. Sampeck.

Mr. Rose believes that Ms. Walters would have continued at UDC and obtained a degree. Ms. Sampeck, however, believes that Ms. Walters would not have obtained any higher level education than what she already had at the time of her death, a high school diploma. In his original report, Mr. Rose discusses the possibility that Ms. Walters could have pursued a career in security, but he ultimately concludes that Ms. Walters would have achieved her goal of becoming a nurse. *See*, Report of Joseph Rose, dated October 30, 2007, attached hereto as Exhibit A. In response to Ms. Sampeck's opinions, Mr. Rose provided a rebuttal to her opinion that Ms. Walters' highest level of educational attainment would have been a high school degree. *See*, Rebuttal Report of Joseph

Rose, dated April 5, 2008, attached hereto as Exhibit G. Since Ms. Walters was excelling in her position at Admiral Security at the time of her death, it is reasonable that, had she not completed her degree at UDC, she would have continued working for Admiral Security. If she would have continued working there, she would have earned a greater income than what Ms. Sampeck calculated as the average for someone with just a high school diploma. *Id.*

In his supplemental report, Dr. Staller took the information from Mr. Rose's rebuttal report and calculated Ms. Walters future lost earnings based on a career in security. *See*, Report of Jerome M. Staller, Ph.D., dated April 14, 2008, attached hereto as Exhibit H. This is directly in opposition of Dr. Borzilleri's calculations of what Ms. Walters earnings would have been based on a high school diploma. A career in security at Admiral Security was a viable option for Ms. Walters had she not completed her degree at UDC as it does not require any higher level of education other than what she already had, a high school diploma. *See*, Filsinger Deposition, attached hereto as Exhibit F, p. 25, ln. 6 through p. 26, ln. 1.

Therefore, for the reasons discussed above and the entire record in this case, Plaintiff respectfully requests that this Court deny the Defendant's Motion.

Respectfully submitted,

CARR MALONEY P.C.

By:    /s/ Kelly M. Lippincott
       Paul J. Maloney, Esquire
       D.C. Bar No. 362533
       Kelly M. Lippincott, Esquire

9

D.C. Bar No. 484610
1615 L Street, N.W., Suite 500
Washington, D.C.  20036
(202) 310-5500 (telephone)
(202) 310-5555 (facsimile)


<u>CERTIFICATE OF SERVICE</u>


I HEREBY CERTIFY that a copy of the foregoing ***Plaintiff's Opposition to Defendant's Motion in Limine to Exclude the Testimony of Plaintiff's Experts Joseph H. Rose and Dr. Gerald Staller*** was e-filed and served electronically this 5th day of May, 2008, to:

Fredric H. Schuster, Esq.
David J. Shaffer, Esq.
Assistant General Counsel
Washington Metropolitan Area
 Transit Authority
600 Fifth Street, N.W.
Washington, D.C. 20001


<u>/s/ Kelly M. Lippincott</u>
Kelly M. Lippincott

Rehabilitation Counselors, Incorporated
P.O. Box 1217
Bowie, Maryland 20718
Phone: 202-408-9555      Fax: 301-352-5331

**Joseph H. Rose M.Ed., C.R.C.**
**Vocational Expert**

October 30, 2007

Paul J. Maloney, Esquire
Kelly M. Lippincott, Esquire
1615 L Street, N.W.
Suite 500
Washington, D.C. 20036

  Re: **Angel Claudette Walters, Deceased v. Washington Metropolitan Transit Authority**
    Vocational Assessment/Occupational Outlook

## Referral

This vocational assessment/occupational outlook is pursuant to your request to evaluate the decedent, Angel C. Walters' current and future employability and wage earning capacity had she not been killed on February 17, 2007, by a Metro Bus. I had access to medical and other file records and initial disclosures provided by your office, that I will not individually identify at this time. However, I reviewed the information for a history of her injuries, work history and educational attainments, as well as future educational plans.

I interviewed her mother, Gladys C. Sutton and other family members, initially on September 20, 2007 and Mrs. Sutton again on October 30, 2007 for an overall personal, educational and work history of the decedent. This information was adequate for me to assess Angel Walters' past and future employability within a reasonable degree of professional certainty in the field of rehabilitation counseling.

## Client History

Angel Walters was a twenty-one year old woman who was born on August 28, 1985 in Washington, D.C. She was a 2005 graduate of Calvin Coolidge High School, Washington, D.C. It should be noted that the decedent became pregnant while in high school, but never dropped-out, due to her determination to earn her high school diploma. While she was pregnant, she had a tutor, and attended high school at night until she delivered her daughter, Aubria Walters. After the birth of Aubria, she returned to regular classes at Calvin Coolidge High School. After completing high school, the decedent earned a Certificate in Home Health Care from the VMT Nursing School, located in Washington, D.C., in 2006. At the time of her



death, she was enrolled in the Nursing Program at the University of the District of Columbia, pursuing a Registered Nursing Degree.

## Employment History

The following is an analysis of the jobs Angel Walters had held since approximately 2005. The skills developed and/or demonstrated during her employment provide a basis for determining future employability, as well as her future wage earnings capacity had she lived.

1. Position:            Security Officer
   Employer:            Admiral Security Services
   Dates of Employment: 5 – 6 months prior to her death
   Earnings:            $10.50 per hour, after her probationary period, she would have
                        participated in the companies 401K Plan and received health &
                        medical benefits.

2. Position:            Checker/Cashier
   Employer:            Giant Food, Inc.
   Dates of Employment: Approximately 8 months
   Earnings:            $9.00 - $10.00 hr. (P/T)

3. Position:            Home Health-Care Attendant
   Employer:            VMT Nursing School
   Dates of Employment: 12/04 – 03/05
   Earnings:            $9.00 per hour (approximately)

## Medical/Status

Angel Walters' medical records are available to all parties and will not be repeated individually. However, she did not have any disabilities or problem issues that would have prevented her from realizing her dreams to become a registered nurse.

The Autopsy Report dated February 18, 2007, by Carolyn H. Revercomb, M.D., noted the following:

Final Diagnosis:

I.    Blunt-Trauma, head and neck.
II.   Blunt-Trauma, thorax and abdomen.
III.  Blunt-Trauma, extremities
IV.   Evidence of emergency medical intervention.

Cause of Death:    Multiple Blunt-Force Injuries

Page 3.
Walters.

## Occupational Outlook

Angel Walters' vocational/occupational outlook was extremely optimistic at the time of her death on February 17, 2007. She was enrolled in the Nursing Program at the University of the District of Columbia, pursuing a Registered Nurses Degree. Her initial course work was towards obtaining an Associate in Applied Science in Nursing (AASN), for the first two years and ultimately a Bachelor of Science in Nursing (RN). I met with Connie M. Webster, PhD., RN, CNA, BC, Professor, Chair/Director, Nursing and Allied Health, University of the District of Columbia on October 15, 2007, to get a first hand account of the nursing program. The U.D.C., Department of Nursing & Allied Health has a long and rich history of training nurses and individuals who work in the Allied Health Industry.

Dr. Webster indicated that she had met Angel Walters in her office prior to her death, and was impressed by Ms. Walters' overall demeanor and enthusiasm as well as her tender and nurturing attitude towards her daughter, Aubria Walters. Dr. Webster noted that the nursing graduates have employers recruiting them before they graduate.

In addition to the pursuit of a nursing degree, Ms. Walters was working as a security officer for Admiral Security Services. I spoke with her former supervisor, Mr. Buddy Silfinger, who stated that Angel Walters had a bright future with his company. He described her as a confident and dependable employee who had the potential to advance in the job. He noted that she could have advanced to Lead Officer or Site Supervisor within 6-8 months, and could have earned a range of $35,000 to $95,000 annually, if she became a Portfolio Manager or Account Manager for Class A Buildings.

