UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| GLADY SUTTON, As Mother and | : | |
| Next Kin of Deceased Daughter, | : | |
| ANGEL WALTERS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No.: 1:07cv1197 (JDB) |
| | : | |
| WASHINGTON METROPOLITAN AREA | : | |
| TRANSPORTATION AUTHORITY, | : | |
| | : | |
| Defendant. | : | |

<u>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
TESTIMONY OF DR. JOAN KINLAN**</u>

Four months prior to trial, Washington Metropolitan Area Transportation Authority ("WMATA") has filed a Motion *in Limine* to Exclude Testimony of Dr. Kinlan ("Motion"), plaintiff's expert child psychiatrist. Defendant's Motion should be denied for at least the following two reasons: (1) defendant's Motion is premature and should not be decided until trial; and (2) Dr. Kinlan's testimony will help place in perspective for the jury the issues of six year old Aubria Walters' loss of care, education, training, guidance, and parental advice due to the death of her mother.

## I.    FACTUAL BACKGROUND

A WMATA bus driver ran over and killed Angel Walters ("Angel"), on February 17, 2007. Aubria Walters, ("Aubria") was five years old at the time,[1] and is the beneficiary of Angel's estate. Plaintiff does not contend that Aubria was in the "zone of danger" at the time of the

---

[1] Aubria's date of birth is December 28, 2001.

accident.  However, she was present and saw her mother as she lay bloodied and broken on the street that night.  Angel's death at the age of twenty-one has had and will have a profound impact on her only child that she was raising as a single mother.

At the time of Angel's death, she was working full-time as a security guard for Admiral Security and attending classes at the University of the District of Columbia in order to become an RN or an LPN.  Angel and Aubria had been shopping with three of Angel's friends for household items for Angels' new apartment on the day she died.  Angel was waiting to cross the street to her apartment, bags in hand, when she was run over by the WMATA bus.  Angel and Aubria had not yet stayed one night in the new apartment.

Since her mother's death, Aubria has lived with her maternal grandmother, Gladys Sutton.  Except for a short period of time, Angel and Aubria had always lived with either Gladys Sutton or Angel's maternal grandmother, Jeannette Turner.

Aubria had a difficult time adjusting to the loss of her mother.  She was in a full-day kindergarten at the Community Academy Public Charter School ("CAPCS") when her mother died.  Her teachers testified at deposition that following her mother's death, Aubria began acting out in school and fell behind the other students.  She had frequent tantrums and outbursts and ultimately her scheduled was reduced to half-day of school.  *See*, Deposition Transcript of Sophia Watts, February 25, 2008, attached as Exhibit 1, p. 16, ln. 7 through p. 17, ln. 18; p. 21, lns. 2-17; p. 23, ln. 12 through p. 24, ln. 16; Deposition Transcript of Toosdhi Tucker, February 25, 2008, attached as Exhibit 2, p. 13, ln. 13 through p. 14, ln. 20. According to her teacher, Diane Melvine, Aubria continued to have trouble in school when she started the first grade at Langdon Elementary School. *See*, Deposition Transcript of Diane Melvine, April 8, 2008, attached as Exhibit 3, p. 8, lns. 12-20.

She also has had outbursts and temper tantrums at her new school. *Id.* at p. 12, ln. 4 through p. 13, ln. 1.

Angel was pronounced dead at 11:49 p.m. on February 17, 2007. *See*, Death Certificate, Exhibit 4. Three days later, from jail, the putative father, Aubrey Canarte signed an Affidavit seeking custody of Aubria through his mother, Monica Canarte. *See*, Exhibit 5, Affidavit of Aubrey Canarte. This Affidavit was included in a Petition for Custody filed by Monica Canarte on February 28, 2007 in the Superior Court of the District of Columbia. Mr. Canarte has had little to no involvement in raising Aubria. Gladys Sutton was unaware of the Custody Petition until police officers showed up at her home on May 16, 2007. They presented a custody order, and took away a frightened Aubria. The custody order was reversed that day and Aubria returned to Gladys Sutton.

## II.  DEFENDANT'S MOTION IS PREMATURE

Dr. Joan Kinlan ("Dr. Kinlan"), a prominent child psychiatrist in Washington, D.C., was retained to evaluate Aubria after her mother's death. There were concerns about her mental health and her progress in school. Dr. Kinlan first met with Gladys Sutton on April 19, 2007. She first saw Aubria on May 15, 2007, the day before the police took her away. Mr. Canarte continues to maintain his custody action for Aubria, and there will likely be a hearing on this in the next several months. Dr. Kinlan will be a critical witness at this hearing to testify concerning the best interest of Aubria. If a blood test confirms that he is the father, Mr. Canarte has already told the Court that he wants to take Aubria to Norfolk, Virginia to live. *See*, Transcript of Court hearing dated September 25, 2007, pp. 16-19, attached as Exhibit 6. If this occurs, it will be a double tragedy for Aubria-- first, the loss of her mother, and second the loss of her extended maternal family. This issue may be decided prior to trial in this litigation. Dr. Kinlan's testimony in the custody case, and particular

issues concerning the best interest of Aubria, will have an impact on the jury's consideration of the losses permitted by law in this action.

### III.  DR. KINLAN SHOULD BE PERMITTED TO TESTIFY WITH RESPECT TO DAMAGES RECOVERABLE PURSUANT TO THEDISTRICT OF COLUMBIA WRONGFUL DEATH ACT

Plaintiff agrees that Aubria is not entitled to recover for the sorrow, mental distress or grief, or for the loss of love and affection that she may have suffered because of the loss of her mother pursuant to the D.C. Wrongful Death Act *See,* Standardized Civil Jury Instruction §14:05.  However, she is entitled to recover for the loss of care, education, training and guidance and personal advice she received from her mother.  *Id.*  Aubria's age and emotional status are critical factors in the jury's assessment of these damages.  Dr. Kinlan's testimony will be of great benefit in helping the jury evaluate this loss.[2]

Dr. Kinlan has conducted extensive interviews with Aubria, her grandmother, extended family members, and teachers.  She evaluated a young impressionable five-year-old who will go through life without the benefit of her mother—the only parent she has ever known.  She has concluded, in relevant part, that

> Aubria…has had significant emotional, physical and cognitive symptoms since witnessing the traumatic death of her mother by a metrobus. …
>
> The loss of her mother has caused great pain to this young child.  She may never recover sufficiently to achieve her full potential.  …

---

[2]  Contrary to the suggestion in defendant's Motion, Dr. Kinlan will not put a dollar amount on Aubria's compensable loss.  *See,* Motion at p. 2-3.  Rather, plaintiff's economist, Dr. Staller will testify to a loss of household services in the amount of $200,614.  Defendant's expert, Dr. Borzilleri does not contest this figure.  The loss of household services are different from the damages that Dr. Kinlan will address—*i.e.,* the loss of care, education, training, guidance, and parental advice.