According to the latest U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics, May 2005, Metropolitan Area Occupational Employment and Wage Estimates for the Washington-Arlington-Alexandria, DC-VA-MD-WV, are as follows:

### Licensed Practical Nurses

| Employment | Median Hourly | Mean Hourly | Mean Hourly |
|---|---|---|---|
| 8,370 | $20.50 | $20.85 | $43,370 |

### Registered Nurses

| Employment | Median Hourly | Mean Hourly | Mean Hourly |
|---|---|---|---|
| 34,930 | $30.49 | $30.68 | $63,810 |

Page 4.
Walters.

## Summary/Conclusions

It is my conclusion within a reasonable degree of professional certainty in the field of rehabilitation counseling that had Angel Walters survived, she would have continued in the nursing career path that she had chosen. I met with the following family members, Gladys Sutton (mother), Brenda Mims (aunt), Robert Turner (uncle), Maurice Turner (uncle), and Anthony Turner (uncle), who individually and collectively stated that Angel Walters had the drive and determination to fulfill her dream of ultimately

becoming a Registered Nurse. The aforementioned family members are each successful in the occupations they have chosen. This bodes well for the fact that the core family members have established a pattern of successful work ethics and productiveness.

By all accounts of the aforementioned individuals that I have spoken with in preparing this report, the decedent was a unique individual who had proven her determination to be successful in goals that she set for herself. She was well on her way to becoming a Licensed Practical Nurse and eventually a Registered Nurse within the next two to three years starting at the time of her death.

Should you have any questions, please feel free to contact me.

Sincerely,

Joseph H. Rose, C.R.C., M.Ed.

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
--------------------------------:
GLADYS CLAUDETTE                 :
SUTTON                           :
             Plaintiff           : CA 07-1197
       v.                        : (JDB)
WASHINGTON                       :
METROPOLITAN AREA                :
TRANSIT AUTHORITY                :
             Defendant           :
--------------------------------:
```

Washington, D.C.

Monday, January 14, 2008

Deposition of:

DR. CONNIE M. WEBSTER,

called for oral examination by counsel for

Defendant, pursuant to notice, at the WMATA,

600 Fifth Street, N.W., 2nd Floor, Washington,

D.C., before Sheri C. Stewart, Registered

Professional Reporter and Notary Public

in and for the District of Columbia, beginning

at 9:58 a.m., when were present on behalf of

the respective parties:



EXHIBIT
B

Capital Reporting Company

Page 14

1    Q    That's kind of a standard form that's

2    sent out for people who make application to enroll

3    in the University of the District of Columbia,

4    correct?

5    A    Um-hum.   Yes.

6    Q    Thank you.   And if you could look at

7    the second paragraph where it says, "all"?

8    A    Yes.

9    Q    Says, "All new freshmen and transfer

10   students with less than 30 transferable credits

11   must take the basic skills assessment test in math

12   and English.   The test is administered to

13   determine appropriate course placement.   The

14   testing office will notify you by mail of your

15   scheduled test date"?

16   A    Yes.

17   Q    And that's fairly standard policy,

18   correct?

19   A    Yes, it is exactly what I just stated

20   about the placement test.

21   Q    And I agree, that is what you stated.

22   A    Yes.

434e9ffd-d9ae-4cc0-9636-71a030e0c314

Capital Reporting Company

Page 15

1      Q      Okay.  Now, are you aware that at some

2   point Ms. Walters took the placement test?

3   Placement tests?

4      A      I am aware by way of the fact that the

5   only way she could have come into our department

6   for advisement and registration was that she had

7   to come with test scores.

8      Q      Okay.  Now, could you mark this No. 3,

9   please?

10             (Whereupon, Exhibit No. 3 was marked

11   for identification.)

12   BY MR. SCHUSTER:

13      Q      Let me show you Deposition Exhibit

14   No. 3.  Tell me whether this helps refresh your

15   recollection or clarify your recollection.

16      A      In regards to?

17      Q      The preliminary test that Angel Walters

18   had to take.

19      A      Well, it does two things.

20      Q      Okay.

21      A      It does identify the general areas of

22   testing for all students that are coming, but what

Capital Reporting Company

Page 16

1    it does for me more specifically is shows me where

2    her placement is.  And as I stated, that placement

3    I thought was reading improvement, an English

4    fundamentals course and math.

5         Q    Okay.  So she took a preliminary test

6    and based upon performance of that test was

7    thought that she needed remedial courses in

8    reading comprehension, sentence skills,

9    elementary, algebra and arithmetic?

10        A    Um-hum.

11        Q    And would that mean that she was, at

12   least at that point, she was not up to college

13   level English and math?

14        A    Based on the test scores it would

15   indicate that she needed remediation in order for

16   her to perform at college level, yes.

17        Q    Now, you notice at the top of that page

18   it says, "major name, nursing, two year"?

19        A    Um-hum.

20        Q    Now, when a person applies to the

21   University of the District of Columbia, is that

22   simply an indication of what a student would like,

Page 22

1    her testing it was determined that she needed

2    these improvement courses in reading and math --

3         A    Um-hum.

4         Q    -- if that person was unable to pass

5    those remedial programs?

6              MS. LIPPINCOTT:  Objection.  Calls for

7         speculation.  You may answer.

8    BY MR. SCHUSTER:

9         Q    As a student, do you have to pass the

10   remedial courses in order to continue to take

11   courses at the University of the District of

12   Columbia?

13        A    To progress, one should pass, must pass

14   course work with a satisfactory grade.  Now, I

15   also need to say that for the University, that

16   could be at a D level as well.  So at minimum the

17   student would have to make a D to identify that

18   they had successfully passed the courses and that

19   in itself would permit progression to go into the

20   next level.

21        Q    Okay.  Now, you notice that on top of

22   the Exhibit No. 4, it says group one, 3DE course.

Capital Reporting Company

Page 55

1      Q      That's all the questions I have.  You

2  have any follow-up?

3      EXAMINATION BY COUNSEL FOR THE PLAINTIFF

4  BY MS. LIPPINCOTT:

5      Q      Dr. Webster, did you ever meet Angel

6  Walters?

7      A      I did.

8      Q      How many times did you meet her?

9      A      I probably met her maybe six times or

10  more.  But three that I am -- when I say met, I

11  mean interactions with, three I'm probably more

12  familiar with than others because I don't normally

13  do advisement, I'm the Chair.

14          And she has an assigned advisor but

15  when students come in and they're trying to get

16  straightened out during registration, if somebody

17  knocks on my door and I have access to the student

18  information system, I generally will not turn them

19  away.  And on two occasions, late in the evening,

20  Ms. Walters -- I met her first because we were

21  just talking about nursing in general and how bad

22  she wanted to do this.  And then on two occasions

## Capital Reporting Company

Page 56

1    she came into the department very late when

2    everybody else was gone and I usually turn off

3    lights and pull in the rugs so she needed somebody

4    to assist her with trying to get her courses and

5    she came with her child.

6           And I remember those two times more

7    than any.  And one was the last time after we

8    finally got her straightened out.  I literally

9    just put her numbers in the system for her so that

10   she could go over and get her classes finalized.

11       Q     So did you help her select the three

12   courses that she was enrolled in at the time of

13   her death?

14       A     No.  That is done totally by testing.

15       Q     Okay.  Were there multiple courses of

16   that description offered at different times at the

17   University?

18       A     Yes.

19       Q     Did you work with her to help select

20   the specific times or specific class sections that

21   she was going to enroll in?

22       A     The last time.  The last time I did.

1

1       UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF COLUMBIA

3   - - - - - - - - - - - - - - - x
                                  :

4   GLADYS CLAUDETTE SUTTON,      :

                                  :   COPY

5   Individually and as Personal  :

                                  :

6   Representative of the Estate  :

                                  :

7   and Next of Kin of ANGEL      :

                                  :

8   CLAUDETTE WALTERS, Deceased,  :

                                  :

9           Plaintiff             :

                                  :

10          V.                    :  CA No. 07-01197 (JDB)

                                  :

11  WASHINGTON METROPOLITAN AREA  :

                                  :

12  TRANSIT AUTHORITY,            :

                                  :

13          Defendant             :

                                  :

14  - - - - - - - - - - - - - - - x

15

16          Deposition of JOSEPH H. ROSE

17              Washington, D.C.

18          Tuesday, February 19, 2008

19                 10:12 a.m.

20  Job No.: 1-122960

21  Pages 1 - 87

22  Reported by:  Jane L. Vaughan

EXHIBIT



L.A.D
REPORTING &

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com

8

1       Q.    Okay, can I have Exhibit 1 back.

2             Oh, it's right here.

3       A.    Yeah.

4       Q.    And did those additional employment records

5    add anything to your original opinion, either detract

6    anything, change anything, add anything?

7       A.    They didn't detract or change anything other

8    than confirm my understanding that this young woman

9    was a dedicated worker at a very young age, was in her

10   maturation process as it relates to maturing, but that

11   she clearly had a strong work ethic at a very young

12   age.

13      Q.    Now could you turn to page 2 of your report?

14      A.    (Complies.)

15            MR. SCHUSTER:  Could you just mark this

16   Number 3.

17            (Rose Deposition Exhibit Number 3 was marked

18   for identification and retained by counsel.)

19            MR. SCHUSTER:  You have a copy of the

20   report; don't you, Paul?

21            MR. MALONEY:  Yes, kind of.

22            MR. SCHUSTER:  Here it is.

34

1    college level courses?

2        A.    Yes.

3        Q.    And that's what was happening -- that's what

4    happened with Angel Walters; isn't it?

5             When she applied to UDC standard protocol

6    they gave her tests, they found that she was deficient

7    in reading and English and basic mathematics.  So they

8    enrolled her in some remedial courses?

9             MR. MALONEY:  Objection; form and substance.

10            Do you have an extra copy?

11            MR. SCHUSTER:  Yes.  I'm sorry.  Here you

12   go.

13            THE WITNESS:  I said yes.  I am not

14   understanding what your point is.

15            BY MR. SCHUSTER:

16       Q.    I am just asking you to acknowledge what I

17   just said.

18       A.    Well, that's part of the process.  That's

19   part of the record.  Now that's not to say that

20   because a person starts in -- with the developmental

21   courses that they aren't going to be successful later

22   on.  Some do and some don't.

35