> It is critical to note that were her mother alive and caring for her,
> Aubria would be coping well and relating to peers and nieces without
> any difficulty as she had previously.  She would also be able to
> function and learn in school. …
>
> None of the problems that Aubria is experiencing would be present
> but for the death of Angel Walters.  It is with a reasonable degree of
> medical probability that Aubria would not be facing these issues in
> her life had she not lost her mother.

*See*, Defendant's Motion, Exhibit A, pp. 7, 8.

Dr. Haller, defendant's expert psychiatrist, agrees that Aubria may have qualified for a post-traumatic stress disorder ("PTSD") diagnosis early on.   *See*, Exhibit 7, Dr. Haller deposition, p. 69.  He further admits that Aubria currently suffers from an adjustment disorder (DSMR 309.4) and hyperactivity and loss of concentration in the classroom.  *Id*.  When asked whether Aubria has suffered a loss of care as a result of losing her mother, he responded in the affirmative, and noted that the loss was "a hundred percent."  *Id*. at pp. 23, 24.  With respect to the loss of education, he conceded that Aubria is unable to benefit from the educational services provided by Angel.  He also testified that because of the loss of her mother and her reaction thereto, Aubria was not functioning as well in school for some time after the death of her mother *Id*. at p. 25.  When asked if Aubria suffers from loss of training provided by her mother, he responded "she cannot benefit from training from a person who does not exist." *Id*. at p. 28.  Finally, Dr. Haller agreed that as Aubria becomes older, part of her struggles toward independence may well involve questions of whether her life would have been better if her mother was present.  Aubria will potentially face "you're not my mother" issues, which may well require counseling.  *Id.* at p. 65.

Beginning February 17, 2007, Aubria lost the care, education, training, guidance and

personal advice provided by her mother. She is entitled to compensation for this loss during the joint life expectancy for her and her mother. *See*, *Doe v. Binker*, 492 A.2d 857 (1985), and *District of Columbia v. Hawkins*, 782 A.2d 293 (2001). The jury should consider each of these elements individually and compensate Aubria therefore. Dr. Kinlan is uniquely situated to assist the jury in this process. Aubria's PTSD has been part of her psychological makeup over the last 15 months. While the PTSD and grief cannot be directly compensated by law, the fact that Angel is not there to provide the care, guidance, advice, *etc*. for her daughter with the emotional issues that she now faces is compensable. None of this would have been an issue if Angel had not been killed.

In reliance upon FRCP 702, defendant contends that Dr. Kinlan's testimony will not assist the trier of fact to understand the evidence or to determine a fact in issue. *See*, Motion at pp. 7-8. The Advisory Committee Notes to the 1972 Proposed Rules notes that "[a]n intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge." FRCP 702 Advisory Committee Notes. The Notes go on to state that not all expert testimony is in the form of opinions, but rather experts on the stand may give a dissertation or exposition of scientific or other principals relevant to the case, leaving the trier of fact to apply them to the facts. Here, Dr. Kinlan has evaluated five-year-old Aubria, and she can clearly place in context the loss of her mother for the prospective jurors. While expert testimony may not be required to prove the losses claimed by Aubria, such testimony should at least be permitted. Aubria did not cause the emotional problems or the problems she is having at school—WMATA did. Plaintiff is entitled to have a child psychiatrist, an expert on these issues, put Aubria's life and resulting loss in proper context for the jury.

Respectfully submitted,

CARR MALONEY P.C.


By:      /s/ Paul J. Maloney
         Paul J. Maloney, #362533
         Kelly M. Lippincott, #484610
         1615 L Street, N.W.
         Suite 500
         Washington, D.C.  20036
         (202) 310-5500 (telephone)
         (202) 310-5555 (facsimile)


<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Opposition to Defendant's Motion to Exclude the Testimony of Dr. Kinlan was e-filed and served electronically this 5th day of May, 2008 to:


Frederic H. Schuster, Esquire
David J. Shaffer, Esquire
Associate General Counsel
600 Fifth Street, N.W.
Washington, D.C.  20001


     /s/ Paul J. Maloney
     Paul J. Maloney

7

1

```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
 2                         OF COLUMBIA
 3      --------------------------------
                                        |
 4      GLADYS CLAUDETTE SUTTON,        |
                                        |
 5      Individually and as Personal    |
                                        |
 6      Representative of the Estate and|
                                        |
 7      next of kin of                  |
                                        |
 8      ANGEL CLAUDETTE WALTERS, Deceased|
                                        |
 9                    Plaintiff,        |
                                        |
10            v.                        |Civil Action NO.
                                        |
11      WASHINGTON METROPOLITAN AREA     |07-01197(JDB)
                                        |
12      TRANSIT AUTHORITY               |
                                        |
13                    Defendant.        |
                                        |
14      --------------------------------
15             Deposition of Sophia Watts
16                  Washington, D.C.
17             Monday, February 25, 2008
18                    1:06 p.m.
19
20      Job No.:1-123406
21      Pages 1 - 46
22      Reported by:  Jennifer A. Bosley
```

COPY

EXHIBIT
1


L.A.D.
REPORTING &

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com

DEPOSITION OF SOPHIA WATTS
CONDUCTED ON MONDAY, FEBRUARY 25, 2008

16

1    early 2007 her mother was killed?