```
 1            So my theory in this is that because this
 2   young woman never dropped out of high school, which
 3   meant that she was in the 20 percentile of teenagers
 4   who get pregnant, she received her diploma on time I
 5   believe, she was able to work, go to school, and care
 6   for her child at the same time while she was still in
 7   high school, the fact that you see these W's next to
 8   these courses means that she withdrew because she was
 9   dead.
10       Q.    I understand that.
11       A.    So I am just trying to answer your
12   question.
13            You make a big deal of the fact that she
14   started developmental courses.  Well, that's what is a
15   lack of result of many of the children or youth who
16   come out of the D.C. public school system.
17       Q.    Okay.
18       A.    That's not her fault.
19            Now certainly could she have been a better
20   student in high school and been more mature, that's
21   why they are teenagers.
22       Q.    Well, my point is that the fact is that she
```

38

1            And for you to sit here and say that, you

2    know, after only three weeks she would have been a

3    failure when she is dead is unfair, at least in my

4    opinion as a professional.

5        Q.    In your opinion, okay.

6            In your package of I guess articles and part

7    of your file I notice that there was numerous studies

8    on teenage pregnancy.  And I was wondering what these

9    studies -- what were you looking for in these studies

10   that had some relevance as to your opinions.

11           I do realize of course that Ms. Walters did

12   get pregnant in high school and had a child.  But I

13   was having difficulty understanding what the contents

14   of these studies have to do with your opinions about

15   her employability.

16       A.    Just information.

17       Q.    Is that it?

18       A.    And the fact that there are some -- some

19   issues on teenage pregnancy that address poverty,

20   moving ahead in life once you are pregnant, dropout

21   rates for high school students.

22           And looking at this information Angel

39

1    Walters was not the norm.  She never stopped high

2    school.  She completed high school on time.  She

3    worked and cared for her child with the family

4    support.  She was in a very small percentile of

5    individuals who had not had done well in later life.

6    And that's attributable to her -- one, her family work

7    history, a strong family work ethic, the fact that she

8    did not want to be dependent on the welfare system,

9    that she wanted to provide her child with the kind of

10   nurturing and educational opportunities and support

11   that mothers provide their children.

12           And I think that's born out in her success

13   there in Aubria, her daughter's really tragic loss of

14   a mother who was nurturing and loving and did things

15   with her, played with her, cared for her.  And, you

16   know, this child can't understand where her mother is

17   and why she is gone.

18           And so that's a significant loss to not only

19   Angel but also her daughter and the rest of her

20   family.

21           Can we take a break for a second?

22       Q.   Yeah.  Sure.  Absolutely.

72

1    A.    Well, maybe she didn't want to accept those

2  things that she omitted based on Dr. Deutsch's guide

3  to rehabilitation, which is at least in my opinion

4  more theoretical than practical.

5    Q.    Okay.

6    A.    What Ms. Sampeck does not understand or has

7  not made any provision for is that in the African

8  American community there are some issues and some

9  facts that aren't necessarily born out in research.

10    What I understand --

11    Q.    For instance?

12    A.    For instance, her academic performance was

13  below average.  Well, she came out of a below average

14  school system that didn't bode well for her when it

15  came to mathematics and science and reading and some

16  of the other academic areas.

17    That is not necessarily an indicator that

18  this young woman was not going to do well.

19    She noted that -- she noted that she was

20  enrolled in remedial classes at UDC at the time of her

21  death.  However, she didn't say that she had only been

22  in those classes for three weeks prior to her death.

73

1    And that's not a good way to determine whether or not

2    she would have been successful.

3              She also indicated that in her previous

4    performance evaluations they reflected problems with

5    absenteeism, tardiness, reliability, dependability.

6    That was only -- most of this negative stuff as I

7    understand it only came from her VMT records and the

8    absenteeism and tardiness was from Giant whereas the

9    Admiral Security records do not bear that out in terms

10   of how she had matured and was in -- at her age was

11   still in the maturation process.

12             So I think there is some elements of her

13   report that don't take into consideration the whole

14   picture of this young woman but simply point to what I

15   believe the defense is attempting to do, which is show

16   that this young woman didn't have a whole lot of

17   potential, was going to be a failure, would have only

18   earned the average income of a high school black -- a

19   high school graduate, which I disagree with.

20             I see it just the opposite.  This was a

21   young woman who even though she became pregnant at 16,

22   age 16 she never stopped school.  She was in the top

74

1    20 percent of those young women who get pregnant in

2    high school and continued to and gone to get their

3    high school certificates or diplomas.

4          And beyond that she had endeavored to get

5    training as a home health attendant, to get a

6    certification as such, to enroll in UDC even though

7    she was in a position to have to take the enhancement

8    courses, that she was doing so, that with someone who

9    has good innate intelligence, which I believe this

10   young woman had which is born out by the fluctuation

11   in her grades, A's, B's, C's -- she did get some F's

12   and some D's, but that as a rehabilitationist with

13   some tutorial help and help in those areas of her

14   weaknesses academically that she could have done very

15   well.

16          So I don't see this report as being as un --

17   I don't want to say unbiased.  I don't see this report

18   as being as objective as it could be.  To say that her

19   ability or her potential to become a nurse at some

20   point was remote I think is speculation and it's

21   unfair.

22          Q.    Even though she had only been at UDC for

75

1    three weeks?

2        A.    Well, if she hadn't been killed by the Metro

3    bus she would have completed the nine week course or

4    whatever length that the course was.  Now she may have

5    needed some help with math and algebra certainly.

6        Q.    But the three weeks is all that we have

7    whether we like it or not; isn't it?

8        A.    And my point is that if it had not been for

9    this horrible incident that this young woman would

10   have had an opportunity to complete her enhancement

11   courses.

12       Q.    An opportunity but not necessarily a

13   guarantee that she would have?

14           MR. MALONEY:  Objection to form, form and

15   substance.

16           Go ahead.

17           THE WITNESS:  That's speculative in and of

18   itself because she didn't have an opportunity to do

19   so.

20           She had an opportunity to complete high

21   school without dropping out and she did.  That means a

22   lot in terms of this young woman's motivation and

DEPOSITION OF JOSEPH H. ROSE
CONDUCTED ON TUESDAY, FEBRUARY 19, 2008

76

1    ability to do homework, to do school work, to care for

2    her child and to work competitively.

3              BY MR. SCHUSTER:

4         Q.    Is there anything else in Ms. Sampeck's

5    report?

6         A.    Well, I think that pretty much sums up the