2        A    Yes.

3        Q    That was in?

4        A    February.

5        Q    February 2007, correct?

6        A    Yes.

7        Q    Okay.  Can you describe to me any changes in

8    her behavior immediately after that incident?

9        A    Well, she constantly thought that the

10   children were -- that, you know, everybody in the

11   classroom did know that her mother had, you know, been

12   killed.

13            And she -- you know, I spoke to my children

14   about it, you know, with Aubria not being in the

15   classroom.  I said, You know, we need to be sensitive

16   to what Aubria's going through right now.

17            But she really thought that a lot of the

18   children were making fun of her.  If we were in

19   classroom doing an activity or something and someone

20   took a pencil from her, she would get very very upset

21   and say, He's being mean to me because my mother died.

22            She, you know, didn't really have a good

DEPOSITION OF SOPHIA WATTS
CONDUCTED ON MONDAY, FEBRUARY 25, 2008

17

1   relationship with the children because she was just

2   very -- you know, she just was really really just

3   angry, you know.  She would often throw tantrums.

4          She started being very disobedient towards

5   myself, my assistant, and the other teachers in the

6   school.

7          We had a problem with her as far as when we

8   would go outside on the playground, you know, we would

9   go outside each day for 45 minutes to an hour.  And

10  when it was time to come back in, she refused.  It was

11  a problem that she would not come back.

12         She would just sit on the -- stay on the

13  playground.  And then, you know, when she was, you

14  know, told she needed to come in or reprimanded, she

15  would start crying, kicking, trying to hit me or, you

16  know, my assistant or anybody who would try to

17  restrain her because when she had episodes like that,

18  she would have to be restrained.

19     Q    How would you restrain her?

20     A    I would just hold her, hug her from behind.

21  And, you know, I would say, Aubria, we can't do that.

22  We can't hurt our friends.  I don't like that you're

DEPOSITION OF SOPHIA WATTS
CONDUCTED ON MONDAY, FEBRUARY 25, 2008

21

1    apologize.

2              Describe to me how you accomplished that.

3         A    Okay.  She came in the morning.  And she

4    would eat lunch.  We start at 8:15, so she'd come at

5    about 8:15, 8:30.  And we ate lunch at about 11:45.

6    And after lunch, her grandmother would pick her up and

7    take her home.

8         Q    Did this reduced schedule help the

9    situation?

10        A    No.  I mean, she was still having the

11   tantrums in the morning with us.  But I guess it

12   helped in a sense that she wasn't at school all day,

13   that, you know, so that whatever break that she needed

14   or, you know, time to herself or time maybe just being

15   with her grandmother without all the children being

16   around, I guess that helped her.  But she was still

17   having tantrums and things in the morning.

18        Q    Did they lessen?

19        A    I would say that they started happening

20   around the time that we were getting ready to -- they

21   would start when we were coming inside from playing on

22   the playground.  She always refused to come back

23

1    and two kindergarten.  So they're on a different

2    schedule.  They go outside from 10:00 to about 10:45.

3          So they'd be inside during our outdoor time,

4    so she would go with them.  Or maybe myself or my

5    assistant would stay inside with her and let her maybe

6    play on the computer or draw or something like that.

7          So everybody on the floor was pretty much

8    sympathetic to her.  So they would, you know, take her

9    and do things with her.  She may help another teacher

10   with lunch, or she would maybe help the lunch lady do

11   lunch during that time.

12     Q    Can you describe for me whether there was

13   any change in her academic ability immediately

14   following the death of her mother?

15     A    Well, yeah, there was definitely a change

16   because as I told you before she needed intervention

17   at the beginning of the year.  And with the

18   intervention, she had really made some great strides.

19          I had actually -- like I said, we had three

20   reading groups, low, middle, and our high which the

21   children don't know that.  We just give them names.

22   They were like Stars, Rainbows, Sunbeams.  So she was

DEPOSITION OF SOPHIA WATTS
CONDUCTED ON MONDAY, FEBRUARY 25, 2008

24

1      in the low group.  And by the -- by January, she was

2      moved into the -- moved up into, you know, a mid

3      group.

4              But then when, you know, after her mom died,

5      she couldn't focus.  She wasn't able to sit down and,

6      you know, do her work.  She wasn't able to be in a

7      small group with myself and, you know, the other

8      children.

9              The interventionist who was working with her

10     had told me before that we had started putting her on

11     the half-day schedule because the interventionist

12     comes in the afternoon said, It's not -- it's really

13     too distractive for Aubria to be in the group with us.

14             So she can't be in the intervention for that

15     time that it happened, for the time after that it

16     happened until she started the half days.

17     Q     All right.  I'm a little unclear by what you

18     meant by your last answer.