7    narrow focus that Ms. Sampeck used.  And the guide to

8    rehabilitation does not take into account all of the

9    issues that different ethnic groups have in

10   rehabilitation, period.

11        Q.    And in your experience under these

12   circumstances what guide or protocol would you use or

13   would you have used in forming your opinions as

14   opposed to the Deutsch guide?

15        A.    Well, I am not necessarily saying in

16   opposition of the Deutsch guide.  I am saying the

17   Deutsch guide is a theoretical academic endeavor.

18              I am saying that every person who is in need

19   of rehabilitation services or services, period, or

20   development is different.  And in this particular case

21   the Turner family, the Sutton family is a prime

22   example of how individuals as well as families are

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
GLADYS CLAUDETTE SUTTON,        :
et al.,                         :
                Plaintiffs,     :
vs.                             :   Civil Action
                                :   07-01197 (JDB)
WASHINGTON METROPOLITAN AREA    :
TRANSIT AUTHORITY,              :
                Defendant.      :
- - - - - - - - - - - - - - x

                        Alexandria, Virginia

                    Wednesday, March 12, 2008


        Deposition of KATHLEEN F. SAMPECK, M.A., a

witness, called for examination by counsel for

plaintiff, pursuant to notice, at the offices of

Kathy A. Sampeck, M.A., 2121 Eisenhower Avenue,

Suite 200, Alexandria, Virginia  22314, before

Sandria L. Cox, a notary public in and for the

Commonwealth of Virginia, beginning at 11 o'clock

a.m., when were present on behalf of the respective

parties:


Reported by:  Sandria L. Cox
Job No. 122529



EXHIBIT
D

DEPOSITION OF KATHLEEN F. SAMPECK, M.A.
CONDUCTED ON WEDNESDAY, MARCH 12, 2008

Page 25

1       Q.    Do you have any idea what her job

2    performance was at Admiral Security?

3       A     Well, I know from Mr. Rose.  He

4    indicated that the employer viewed her favorably.

5       Q.    Would it be significant if she received

6    good performance evaluations or was considered a

7    good employee by her supervisors at Admiral

8    Security?

9       A.    Sure; I think that's significant.

10      Q.    Do you know if she had any absences

11   while she was employed an Admiral Security?

12      A.    I don't know her absence record at

13   Admiral.

14      Q.    Do you know if she had any tardies

15   during her time at Admiral?

16      A.    I don't know.

17      Q.    Would it be significant to know what her

18   attendance and whether or not she had any tardies

19   during the time she was employed at Admiral?

20      A.    I guess it would depend on -- whether it

21   would be significant -- on what the record was.

22   Certainly it would be significant if she wasn't

DEPOSITION OF KATHLEEN F. SAMPECK, M.A.
CONDUCTED ON WEDNESDAY, MARCH 12, 2008

Page 26

1    showing up.

2         Q.    Would it be significant if she was

3    showing up and always showing up on time?

4         A.    I think that's good, but I don't think

5    that less than six months is necessarily something

6    to hang your hat on.  But it's a good indicator.

7              MR. SCHUSTER:  I want to put on the

8    record also that Admiral Security's file for Angel

9    Walters in its entirety was subpoenaed and provided

10   by Admiral Security, asking for the entire contents

11   of her employment personnel file.  Those were in

12   turn provided to Ms. Sampeck, and in reviewing

13   those files, there were no performance evaluations

14   contained therein.

15              So if there are performance appraisals

16   out there, they were not provided in their response

17   to the subpoena.

18              Thank you.

19              BY MS. LIPPINCOTT:

20         Q.    Do you know whether Angel had any --

21   Angel Walters had any problems during her six

22   months at Admiral Security with following the

DEPOSITION OF KATHLEEN F. SAMPECK, M.A.
CONDUCTED ON WEDNESDAY, MARCH 12, 2008

Page 43

1    A.    I didn't say she would not have.  I'm

2    saying I don't --.  My opinion is not she would

3    have gotten an Associate's degree.

4    I'm giving a range of earnings based on

5    educational attainment.  The only thing we know for

6    sure is she was a high school graduate and she had

7    that level of earning capacity.

8    Q.    And she was enrolled in classes at UDC.

9    A.    Well, she was enrolled in remedial

10   classes and we don't know if she would have been

11   able to pass those and enroll in regular college

12   classes.

13   In fact, the history up to that point

14   suggests that that may have been a problem for

15   her.  All the indicators before that indicate that

16   that would have been a problem.

17   Q.    Based on her performance in high school?

18   A.    And her achievement test results.  Her

19   grade and aptitude and achievement test results.

20   Q.    Well, the aptitude and achievement test

21   results mean that she had to take remedial courses

22   before beginning college work; is that correct?

1

1

2            UNITED STATES DISTRICT COURT

3        IN AND FOR THE DISTRICT OF COLUMBIA

4

5                                    ORIGINAL

6    - - - - - - - - - - - - - - - x

    GLADYS SUTTON                    ) Case No.

7        Plaintiff                   ) 1:07cv1197

    vs.                              )

8    WASHINGTON METROPOLITAN AREA    )

    TRANSIT AUTHORITY                )

9        Defendant                   )

    - - - - - - - - - - - - - - - x

10

11

12        Deposition of Lee H. Haller, M.D.

13            Potomac, Maryland

14        Thursday, March 20, 2008

15              1:00 p.m.

16

17

18

19

20    Job No. 1-124764

21    Pages:  1-158

22    Reported by:  Bonnie Russo

EXHIBIT

E



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW  •  Suite 850, Washington, D.C. 20036
Tel: 202.861.3410  •  800.292.4789  •  Fax: 202.861.3425
Web: ladreporting.com  •  E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD  •  Baltimore, MD  •  Greenbelt, MD  •  McLean, VA

31

1      A.    I know she graduated from high

2   school.  I do not know whether it was --

3   specifically whether it was on time or not.

4      Q.    Do you know what the percentage of

5   high school students are in the District of

6   Columbia that, number one, graduate from high

7   school, and number two, graduate on time?

8      A.    I do not.

9      Q.    Have you ever seen any such

10  statistics?

11     A.    I'm sure I have, but I have not --

12  do not recall them.

13     Q.    Is it your understanding that she,

14  Angel Walters had gone back to class at UDC to

15  begin the path toward getting a nursing degree?

16     A.    She was in school for some reason in

17  the nursing field.  I do not know what school

18  she was going.  She was pursuing some kind of

19  post high school education in the nursing

20  field.

21     Q.    Does that show determination on her

22  part?

32

1    A.    It does.

2    Q.    Does it show a desire to better

3 herself?

4    A.    It does.

5    Q.    Was the loss of Aubria's mother a

6 traumatic event for her?

7    A.    Yes.

8    Q.    For how long a period of time?

9    A.    Well, it still represents a trauma

10 to her in some degree.

11    Q.    But I take it from your report that

12 it doesn't rise to the level of a trauma that

13 would equate with Post-Traumatic Stress

14 Disorder?

15    A.    I do not believe that Aubria at this

16 time qualifies for a diagnosis of

17 Post-Traumatic Stress Disorder.

18    Q.    But she still suffers from ongoing

19 trauma, is that your opinion?

20    A.    Her -- from the -- her reaction to

21 the trauma.

22    Q.    But I take it from your report that

Page 1

IN THE US DISTRICT COURT OF THE DISTRICT OF COLUMBIA
Civil Division

- - - - - - - - - - - - - - -:
GLADYS CLAUDETTE SUTTON,       :
INDIVIDUALLY AND AS PR OF THE:
ESTATE OF ANGEL CLAUDETTE      :
WALTERS, DECEASED,             :