19     A     The intervention group happened in the

20     afternoons, and she wasn't -- the interventionist said

21     she couldn't come.  It was too distracting for the

22     other children because it was her behavior, the

1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
 2                         OF COLUMBIA
 3    - - - - - - - - - - - - - - - - - - -
                                           |
 4    GLADYS CLAUDETTE SUTTON,             |
                                           |
 5    Individually and as Personal         |
                                           |
 6    Representative of the Estate and     |
                                           |
 7    next of kin of                       |
                                           |
 8    ANGEL CLAUDETTE WALTERS, Deceased    |
                                           |
 9                     Plaintiff,          |
                                           |
10              v.                         |Civil Action NO.
                                           |
11    WASHINGTON METROPOLITAN AREA         |07-01197(JDB)
                                           |
12    TRANSIT AUTHORITY                    |
                                           |
13                     Defendant.          |
                                           |
14    - - - - - - - - - - - - - - - - - - -
15              Deposition of Toosdhi Tucker
16                   Washington, D.C.
17              Monday, February 25, 2008
18                     2:01 p.m.
19
20    Job No.:1-123406
21    Pages 1 - 29
22    Reported by:  Jennifer A. Bosley
```

COPY

EXHIBIT

2

L.A.D. REPORTING &

1100 Connecticut Avenue, NW • Suite 850,
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com

DEPOSITION OF TOOSDHI TUCKER
CONDUCTED ON MONDAY, FEBRUARY 25, 2008

13

1    me because there were outbursts in the classroom.

2        Q    So how would you see her -- prior to the

3    accident, would you see her on a weekly basis or a

4    daily basis?

5        A    I saw her probably almost every day because

6    I walk through the building every day.  And I kind of

7    sat in and made sure that I was in the classroom for

8    at least 20 minutes just looking and making sure

9    everything was okay.

10       Q    So it would be your routine to go around and

11   sit in each classroom for about 20 minutes or so?

12       A    Yes.

13       Q    Okay.  Now, immediately following the

14   accident, did you observe any changes in Aubria's

15   behavior?

16       A    Yes.

17       Q    Can you describe those for me.

18       A    She was withdrawn.  There were lots of

19   outbursts, just crying, kind of wanting to go off on

20   her own.  And if Ms. Watts or her teacher assistant at

21   the time tried redirect her to come back to the group

22   again, there would be the crying and the outbursts.

14

1           And there have been times where they had to

2    remove her from the classroom and bring her down to

3    the office, literally pick her up and bring her down.

4           Sometimes she was kicking and screaming.

5    And I had to close the door to my office and kind of

6    just hug her until she calmed down.  And during that

7    time when she was crying and kind of having a tantrum,

8    she was just screaming that she wanted her mom.

9        Q    And how long did that severity of behavior

10   continue?

11       A    Probably I want to say at least two or --

12   maybe a month or two.  And then -- she wasn't -- her

13   grandmother I think was really concerned about her.

14   So if Aubria didn't feel like coming to school, then

15   her grandmother would keep her home.  But we often had

16   to call Ms. -- I'm sorry.

17       Q    Sutton?

18       A    I'm sorry, Mrs. Sutton to come and get her

19   because we felt like a full day was too much for her

20   at that time.

21       Q    Okay.  And then at some point in time, a

22   group of you met and decided to change her to a

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

District of Columbia

— — — — — — — — — — — — — —

GLADYS SUTTON,                         :

                           :

       Plaintiff,                  :    CASE NO.

                           :

     v.                              :    07-1197 (JDB)

                           :

WMATA,                                 :

                           :

       Defendant.                  :

— — — — — — — — — — — — — — :

**COPY**

Washington, D.C.

Tuesday, April 8, 2008

Deposition of:

DIANE MELVINE

called for oral examination by counsel for
Defendant, pursuant to notice, at the
Offices of Carr Maloney, P.C., 1615 L Street,
Northwest, Suite 500, Washington, D.C., before
Constance H. Rhodes of Capital Reporting Company,
a Notary Public in and for the District of
Columbia, beginning at 4:32 p.m., when were
present on behalf of the respective parties:

EXHIBIT

3

**Capital Reporting Company**

Page 8

1    level they would be in.  Then I will have them

2    read for me and that will also further give me

3    some insight on what reading level they need to

4    be in.

5         Q    Okay.  And how many levels are there?

6         A    Three.

7         Q    Which level is Aubria in?

8         A    She's on below level.

9         Q    How does your class approximately shape

10   out?  Is it about a third in each level?

11        A    Yeah.

12        Q    Okay.  Now, how would you describe

13   Aubria's general knowledge as compared to other

14   students?

15             MS. LIPPINCOTT:  Objection as to form;

16   you may answer.

17             THE WITNESS:  She is able to do work, but

18   she does it on a different level.  She does it at

19   a slower pace than the other children in the

20   classroom would.

21   BY MR. SHAFFER:

22        Q    And is this just in reading or is it in

Page 12

1      Q    Have you formed any opinions as to the

2    cause of her being below her peers?

3      A    No.

4      Q    Now, could you describe her behavior in

5    the classroom?

6           MS. LIPPINCOTT:  Objection as to the time