                               :
          Plaintiff,           :
                               :
     v.                        :Case No.:
                               :07-1197(JDB)
WASHINGTON METROPOLITAN AREA   :
TRANSIT AUTHORITY,             :
                               :
          Defendant.           :
- - - - - - - - - - - - - - -:
                    Washington, DC

               Wednesday, March 19, 2008

Deposition of:

          GEORGE FILSINGER, JR.

called for oral examination by counsel for the

Defendant, pursuant to notice, at the Offices of

Washington Metropolitan Area Transit Authority, 600

Fifth Street, Northwest, 2nd Floor, Washington, DC,

before Denise Reiter, a Notary Public in and for the

District of Columbia, beginning at 10:37 a.m., when were

present on behalf of the respective parties:



EXHIBIT

F

Capital Reporting Company

Page 19

1    after six months on the job at a permanent assignment.

2    Then a review would be done by that site supervisor and

3    submitted to me and then I would thus submit for pay

4    increase or promotion whether it be -- at some locations

5    I have captains, lieutenants, sergeants. That would be

6    submitted to me from the site supervisor.

7         Q     It would be at least six months before an

8    initial performance evaluation would be done?

9         A     That's correct.

10        Q     To your knowledge, did Ms. Walters ever have a

11   performance evaluation done?

12        A     I don't believe she did, no.

13        Q     What would be your assessment of her

14   performance?

15        A     Of?

16        Q     Ms. Walters.

17        A     She was very dependable, reliable, always

18   sharp in uniform, the tenants of the building absolutely

19   loved her.

20        Q     What was the last thing you said?

21        A     The tenants of the building that she was

22   working at loved her because she has -- basically most

## Capital Reporting Company

Page 20

1    of my jobs are lobby attendants. We say security, but

2    they are lobby attendants. Very professional, very

3    helpful to the public coming in because it was a multi-

4    tenant building that she was located in. It just wasn't

5    one major tenant.

6        Q    Did you ever have any discussions with her

7    about her aspirations to become promoted higher in the

8    chain at Admiral?

9        A    Yes, I did.

10       Q    What were those discussions?

11       A    Ms. Walters -- before the accident, she had

12   expressed to me that she was looking into going into

13   nursing, but she still wanted to keep working for

14   instance and could I adjust her schedule. I said you

15   give me your school schedule and we'll work around that

16   because I can do that in almost any building I have. It

17   had never gotten to that point, but she had impressed

18   upon me that nursing was the career or the field that

19   she wanted to go in. We discussed security. I had her

20   scheduled for a few classes. I had her scheduled for

21   instance for CPR and first-aid certification which most

22   of my buildings now require. I wanted to get her into

Capital Reporting Company

Page 21

1    that and get that behind her so she could be certified

2    in CPR and first-aid trained.

3        Q    As far as you know she didn't want to become

4    permanently located in the security field?

5        A    We hadn't gotten that far. I don't believe --

6    I mean she could have been. Like I said, she was very

7    professional. I don't know how it would've -- I don't

8    want to say bit her, but in a progression through the

9    security industry she may have changed her mind down the

10   road some time. I don't know.

11       Q    That would just be speculation on your part?

12       A    Exactly. Yes.

13           MR. SHAFFER:  That's all the questions I have.

14   Do you have any questions Kelly?

15           EXAMINATION BY COUNSEL FOR THE PLAINTIFF

16   BY MS. LIPPINCOTT:

17       Q    Mr. Filsinger, after Angel's death, did the

18   tenants do anything in response to the news of her

19   passing?

20       A    Yes -- now, I was not involved but I heard

21   they took up a collection. I had a couple of the major

22   tenants call me for information on her arrangements,

Capital Reporting Company

Page 22

1    funeral or where could they send flowers or was there a

2    donation or whatever and that was within the next week

3    that I started receiving phone calls.

4        Q    Do you believe that Angel could've had a

5    future in security particularly security at Admiral?

6        A    I believe so, yes. It's a changing industry.

7    Our so-called leader, our executive vice president,

8    doesn't like the term for instance security guard. He

9    likes them to be called officers and he likes them to

10    look at making or wanting to be a career in that. We

11    have one of the best training programs in the industry

12    that we simply give to all of our officers.

13        Q    What types of topics or skills are a part of

14    this training program?

15        A    It runs the hold gamut. They go like I said

16    for CPR and first-aid training. We have programs that

17    will take them through laws, rules and regulations of

18    the industry. Our training -- one training session we

19    have gets them completely involved into contracts. I sit

20    down with you as a client, what's the process from step

21    one until I give you a proposal and how the numbers are

22    derived throughout the contract. That's a three-day

## Capital Reporting Company

Page 25

1    BY MR. SHAFFER:

2        Q    At the higher levels of progression in your

3    system, do people typically have some college or a

4    college degree?

5        A    Yes.

6        Q    At what level is a college degree usually

7    required?

8        A    It's not really required, but most of the

9    portfolio managers have probably a two-year -- I'd

10   probably say 60% of them have a two-year criminal

11   justice degree. We do have accounts that -- for instance

12   we lost to a bid Fannie Mae. Fannie Mae was very

13   restrictive on what kind of security officer could work

14   at their site. Either they have four years military,

15   two-year college degree or four year police background

16   or they weren't even allowed on the site. If I had a

17   two-year criminal justice degree I can work at the

18   Fannie Mae account and we had the one on Wisconsin

19   Avenue and the new one in Urbana and we have -- I think

20   in Miami we have two accounts where a college degree is

21   required. I'm not that familiar with our Miami

22   operations because it's sort of brand-new, but there are

Joseph H. Rose M.ED., C.R.C.
P.O. Box 1217
Bowie, Maryland 20718
Phone: 202-408-9555      Fax: 301-352-5331

April 5, 2008

Paul J. Maloney, Esquire
Kelly M. Lippincott, Esquire
Carr Maloney P.C.
1615 L Street, N.W.
Suite 500
Washington, D.C. 20036

Re:    **Gladys Sutton, et al. v. MWATA**
       Supplemental Vocational. Assessment/Occupational Outlook

Dear Ms. Lippincott;

Since my report dated October 30, 2007, and my deposition testimony on February 8, 2008, I have
reviewed the depositions of Buddy Filsinger, Kathleen Sampeck, Dr. Thomas C. Borzilleri, Brenda
Gordon Williams, Anthony Turner, Maurice Turner, and Robert Turner. I have also, researched in more
detail, the history of the University of the District of Columbia College, starting with the former D.C.
Teachers College and UDC's predecessor, the former Federal City College. As you are aware, U.D.C. is
an open admissions university serving primarily District of Columbia students, of which some are
deficient in Reading, Mathematics and English. When students are unsuccessful in passing entrance
examinations in the aforementioned courses, they are allowed admission into the university by taking
remedial classes until they are able to successfully pass into full admission into the university. Tutorial
assistance is provided to those students who are required to take remedial courses. Angel Walters from all