7    frame.

8    BY MR. SHAFFER:

9      Q    During the time period in which you've

10   observed her.

11     A    In the beginning it was kind of rough

12   because it was a new school.  She was trying to

13   adapt to the new atmosphere, not being at her

14   regular school that she was used to.  Then she

15   would have little outbursts after January.  When

16   we came back in January, she would have little

17   outbursts.  Around the time of her mother's death

18   is when she had temper tantrums.  And lately,

19   after the passing of her mother a year ago and,

20   you know, the anniversary that just came up, she

21   has not exhibited any, you know, behavioral

22   problems other than what regular first graders

Capital Reporting Company

Page 13

1    would do as far as talking and playing.

2        Q    Okay.  What did you mean by it was a

3    little "rough"?

4        A    As far as her getting to know the

5    atmosphere of the school because she wasn't used

6    to the school.  If I'm not mistaken, the school

7    she went to before was CAPS.

8        Q    Yes.

9        A    And so it was just trying to get her

10   adjusted to a new atmosphere, a new teacher, and

11   new students that she did not know.

12       Q    Okay.  But she's grown out of that

13   problem?

14       A    Yes, she has.

15       Q    Okay.  Have you had parent-teacher

16   meetings with her grandmother?

17       A    Yes, I have.

18       Q    And how many times have you had such

19   meetings?

20       A    We have had three meetings so far this

21   year.

22       Q    Did her grandmother relate to you any

TOUCAN BUSINESS FORMS, INC. ® (202) 543-0182

44140

GOVERNMENT OF THE DISTRICT OF COLUMBIA • DEPARTMENT OF HEALTH
CERTIFICATE OF DEATH

070000801

Date Filed

File number 108–

| 1a. DECEDENT'S LEGAL NAME (First, Middle, Last) | 1b. DECEDENT'S AKA | 2. SEX | 3. DATE PRONOUNCED DEAD | 4. TIME PRONOUNCED DEAD |
|---|---|---|---|---|
| ANGEL    CLAUDETTE    WALTERS | N/A | F | FEBRUARY 17, 2007 | 2349 |

| 5. SOCIAL SECURITY NUMBER | 6a. AGE | 6b. < 1 YR | 6c. < 1 DAY | 7. DATE OF BIRTH (Mo/Day/Yr) | 8. BIRTHPLACE (City and state or foreign country) |
|---|---|---|---|---|---|
| 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 | 21 | Mo.  Days | Hrs.  Min. | April 28, 1985 | Washington, D. C. |

| 9a. RESIDENCE - STATE | 9b. COUNTY | 9c. CITY, TOWN, OR LOCATION |
|---|---|---|
| District of Columbia | | Washington |

| 9d. STREET AND NUMBER AND QUADRANT | 9e. APT. NO. | 9f. ZIP CODE | 9g. INSIDE CITY LIMITS? |
|---|---|---|---|
| 714 Jefferson Street, N. W. | | 20011 | ☒ YES  ☐ NO |

| 10. EVER IN U.S. ARMED FORCES? | 11. MARITAL STATUS AT TIME OF DEATH | 12. MAIDEN NAME (if ever married woman, enter maiden name) | 13. SURVIVING SPOUSE (if wife, give name prior to first marriage) |
|---|---|---|---|
| ☐ YES  ☒ NO  ☐ Unknown | ☐ Married  ☐ Married, but separated  ☐ Widowed  ☐ Divorced  ☒ Never Married  ☐ Unknown | Walters | None |

| 14. FATHER'S NAME (First, Middle, Last) | 15. MOTHER'S NAME PRIOR TO FIRST MARRIAGE (First, Middle, Last) |
|---|---|
| Leroy  Walters, Sr. | Gladys  Claudette  Turner |

| 16a. INFORMANT'S NAME | 16b. RELATIONSHIP TO DECEDENT | 16c. MAILING ADDRESS (Street and Number and Quadrant, City, State, Zip Code) |
|---|---|---|
| Gladys Turner Sutton | Mother | 1721 Montana Avenue, N. E. Washington, D. C. 20018 |

| IF DEATH OCCURRED IN A HOSPITAL: | IF DEATH OCCURRED SOMEWHERE OTHER THAN HOSPITAL: | 17a. PLACE OF DEATH (Check only one) |
|---|---|---|
| ☐ Inpatient  ☐ ER/Outpatient  ☐ DOA | ☐ Hospice Facility  ☐ Nursing Home/Long Term Care Facility  ☐ Decedent's Home  ☐ Other (Specify) | |

| 17b. FACILITY NAME (If not institution, give street and number) | 17c. CITY, TOWN, STATE | 17d. ZIP CODE |
|---|---|---|
| WASHINGTON HOSPITAL CENTER | WASHINGTON, D.C. | 20010 |

| 18. METHOD OF DISPOSITION | 19a. PLACE OF DISPOSITION (Name of cemetery or crematory, other place) | 19b. DATE OF DISPOSITION |
|---|---|---|
| ☒ Burial  ☐ Donation  ☐ Removal from District of Columbia  ☐ Cremation  ☐ Entombment  ☐ Other | National Harmony Memorial Park | February 24, 2007 |

| 19c. LOCATION - CITY OR TOWN AND STATE | 20. NAME AND COMPLETE ADDRESS OF FUNERAL FACILITY |
|---|---|
| Landover, P.G.Co.,Maryland | R. N. Horton Company Morticians, Inc.; 600 Kennedy Street,N.W.; Washington, D. C. 20011 |

| 21. FUNERAL SERVICE LICENSEE (TYPE & SIGN) | 22. LICENSE NUMBER |
|---|---|
| Randolph B. Horton    Randolph B. Horton | 1058 |

| 23. DECEDENT'S EDUCATION (Check the box that best describes the highest degree or level of school completed at the time of death) | 24. DECEDENT OF HISPANIC ORIGIN? (Check one or more boxes to best describe whether the decedent is Spanish/Hispanic/Latino. check the "No" box if decedent is not Spanish/Hispanic/Latino) | 25. DECEDENT'S RACE (Check one or more races to indicate what the decedent considered himself or herself to be) |
|---|---|---|
| ☐ 8th grade or less (includes none) | ☒ No, not Spanish/Hispanic/Latino | ☐ White |
| ☐ 9th - 12th grade, but no diploma | ☐ Yes, Mexican, Mexican American, Chicano | ☒ Black or African American |
| ☒ High school graduate or GED completed | ☐ Yes, Puerto Rican | ☐ American Indian or Alaska Native (Name of enrolled or principal tribe) |
| ☐ Some college credit, but no degree | ☐ Yes, Cuban | ☐ Asian Indian |
| ☐ Associate degree (e.g., AA, AS) | ☐ Yes, other Spanish/Hispanic/Latino (specify) | ☐ Chinese |
| ☐ Bachelor's degree (e.g., AB, BA, BS) | ☐ Unknown | ☐ Filipino |
| ☐ Master's degree (e.g., MA, MBA, MEd, MS, MSW) | | ☐ Japanese |
| ☐ Doctorate or professional degree (e.g., DDS, DO, DVM, EdD, JD, LLB, MD, PhD) | | ☐ Korean |
| ☐ Unknown | | ☐ Vietnamese |
| | | ☐ Other Asian (specify) |

| 26. DECEDENT'S USUAL OCCUPATION (Indicate type of work done during most of working life. Do not use retired.) | ☐ Native Hawaiian |
|---|---|
| Security Guard | ☐ Guamanian or Chamorro |
| | ☐ Samoan |

| 27. KIND OF BUSINESS / INDUSTRY | ☐ Other Pacific Islander (specify) |
|---|---|
| Admiral Security Company | ☐ Other (specify)  ☐ Unknown |