accounts, had the innate cognitive skills to master the challenging remedial courses that she was taking at
the time of her death.

It should be noted, that Angel Walters was in the 20 percentile of high school girls who became pregnant,
but never dropped out during their pregnancies. She graduated from high school on time with her class.
According to her family representations and her history, she not only completed high school, she worked
in part-time jobs, cared for her daughter and prior to her death, she attended U.D.C., and worked a full
time job at Admiral Security.

I have also had an opportunity to review the letter from Ms. Walters' English class at UDC. This further
demonstrates that Ms. Walters was a personable, well-liked individual who had developed close
relationships with her professors and fellow students at UDC.



Page 2.
Sutton.

It also serves to show the type of spirit and determination she had to succeed in the nursing field.

In addition to the pursuit of a nursing degree, Ms. Walters was working as a security officer for Admiral Security Services. I spoke with her former supervisor, Mr. George "Buddy" Filsinger, who stated that Angel Walters has a bright future with his company. He described her as very dependable, reliable, always sharp in uniform, loved by the tenants of the building, very professional, and very helpful to the public. Ms. Walters told Mr. Filsinger that she wanted to go into nursing, but that she still wanted to keep working. Mr. Filsinger was willing to work with her to adjust her work schedule to accommodate her school schedule. Mr. Filsinger discussed a possible career in security with her. He had her scheduled for a few classes, including CPR and first-aid certification. Mr. Filsinger believes she could have had a future in security.

At Admiral, the lowest level position is security guard. The next level about security guard is site supervisor, and after that is portfolio manager. The pay range for security guards in the Washington Metropolitan Area at Admiral in January of 2007 was $10.00 - $11.00 per hour. D.C. has since passed new wage guidelines. Security officers now make $12.40 per hour to start. Site supervisors earn between $15.75 - $19.00 per hour. It typically takes a security officer three to five years to be promoted to site supervisor. There is a high turn over rate of approximately 300% per year for Admiral security guards. This is due to promotions and officers finding higher paying jobs.

I disagree with the conclusions reached by Ms. Sampeck that Angel Walters would have, at best, earned only the income of a high school graduate. As Dr. Borzilleri mentioned, having at least some college credits, substantially increases an individual's earning power. Having some college would have assisted her career in the security field had she chosen at some point not to pursue work in the health care field.

In closing, it is my opinion within a reasonable degree of professional certainty and objectivity in the field of rehabilitation counseling, that Angel Walters possessed the motivation and determination to succeed in her college level training. It is correct that she would have been challenged by the remedial courses that she was required to take. However, according to the University of the District of Columbia's Student Services, she was entitled to tutorial assistance in math, reading, writing and study skills.

Even in the event that she decided to change her educational focus from nursing to some other major at the appropriate time, she would have had the benefit of a full or partial college education.

Should you have any questions, please feel free to contact me.

Sincerely,

Joseph H. Rose, C.R.C., M.Ed.

ATTACHMENTS (A & B)

*attachment H*

# University of the District of Columbia
4200 Connecticut Ave Nw
Washington, DC 20008

## STATISTICS

| | |
|---|---|
| Type Of College: | Public, 4-year or above |
| Highest Degree Offered: | Master's degree |
| Classification: | Masters Colleges and Universities I |
| Full Time Enrollment: | 3,282 |

## FEES & LIVING EXPENSES

| | |
|---|---|
| In state, living on campus: | $0 |
| Out of state, living on campus: | $0 |
| In state, living off campus: | $11,820 |
| Out of state, living off campus: | $14,460 |

Chartered in 1974 from three other institutions of higher learning, The University of the District of Columbia is the only public institution of higher education in the District of Columbia. This Historically Black University maintains an open admissions policy, and is the only urban land-grant institution in the nation.

Not only is this Washington, DC-based school an academic institution granting graduate and baccalaureate degrees, but it also serves as a community college that is attuned to the occupational needs within the city it inhabits. Constantly aware of its Washington, DC-based surroundings and residents, the university designs its programs with the evolving, growing, and critical needs of the District in mind.

In addition to designing its curriculum based on the needs of the city, The University of the District of Columbia also reaches out to city residents to help them boost their skill sets and advance their education, particularly those who are already on the job or who wish to become more competitive to qualify for jobs. Also, as an urban land-grant institution, the University ensures that its core charge of teaching, research, and public service, as specified in the Morrill Act, is in vanguard for improving the quality of life of the residents of the District of Columbia.

Diversity is key to this Washington, DC-based school. With its open admissions policy, the University of the District of Columbia provides broad opportunities for those under-prepared as well as for those adequately prepared for higher education. The mission of this Historically Black University is to enable its students with marketable skills that can then be cycled into the working mechanics of the city. According to the University, its role in developing the under-prepared student is critical to the success of its students as well as to the future financial health and well-being of the District of Columbia.

But the learning doesn't stop at the borders of the district. With more than 25 nation represented, The University also boasts a large international student population. These visiting students are fully embraced by the university community, and the city benefits from their diverse presence as well.

**Quick Facts:**

- The University of the District of Columbia offers 75 graduate and undergraduate degree programs.
- The University received word of accreditation of nine education program in March, 2005 from the National Council for Accreditation of Teacher Education.
- The University entered into a partnership with District Public School 's Friendship Edison Charter High School in 2004 to launch the first Early College High School program in the District of Columbia.
- USA Today named the University of the District of Columbia one of the top 10 Division II schools in the country for improvement of graduation rate for its student athletes in 2002.

## EXPENSES

**Tuition and fees:**

$3,210 in-state, $6,510 out-of-state

**Room/board:**

N/A

## STUDENT SERVICES

**Basic services offered:**

nonremedial tutoring, placement service, day care, health service, health insurance

**Remedial learning services offered:**

reading, math, writing, study skills

Counseling services offered:

minority student, career, military, personal, veteran student, academic, older student, psychological

## SCHOOL MISSION

(Data appear as originally submitted by this school)
The University of the District of Columbia is an urban land-grant institution of higher education with an open admissions policy. It is a comprehensive public institution offering quality, affordable postsecondary education at the certificate, associate, baccalaureate, and graduate levels. These programs will prepare students for immediate entry into the workforce, for the next level of education, for specialized employment opportunities, and for lifelong learning.