### CAUSE OF DEATH (See Instructions and example)

28. PART I. Enter the chain of events - diseases, injuries, or complications - that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. Enter only one cause on a line.

| | | Approximate Interval: Onset to death (Include Min., Hr., Day, Yrs., etc.) |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | a. MULTIPLE BLUNT FORCE INJURIES | |
| | DUE TO (or as a consequence of): | |
| Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST. | b. | |
| | DUE TO (or as a consequence of): | |
| | c. | |
| | DUE TO (or as a consequence of): | |
| | d. | |

PART II. Enter other significant conditions contributing to death but not resulting in the underlying cause given in Part I.

| 29. WAS AN AUTOPSY PERFORMED? |
|---|
| ☒ Yes  ☐ No |

| 30. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? |
|---|
| ☒ Yes  ☐ No |

| 31. DID TOBACCO USE CONTRIBUTE TO DEATH? | 32. IF FEMALE | 33. MANNER OF DEATH |
|---|---|---|
| ☐ Yes  ☐ Probably  ☐ No  ☒ Unknown | ☒ Not pregnant within past year  ☐ Pregnant at time of death  ☐ Not pregnant, but pregnant within 42 days of death | ☐ Not pregnant, but pregnant within 43 days to 1 year before death  ☐ Unknown if pregnant within the past year | ☐ Natural  ☐ Accident  ☐ Suicide | ☒ Homicide  ☐ Pending Investigation  ☐ Could not be determined |

| 34. DATE OF INJURY (Mo/Day/Yr) (Spell Month) | 35. TIME OF INJURY | 36. PLACE OF INJURY (Decedent's home, construction site, restaurant, wooded area, etc. | 37. INJURY AT WORK? |
|---|---|---|---|
| FEBRUARY 17, 2007 | 2310 | ROAD | ☐ Yes ☒ No  ☐ Unknown |

| 38. LOCATION OF INJURY: Street & Number: | Apartment No.: |
|---|---|
| 1300 CONGRESS STREET SE | |

| City or Town: | State: | Zip Code: |
|---|---|---|
| WASHINGTON | DC | 20032 |

| 39. DESCRIBE HOW INJURY OCCURRED | 40. IF TRANSPORTATION ACCIDENT, SPECIFY: |
|---|---|
| PEDESTRIAN STRUCK BY BUS | ☐ Driver/Operator  ☒ Pedestrian  ☐ Passenger  ☐ Other (specify) |

| 41. NAME OF PERSON PRONOUNCING DEATH (if other than certifier) | 42. LICENSE NUMBER | 43. DATE SIGNED (Mo/Day/Yr) |
|---|---|---|

| 44a. WAS MEDICAL EXAMINER CONTACTED? ☒ Yes ☐ No | IF YES, TYPE NAME OF ME | 44b. DATE | 44c. ME CASE NUMBER |
|---|---|---|---|
| | CAROLYN H. REVERCOMB, M.D. | FEBRUARY 17, 2007 | 07-0384 |

| 45a. CERTIFIER (Check only one) | 45c. TYPE/Print Name: |
|---|---|
| ☐ Certifying physician - To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner stated.  ☐ Pronouncing and Certifying physician - To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner stated.  ☒ Medical Examiner - On the basis of examination, and/or investigation, in my opinion, death occurred due to the cause(s) and manner stated. | CAROLYN H. REVERCOMB, M.D. |

| Signature of Certifier: | 45c. LICENSE NUMBER |
|---|---|
| | |

| 45b. ADDRESS OF CERTIFIER (Type or print) | 45d. DATE CERTIFIED (Mo/Day/Yr) |
|---|---|
| 1910 MASSACHUSETTS AVE SE BLDG. 27, WASHINGTON D.C. 20003 | 02.19.07 |

| 46a. CREMATION AUTHORITY GRANTED BY (SIGNATURE & DATE) | 46b. STAMP |
|---|---|

47. REMARKS - IF DECEDENT UNDER 4 YEARS, ENTER PLACE OF BIRTH – HOSPITAL OR ADDRESS, IF NOT HOSPITAL

Form DOH159   09/2005

I CERTIFY THAT THE ABOVE IS A TRUE AND CORRECT COPY OF THE ORIGINAL CERTIFICATE FILED IN THE VITAL RECORDS DIVISION, DISTRICT OF COLUMBIA, DEPARTMENT OF HEALTH.

WARNING: IT IS UNLAWFUL TO MAKE A COPY OF THIS DOCUMENT AND PRESENT IT AS AN ORIGINAL CERTIFICATE OR COPY OF A VITAL RECORD.

February 23, 2007
DATE ISSUED

JULIA DAVISON RANDALL

EXHIBIT
4

To Be Completed/Verified By: Funeral Director/Medical Examiner
Initiator of record enters the data available for items 1-6

To Be Completed By: CERTIFIER

FAMILY COURT
CENTRAL INTAKE CENTER

Feb.21,2007

To whom it may concern 2007 FEB 28 P 1:04

FILED

My name is Aubrey Canarte, father of Aubria Walters. I'm currently incarcerated and I'm asking the courts to give my mother Monica Canarte temporary custody of my daughter. I don't have long left on this sentence to serve and I don't want my daughter getting shuffled around in this system, so I would like for the courts to grant my mother with temporary custody. If you need to get in contact with me or my mother the information is at the bottom of this page.

Respectfully Submitted,

*Aubrey Canarte*

Aubrey Canarte #37662-007

*Aubrey Canarte*

Smlau 2-22-07

NOTARY PUBLIC OFFICIAL SEAL
S.M.CARR
State of West Virginia
Federal Correctional Institution-Gilmer
My Commission Expires
July 24, 2018
P.O. Box 5000
Glenville, WV 26351

My address:

Aubrey Canarte #37662-007

Federal Correctional Institution (Gilmer)

P.O.Box 6000

Glenville,WV 26351

My mother address/phone number:

Monica Canarte

4226 7th St. N.W. #4

Washington,D.C.

20011

   (202)367-9233



EXHIBIT
5

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
FAMILY DIVISION


- - - - - - - - - - - - - - - x
                              :
CANARTE,                      :
     Plaintiff.               : Docket Number:  DRB0598-07
                              :
     vs.                      :
                              :
CANARTE,                      :
     Defendant.               :
                              : Tuesday, September 25, 2007
- - - - - - - - - - - - - - - x Washington, D.C.


          The above-entitled action came on for a hearing

before the Honorable MICHAEL RYAN, Associate Judge, in

Courtroom Number 103, commencing at 9:44 a.m.

                    APPEARANCES:

                    On Behalf of the Plaintiff:

                    PRO SE

                    On Behalf of Defendant Canarte:

                    PRO SE

                    On Behalf of Defendant Sutton:

                    PAUL J. MALONEY, Esquire
                    Washington, D.C.

                    Guardian Ad Litem:

                    JACK Y. CHU, Esquire
                    Washington, D.C.

                                                08-0268


**Deposition Services, Inc.**
6245 Executive Boulevard
Rockville, MD 20852
Tel: (301) 881-3344 Fax: (301) 881-3338
info@DepositionServices.com www.DepositionServices.com


EXHIBIT

jk