The Office of Recruitment & Admissions at The University of the District of Columbia executes timely orderly processing of admissions/re-admissions applications for prospective and returning students. Specifically, the Office: disseminates appropriate admissions related materials to potential applicants; accepts and processes applications for new and returning students; creates applicant folders for all new students; evaluates transcripts and grants advance standing to eligible students; responds to admissions related questions from prospective or returning students; retrieves and distributes mail and other documents that affect the status of applications; interfaces with academic departments to evaluate academic transcripts, and communicates with individuals regarding the status of their applications, transcripts, and other pertinent information.

Most new students are admitted to the University of the District of Columbia for the fall and spring semesters, although some students may apply for admission during the summer term (See academic calendar for the exact dates). Secondary school students may apply for admission to the University any time following the completion of their junior year of high school.

Application forms and additional information describing the programs offered by the various colleges at the University, the admission procedures, and other rules and regulations can be obtained by writing or visiting the Office of Recruitment & Admissions, 4200 Connecticut Avenue NW, Building 39, Room A-14, Washington, DC 20008, 202.274.6110

**Placement Testing** The Office of Placement Testing is responsible for providing appropriate course placement for all students entering UDC for the first time

**Student Support Services** - Grant The Office of Student Support Services is responsible for providing a variety of academic, psychological, and social support to increase

Funded TRIO Program retention and graduation rates of first generation
college students, eligible low income students, and
students with disabilities who are U.S. citizens or
permanent residents.

## Welcome

Welcome to the Counseling and Career Development Center. Did you know that as an
enrolled UDC student, you have access to free professional counseling services?

The college experience can be great, but it can also be stressful, lonely, and even
overwhelming at times. You may be dealing with personal, family, financial, academic, or
career difficulties. There are many reasons why students come to the Center.

We can help with a wide range of services, including individual and group counseling,
medication services, substance abuse help, career advice, academic support, and
consultation.

**Call us today at (202) 274-6000.**

## Services

**INDIVIDUAL COUNSELING** provides an opportunity to talk about yourself, your feelings,
the way you relate to other people, your values, and any other topics that concern you.
You'll find answers to frequently asked questions in FAQS.

**GROUP COUNSELING** is often the best way to work on changing the way you experience
yourself with others and how you relate to them. You'll find answers to frequently asked
questions in FAQS. We also have more focused support groups —currently one for
international students, one for single parents, and for one for students who are gay, lesbian,
bisexual, transgendered or questioning their sexual identity.

**CAREER COUNSELING** offers advising to help you choose a major and find a career that is
consistent with your talents and interests and job placement assistance. You'll also find lots
of helpful links to online resources here.

**ACADEMIC SUPPORT** is designed to help students succeed in their classes and is
particularly helpful for students who are struggling academically. You'll also find online links
here offering immediate assistance.

**MEDICATION SERVICES** including a medication assessment by a psychiatrist and
prescriptions are available through the Center. During your initial assessment interview, you
can discuss with your counselor whether this is a service that might benefit you.

**DISABILITY AND ADHD SERVICES** include assessment, medication, support services
referrals, and arrangements for academic accommodations.

**STUDENT PROGRAMS** range from targeted year-long support programs like Team 100 that
are designed to help students successfully adapt to college demands to the Student
Leadership Institute to targeted workshops that develop study and time management skills.

**COMMUNITY OUTREACH** provides free academic and career services to adults living in the community, as part of our land-grant institution mission.

**CONSULTATION** is for times when you are concerned about someone else. We are happy to talk with you in person or on the telephone to help develop ideas for dealing effectively with the situation.

**EMERGENCY SERVICES** are described on their own page.

University of the District of Columbia
**Counseling & Career Development Center**
**Bldg 39, Suite 120**
Washington, DC 20008
202/274-6000

## Student Programs

**TEAM 100** is a comprehensive retention program that offers incoming freshmen mentoring to prepare them for the academic, social, personal, vocational, and financial challenges of college. Through bi-weekly group sessions, ongoing development workshops, and monthly one-on-one meetings, students are supported for success.

**STUDENT LEADERSHIP INSTITUTE** is a catalyst to develop the skills and venues for students to prepare for life-long learning, civic responsibility, ethical and moral decision-making. The program includes week-long and day seminars (some locally and some away), as well as short workshops in the District of Columbia. For more information call the SLI coordinator at (202) 274-6000.

**ACADEMIC SUPPORT** is designed to help students succeed in their classes and is particularly suitable for students who are struggling academically. You'll also find online links here offering immediate assistance.

## Community Outreach

To help further UDC's mission, as an urban land-grant institution, community members are provided with services at four locations in the District of Columbia. Services provided include:

- Academic Counseling
- Personal Counseling
- Financial Aid Counseling
- Rehabilitation Counseling
- Career Counseling
- Placement Testing
- Employment/Job Placement Referral
- Services
- Student Support Services (i.e. tutorials and referrals)
- Student Government Activities
- Seminars and Workshops

For more information or to make an appointment, call the community outreach program coordinator at (202) 274-6000.

Attachment B

## Lippincott, Kelly M.

**From:** Lippincott, Kelly M.
**Sent:** Wednesday, April 02, 2008 2:42 PM
**To:** Lippincott, Kelly M.
**Subject:** FW: Angel

-----Original Message-----
From: Petti, Matthew [mailto:mpetti@udc.edu]
Sent: Thursday, March 20, 2008 2:08 PM
To: Lippincott, Kelly M.
Subject: FW: Angel

From: Petti, Matthew
Sent: Wed 3/19/2008 10:50 AM
To: Petti, Matthew
Subject: Angel

February 24, 2007
Dear Family,

We did not know Angel very well, but we knew her well enough to know that there was a lot of love in her heart. She was always smiling, and her smile seemed to be her welcome to all of life. And so this is how we will remember her, and this is how we will picture her in heaven: gorgeous smile, melodic voice, sweet and generous with herself, pretty and full of life, ready to be a giving friend. We know that now your hearts are heavy with sorrow. Nights will be long and days will be dark. A promising young woman's journey has been cut short. But we know also that Angel is with God now. She's in a place of purity, eternally joyous, watching over us, giving friends and family the strength to carry on. She will whisper in our ears, telling us never to take life for granted. And we know you will always remind Angel's precious daughter of the joyful, spirited mother she had, who watches over her most of all. Know that we keep you always in our prayers. And we will always keep a chair for Angel in our classroom and in our hearts.

An Angel was called home.
God needed her help.
He wanted someone special,
someone with a bright smile,
a tender touch. Someone
who could handle the special project