1  until full payment was made, and I know we were making

2  phone calls on that, so I just, I don't recollect the

3  date, but I know it's been done.

4        THE COURT:  Okay.

5        MR. MALONEY:  It was done at the end of July.

6        THE COURT:  Mr. Canarte, what do you want to

7  tell me today?

8        MR. CANARTE:  I was just -- I'm just waiting to

9  take the test.  There ain't much I really can tell you

10 until I take the test.

11       THE COURT:  Okay.  Mr. Chu represented that he

12 spoke with you and that he thought that your plan on being

13 released ultimately is to move out of the D.C. area.  Is

14 that accurate?

15       MR. CANARTE:  Yes.

16       THE COURT:  You're contemplating a move to

17 Norfolk, is that right?

18       MR. CANARTE:  Yorktown.

19       THE COURT:  Yorktown?

20       MR. CANARTE:  Yes.

21       THE COURT:  As far as you know, are you still on

22 track to be sent to a halfway house in May of 2008 and

23 fully released in August of 2008?

24       MR. CANARTE:  Yes, sir.

25       THE COURT:  Any questions that anyone has for

16

jk

1    Mr. Canarte now that we've got him on the phone?

2              MR. MALONEY:  Your Honor, do we know where that

3    halfway house will be at that time?

4              THE COURT:  Do you know where that halfway house

5    would be, Mr. Canarte?  Would it be here in the District

6    or elsewhere?

7              MR. CANARTE:  It would be here in the District.

8              THE COURT:  Okay.

9              MR. MALONEY:  And does Mr. Canarte know where he

10   will be living in Yorktown?  Are there any arrangements

11   that he has for housing there?  Does he know who he will

12   be living with?

13             THE COURT:  Do you have any specifics on where

14   it is in Yorktown you're planning on going, Mr. Canarte?

15             MR. CANARTE:  Yes, it will be 103 Pheasant Watch

16   (phonetic sp.), Yorktown, Virginia.

17             THE COURT:  103 -- again?

18             MR. CANARTE:  Pheasant Watch, Yorktown,

19   Virginia.

20             THE COURT:  And that is a private home or an

21   apartment or a -- what?

22             MR. CANARTE:  A private home.

23             THE COURT:  Okay.

24             MR. MALONEY:  And with whom will he be living at

25   that location, Your Honor, if I may inquire?

jk

1          THE COURT:  With whom would you be living there?

2          MR. CANARTE:  Fiancee.

3          THE COURT:  Beyonce?

4          MR. CANARTE:  Yes.

5          THE COURT:  Perhaps someone else knows who

6    Beyonce is.  Who is Beyonce?

7          MS. CANARTE:  He said his fiancée.

8          THE COURT: Oh, your fiancée.

9          MR. CANARTE:  Yes.

10         THE COURT:  Okay.  And what is her name?

11         MR. CANARTE:  Amber Cleveland (phonetic sp.).

12         THE COURT:  Once again?

13         MR. CANARTE:  Amber Cleveland.

14         THE COURT:  Cleveland?

15         MR. CANARTE:  Cleveland.

16         THE COURT:  Any other questions for Mr. Canarte?

17         MR. MALONEY:  No, Your Honor.  What was that

18   address again?  I did not get that.

19         THE COURT: 103 Pheasant Watch, I believe it is,

20   in Yorktown.  And Mr. Canarte, do you have any questions

21   for anyone here?

22         MR. CANARTE:  No, sir.

23         THE COURT:  We're doing what we can to try to

24   make sure that this testing happens and I think that I'm

25   going to hold off on issuing orders for home studies and

18

jk

1   things like that until after the testing results come

2   back, but I would presume if the testing results come back

3   that you're the child's dad, then it sounds like you're

4   proposing to have custody of the child at the Yorktown

5   address.  Is that right?

6          MR. CANARTE:  Yes, sir.

7          THE COURT:  Okay, well we'll need to get -- do

8   you have a phone number there?

9          MR. CANARTE:  Not at this time, but there's a

10  mobile that you can get in touch with my fiancée.

11         THE COURT:  What's that number?

12         MR. CANARTE:  301-787 --

13         THE COURT:  787?

14         MR. CANARTE:  Yes.  0426.

15         THE COURT:  That's what I need to order the home

16  study, so I've got the information I need.  If it gets

17  down to that point, I can issue the order from chambers.

18         MR. CHU:  Your Honor, if I could just have the

19  Court inquire, is -- would Mr. Canarte have any

20  objections, even if the DNA comes back and confirms that

21  he's the father, assuming that that's the case, would he

22  have any objections to maintaining the current status quo

23  pending the -- his release to the halfway house or his

24  release from jail?

25         THE COURT:  Do you object, Mr. Canarte, to

1

1

2              UNITED STATES DISTRICT COURT

3          IN AND FOR THE DISTRICT OF COLUMBIA

4

5                                    ORIGINAL

6    - - - - - - - - - - - - - - - x

     GLADYS SUTTON              )Case No.

7        Plaintiff             )1:07cv1197

     vs.                        )

8    WASHINGTON METROPOLITAN AREA  )

     TRANSIT AUTHORITY          )

9        Defendant             )

     - - - - - - - - - - - - - - - x

10

11

12          Deposition of Lee H. Haller, M.D.

13                Potomac, Maryland

14            Thursday, March 20, 2008

15                  1:00 p.m.

16

17

18

19

20   Job No. 1-124764

21   Pages:  1-158

22   Reported by:  Bonnie Russo



EXHIBIT

7

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com

DEPOSITION OF LEE H. HALLER, M.D.
CONDUCTED ON THURSDAY, MARCH 20, 2008

23

1    training guidance and parental advice.  And, I

2    take it, then, that you do not intend to offer

3    any opinions on those topics in this case; is

4    that correct?

5        A.    Specific terms of damage loss of

6    parental nurture and care, to the extent I can

7    comment on those I will be certainly happy to

8    give you my thoughts about those.

9        Q.    Have you included those thoughts in

10   your report in this case?

11       A.    No, I have not.