He's working on. An Angel.
That's who he chose.

From English 015
Angel's class
University of the District of Columbia

1

THE CENTER FOR
# FORENSIC ECONOMIC STUDIES
Economic & Statistical Analysis

1608 WALNUT STREET, SUITE 801, PHILADELPHIA, PENNSYLVANIA 19103    (215) 546-5600  FAX (215) 732-8158
CFES@CFES.COM    WWW.CFES.COM

April 14, 2008

Kelly M. Lippincott, Esquire
Carr Mahoney, P.C.
1615 L Street, NW
Suite 500
Washington, DC 20036-5652

Re: Gladys Sutton et al., v. WMATA
Our File #: 0520

Dear Ms. Lippincott:

At your request, we have prepared a supplement to our October 10, 2007 report in the above captioned matter. After reviewing additional information, including the March 19, 2008 deposition of George Filsinger, Jr., the April 5, 2008 supplemental vocational assessment of Joseph H. Rose, M.E.D., C.R.C., the February 19, 2008 deposition of Joseph H. Rose, M.E.D., C.R.C., and the March 12, 2008 deposition of Kathleen F. Sampeck, M.A., we provide a third estimate of lost earnings. All of the assumptions and conclusions of our previous report remain unchanged.

According to his March 19, 2008 deposition, George Filsinger, Jr., the Operations Manager for Admiral Security, Ms. Walters' former employer, stated that Ms. Walters could have had a future with Admiral Security (page 22). Ms. Walters was due for a raise to $11.00 per hour (*Ibid.*, pages 18 & 19). He also stated that new security officers will be making $12.40 per hour right off the street (*Ibid.*, page 13) and that this would soon increase to $14.47 per hour plus health and medical benefits, and sick leave (*Ibid.*, page 14). It is our understanding that these new wage rates took effect on April 9, 2008. In his April 5, 2008 supplement, Joseph H. Rose, M.E.D., C.R.C., stated that after three to five years Ms. Walters could be making from $15.75 to $19.00 per hour as a site supervisor.

In our third estimate of loss we have assumed that Ms. Walters would have continued employment in the security industry. We have assumed that she would have received a raise to $11.00 per hour starting March 1, 2007 and that this would have increased to $14.47 per hour starting April 9, 2008. We have also assumed that after five years she would have been promoted to site supervisor earning from $15.75 to $19.00 (2008 dollars). We use the midpoint of this range, $17.38, as our base of earnings beginning on January 1, 2012.

This report has been prepared for the use of counsel in the instant matter. Any other transmission, copy, or utilization of this report or material contained herein is prohibited without the written consent of the Center for Forensic Economic Studies.



Tables 1a and 2a show earnings and fringe benefits absent the accident assuming continued employment as a security guard and retirement at ages 60.2 and 65, respectively.

**Summary**

As outlined in the Summary Table, the total economic loss, assuming continued employment as a security guard ranges from $580,702 to $594,718. If you have any questions, do not hesitate to contact our office.


Sincerely,

The Center for Forensic Economic Studies


Jerome M. Staller, Ph.D.


Brian P. Sullivan, Ph.D.


Pia Di Girolamo, Ph.D.


Leo Turcotte, Ph.D.

**Summary Table**

**Angel Walters**

**Economic Loss Assuming Continued Employment as a Security Guard**

| Retirement Age | 60.2 | 65 |
|---|---|---|
| Earnings | $995,622 | $1,077,204 |
| Fringe Benefits | 146,356 | 158,349 |
| Household Services | 200,614 | 200,614 |
| less: | | |
| Taxes | 197,495 | 215,133 |
| Maintenance Expenditures | 564,395 | 626,316 |
| Total Economic Loss | $580,702 | $594,718 |

**Estate of Angel Walters**                                    **Table 1a**

**Security Guard Earnings and Fringe**
**Benefits Assuming Worklife to Age 60.2**

| Year | Age | Expected Earnings |
|------|-----|-------------------|
| 2007 | 22 | 19,956 |
| 2008 | 23 | 27,511 |
| 2009 | 24 | 27,153 |
| 2010 | 25 | 26,785 |
| 2011 | 26 | 26,408 |
| 2012 | 27 | 34,187 |
| 2013 | 28 | 33,673 |
| 2014 | 29 | 33,151 |
| 2015 | 30 | 32,622 |
| 2016 | 31 | 32,088 |
| 2017 | 32 | 31,549 |
| 2018 | 33 | 31,007 |
| 2019 | 34 | 30,462 |
| 2020 | 35 | 29,916 |
| 2021 | 36 | 29,369 |
| 2022 | 37 | 28,822 |
| 2023 | 38 | 28,277 |
| 2024 | 39 | 27,732 |
| 2025 | 40 | 27,191 |
| 2026 | 41 | 26,652 |
| 2027 | 42 | 26,116 |
| 2028 | 43 | 25,585 |
| 2029 | 44 | 25,058 |
| 2030 | 45 | 24,537 |
| 2031 | 46 | 24,020 |
| 2032 | 47 | 23,510 |
| 2033 | 48 | 23,006 |
| 2034 | 49 | 22,508 |
| 2035 | 50 | 22,017 |
| 2036 | 51 | 21,532 |
| 2037 | 52 | 21,055 |
| 2038 | 53 | 20,585 |
| 2039 | 54 | 20,123 |
| 2040 | 55 | 19,668 |

Estate of Angel Walters                                    Table 1a Continued

**Security Guard Earnings and Fringe
Benefits Assuming Worklife to Age 60.2**

| Year | Age | Expected Earnings |
|------|-----|-------------------|
| 2041 | 56  | 19,221 |
| 2042 | 57  | 18,781 |
| 2043 | 58  | 18,350 |
| 2044 | 59  | 17,926 |
| 2045 | 60  | 17,510 |

| Summary - Table 1a | |
|---|---|
| **Past** | |
| Earnings | 19,956 |
| Maintenance | 7,164 |
| Taxes | 2,283 |
| Net | 10,509 |
| **Future** | |
| Earnings | 975,665 |
| Maintenance | 557,231 |
| Taxes | 195,212 |
| Net | 223,222 |
| **Total** | |
| Earnings | 995,622 |
| Maintenance | 564,395 |
| Taxes | 197,495 |
| Net | 233,732 |
| Fringe Benefits | 146,356 |
| **Total** | 380,088 |

Estate of Angel Walters                                   Table 2a

**Security Guard Earnings and Fringe
Benefits Assuming Worklife to Age 65**

| Year | Age | Expected Earnings |
|------|-----|-------------------|
| 2007 | 22 | 19,956 |
| 2008 | 23 | 27,511 |
| 2009 | 24 | 27,153 |
| 2010 | 25 | 26,785 |
| 2011 | 26 | 26,408 |
| 2012 | 27 | 34,187 |
| 2013 | 28 | 33,673 |
| 2014 | 29 | 33,151 |
| 2015 | 30 | 32,622 |
| 2016 | 31 | 32,088 |
| 2017 | 32 | 31,549 |
| 2018 | 33 | 31,007 |
| 2019 | 34 | 30,462 |
| 2020 | 35 | 29,916 |
| 2021 | 36 | 29,369 |
| 2022 | 37 | 28,822 |
| 2023 | 38 | 28,277 |
| 2024 | 39 | 27,732 |
| 2025 | 40 | 27,191 |
| 2026 | 41 | 26,652 |
| 2027 | 42 | 26,116 |
| 2028 | 43 | 25,585 |
| 2029 | 44 | 25,058 |
| 2030 | 45 | 24,537 |
| 2031 | 46 | 24,020 |
| 2032 | 47 | 23,510 |
| 2033 | 48 | 23,006 |
| 2034 | 49 | 22,508 |
| 2035 | 50 | 22,017 |
| 2036 | 51 | 21,532 |
| 2037 | 52 | 21,055 |
| 2038 | 53 | 20,585 |
| 2039 | 54 | 20,123 |
| 2040 | 55 | 19,668 |
| 2041 | 56 | 19,221 |

**Estate of Angel Walters**                    **Table 2a Continued**

**Security Guard Earnings and Fringe
Benefits Assuming Worklife to Age 65**

| Year | Age | Expected Earnings |
|------|-----|-------------------|
| 2042 | 57 | 18,781 |
| 2043 | 58 | 18,350 |
| 2044 | 59 | 17,926 |
| 2045 | 60 | 17,510 |
| 2046 | 61 | 17,102 |
| 2047 | 62 | 16,701 |
| 2048 | 63 | 16,309 |
| 2049 | 64 | 15,924 |
| 2050 | 65 | 15,547 |

| Summary - Table 2a | |
|---|---|
| **Past** | |
| Earnings | 19,956 |
| Maintenance | 7,164 |
| Taxes | 2,283 |
| Net | 10,509 |
| **Future** | |
| Earnings | 1,057,248 |
| Maintenance | 619,152 |
| Taxes | 212,850 |
| Net | 225,246 |
| **Total** | |
| Earnings | 1,077,204 |
| Maintenance | 626,316 |
| Taxes | 215,133 |
| Net | 235,755 |
| Fringe Benefits | 158,349 |
| **Total** | 394,104 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GLADY SUTTON, As Mother and | : | |
| Next Kin of Deceased Daughter, | : | |
| ANGEL WALTERS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No.: 1:07cv1197 (JDB) |
| | : | |
| WASHINGTON METROPOLITAN AREA | : | |
| TRANSPORTATION AUTHORITY, | : | |
| | : | |
| Defendant. | : | |

**O R D E R**

UPON CONSIDERATION of Defendant's Motion *in Limine* to Exclude the Testimony of

Plaintiff's Experts Joseph H. Rose and Dr. Gerald Staller, and Plaintiff's Opposition thereto, it is by

this Honorable Court on this ___ day of _____, 2008

ORDERED, that Defendant's Motion be DENIED.

_____
Judge

cc:    Paul J. Maloney, Esquire
       Kelly M. Lippincott, Esquire
       Carr Maloney P.C.
       1615 L Street, N.W., Suite 500
       Washington, D.C.  20036

       Frederic H. Schuster, Esquire
       David J. Shaffer, Esquire
       Associate General Counsel
       600 Fifth Street, N.W.
       Washington, D.C.  20001