12       Q.    Were you asked to do so?

13       A.    No, I was not.

14       Q.    Have you ever?

15       A.    I believe I was given the statute to

16   look at, but I have not been asked to

17   supplement my report.

18       Q.    Well, let me just ask this:  Has

19   Aubria suffered a loss of care as a result of

20   losing her mother?  Has she in the past and

21   will she in the future?

22       A.    Yes.

DEPOSITION OF LEE H. HALLER, M.D.
CONDUCTED ON THURSDAY, MARCH 20, 2008

24

1     Q.     To what extent?

2     A.     A hundred percent.

3     Q.     All right.  How much time did Angel

4   Walters spend with Aubria on an average daily

5   basis or weekly basis or monthly basis prior to

6   her death?

7     A.     I do not know that.  I can tell you

8   that I know that she was going to school and

9   working.  So that that would have taken a good

10  number of her waking hours.

11    Q.     Did Angel Walters drop off Aubria at

12  school prior to her death?  Did she drop her

13  off in the morning?

14    A.     I do not know.

15    Q.     Do you know if she picked her up in

16  the afternoon?

17    A.     I do not.

18    Q.     Do you know if she read with her at

19  home?

20    A.     I do not know.

21    Q.     Do you know if she did homework with

22  her at home?

DEPOSITION OF LEE H. HALLER, M.D.
CONDUCTED ON THURSDAY, MARCH 20, 2008

25

1      A.     I do not know.

2      Q.     Has Aubria suffered a loss of an

3  education both in the past and in the future as

4  a result of the death of her mother?

5      A.     She has suffered in that she is less

6  able to benefit from the educational services

7  that have been given to her.

8      Q.     Why is that?

9      A.     Because the loss of her mother and

10  her reaction thereto.  She was not functioning

11  as well in school for some time after the death

12  of her mother.

13      Q.     Does she continue to not function

14  well in school?

15      A.     I don't know.  Mrs. Sutton did

16  not -- said she did not want me to contact her

17  current teacher.

18      Q.     Do you know if she is in danger of

19  staying back for first grade and having to

20  repeat first grade?

21      A.     I seem to remember that's a

22  possibility.  It would not surprise me given

DEPOSITION OF LEE H. HALLER, M.D.
CONDUCTED ON THURSDAY, MARCH 20, 2008

28

1    Q.    And nobody has provided you any such

2    information?

3    A.    No.

4    Q.    Did you ever ask Ms. Gladys Sutton

5    any such questions?

6    A.    She said Aubria still cries

7    frequently.

8    Q.    That was during the interview that

9    you had with her?

10   A.    Yes.

11   Q.    Is that reflected in your interview

12   notes?

13   A.    Yes..

14   Q.    Would you agree that Aubria has

15   suffered a loss of training both in the past

16   and in the future that she otherwise would have

17   gotten from her mother as a result of the death

18   of her mother?

19   A.    She cannot benefit from training

20   from a person who doesn't exist.

21   Q.    Right.

22         But she has lost that benefit due to

DEPOSITION OF LEE H. HALLER, M.D.
CONDUCTED ON THURSDAY, MARCH 20, 2008

65

1          BY MR. MALONEY:

2          Q.     You said there's possible need of

3     treatment in the future?

4          A.     Yes.  If she -- as she becomes more

5     independent, if she begins to have more a

6     problem with dealing with her mother -- I'm

7     sorry, with her grandmother, Ms. Sutton, part

8     of her struggles towards independence may well

9     involve my life would be better if my mom were

10    here.  So at some point it may be that she

11    would need some kind of treatment to help her

12    over those hurdles.

13         Q.     Could it be the acting out of such,

14    you know, you're not my mother type thing?  You

15    know, you can't tell me what to do, you're not

16    my mother?

17         A.     Correct.

18         Q.     Do adoptive children have those

19    types of problems from time to time?

20         A.     Adopted children do have lots of

21    different kinds of problems related to being

22    adopted.

DEPOSITION OF LEE H. HALLER, M.D.
CONDUCTED ON THURSDAY, MARCH 20, 2008

69

1    the past, not often, but she has seen him.   So

2    that's my understanding and that's what I

3    believe to be the case.

4        A.    Okay.

5        Q.    So I will simply state that for the

6    record.  I don't know if you want to correct

7    your report or not.  But that's -- and maybe

8    you want to go back and look at the video and

9    you can satisfy yourself on that as well.

10            All right.  Did Aubria ever have

11   Post-Traumatic Stress Disorder?

12       A.    I think she might have qualified for

13   that diagnosis early on.

14       Q.    Assuming she did qualify for that

15   diagnosis early on, how long a period of time

16   did she have it?

17       A.    I don't know.  She was -- she was

18   improving -- let me go back because she -- I

19   can't -- I need to -- let me ask you to come

20   back to that question because I gave my

21   secretary my Post-Traumatic Stress Disorder

22   criteria to make copies and I would like to

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLADY SUTTON, As Mother and :
Next Kin of Deceased Daughter, :
ANGEL WALTERS, :
 :
   Plaintiff, :
 :
  v. : Case No.: 1:07cv1197 (JDB)
 :
WASHINGTON METROPOLITAN AREA :
TRANSPORTATION AUTHORITY, :
 :
   Defendant. :

**O R D E R**

UPON CONSIDERATION of Defendant's Motion *in Limine* to Preclude Plaintiff from

Playing or Introducing the 911 Emergency Communication Tape, and Plaintiff's Opposition thereto,

it is by this Honorable Court on this ___ day of _____, 2008

ORDERED, that Defendant's Motion be DENIED.


        _____
        Judge

cc: Paul J. Maloney, Esquire
  Kelly M. Lippincott, Esquire
  Carr Maloney P.C.
  1615 L Street, N.W., Suite 500
  Washington, D.C.  20036

  Frederic H. Schuster, Esquire
  David J. Shaffer, Esquire
  Associate General Counsel
  600 Fifth Street, N.W.
  Washington, D.C.  20001

1