IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GLADYS CLAUDETTE SUTTON | : |
| Plaintiff, | : |
| v. | : Case No. 07–1197 (JDB) |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY | : |
| Defendant. | : |

**DEFENDANT WMATA'S REPLY TO PLAINTIFF'S OPPOSITION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERTS JOSEPH H. ROSE AND DR. GERALD STALLER**

Plaintiff does not dispute that expert testimony based upon factual assumptions which constitute no more than "rampant speculation" is inadmissible. Joy v. Bell Helicopter, 999 F.2d 549, 568 (D.C. Cir. 1993). Plaintiff also does not dispute that 1) when decedent graduated high school in the Spring of 2003 her cumulative GPA was 1.62, her grades were mostly C's and D's, and she failed three classes; 2) that neither of her parents were high school graduates; 3) that she had been terminated from prior jobs at Giant[1] and Brighton Gardens for absenteeism and tardiness, and received a "below average" performance evaluation while employed at VMT Health Care, Inc.; 3) that at the time of her death on February

---

[1] Decedent a 21- year old adult was terminated from Giant in October of 2006, a mere 4 months prior to her death. She was not a pregnant teenager then, or on the date of her death. Opp. at 7. See Def.'s Exh. 3 at 3.

17, 2007, she had been enrolled in the University of the District of Columbia (UDC), an "open admissions" university, for only three weeks as a part-time night student; 4) that based upon pre-enrollment basic skills assessment tests in English and Math she was only enrolled in remedial courses in Reading Improvement, English Fundamentals, and Math; 5) that, even if she passed the three remedial courses,[2] she then would have to take additional remedial courses and pass them before even being permitted to take any college level courses, including pre-nursing courses;[3] 6) that decedent's merely indicating in her application form to UDC an interest in nursing and listing "Nursing (2-yr)" as her major did not guarantee admission to the Nursing Program; 7) that admission to the Nursing Program required a separate application, and nursing admission was very competitive; (8) that at the time of decedent's death, she had not been enrolled in any college level or nursing courses, had not been admitted to the Nursing Program, which is very focused on clinical practice, nor had she applied to or indicated in interest in the Licensed Practical Nurse (LPN) program; 9) that, before one can even apply for admission to UDC's four year Bachelor of Science in Nursing (BSN) program one has to first become a registered nurse (RN) by completing the two-year nursing program, pass a national licensure examination, and become Board certified; 10)

---

[2] Decedent was having difficulty with the remedial math course. See 11/13/07 Dep. of Gladys Sutton at 58, Def.'s Exh. 13.

[3] After decedent graduated high school, she enrolled in a six-month nursing related course at the SANZ School. However, she failed to complete that course. Id at 72-74.

that decedent had only been employed with Admiral Security in its lowest level position of security guard since October 10, 2006, a period of approximately 4 months before her death; 11) that the turnover rate for security guards at Admiral was 300% and decedent had not even received a first performance evaluation; 12) that according to decedent's supervisor at Admiral Security, Buddy Filsinger, it was mere speculation that decedent would have risen to the position of an account or portfolio manager earning $35,000 to $95,000 a year; and (13) that, according to Buddy Filsinger, decedent had told him her long-term ambition was in nursing, rather than security. Def.'s Motion at 1-7,10-11.

Plaintiff opposition argues that decedent had graduated high school in June 2003, expressed a desire to pursue a career in nursing in December of 2006, and met with UDC's School of Nursing Chair Person, Dr. Connie Webster,[4] would have been eligible to enroll in college level courses _if_ she passed her remedial courses, was working, and "maturing into a responsible and determined woman." This she contends provides a sufficient factual foundation for her experts and the jury to conclude she would have become a Registered Nurse (RN) and later received a Bachelor of Science in Nursing, earning the salaries commensurate with those positions. Rose and Staller's expert opinions are based upon insufficient factual assumptions and support, and constitute "rampant speculation."

---

[4] As Plaintiff notes, Dr. Webster merely assisted decedent in registering. Opp. at 4.

In her attempt to overcome the "rampant speculation" which serves as the bases of her experts' opinions, Plaintiff cites several cases which she argues justify denying WMATA's motion. In Athridge v. Iglesias, 950 F. Supp. 1187 (D.D.C. 1996), Plaintiff, pre-injury, was attending Gonzaga College High School, a college prep high school. Plaintiff's siblings were actively enrolled in professional degree programs (law and business) and the court was able therefore to consider the education of his family in determining the probability of reaching a certain educational level to determine he would have least obtained a college degree. On appeal, the District of Columbia Circuit granted Plaintiff's motion for summary affirmance , the Court noting that "appellant conceded all challenges to the district court's award of damages by failing to address the damage issue in his response to the motion for summary affirmance." Athridge v. Iglesias, 1997 U.S. App. LEXIS 19022 (D.C. Cir.). In Boyar v. Korean Airlines Co., LTD, 954 F.Supp. 4 (D.D.C. 1996) the court found the factual bases of Plaintiff's economist Thomas C. Borzilleri's opinions comprised a number of facts, that if proven, provided a reasonable basis for his opinions regarding decedent's future lost income from a medical practice. Decedent and his wife were killed in an airplane crash. Decedent Truppin was a physician with a long and established medical practice in New York. Over the years his practice expanded from a one office solo practitioner to two offices with four full-time physicians. His wife owned and operated a medical staffing business providing staffing to Dr. Truppin's practice. The couple also

owned a business which leased medical equipment to the practice. At the time of their deaths Dr. Truppin was leasing part of his office space to another physician not affiliated with the practice, and was planning to add additional physician staff after the lease expired, making it an eight physician staff. Decedents had also entered into loan agreements with Barclay's Bank to support the expansion, including renovated and modernizing office space and medical equipment. Two months before their deaths, decedents had renegotiated the loans to further expand the practice. In Croley v. Republican National Committee, 759 A.2d 682 (D.C. 2000), a personal injury action, the trial court vacated a jury award of $600,000 for Plaintiff's future economic loss. Plaintiff was self employed. Dr. Borzilleri projected future economic based upon two scenarios predicated on Plaintiff's age, the fact he had an M.B.A. from Harvard Business School, and statistical data relative to both Harvard MBA's and other basic information collected by the federal government concerning the earnings of males with a master's degree by age. Id. at 691. The Court of Appeals, reversing the trial court, affirmed the $600,000 verdict finding that, although the bases for Dr. Borzilleri's two opinions was deficient because it lacked an adequate factual basis, his testimony provided "detailed information concerning his methodology, and set forth assumptions predicated on federal and business documents" which the Court held provided ''some reasonable basis on which to estimate damages.'' This included evidence that the value of Plaintiff's future services would be $35,000 per year, and that two years prior to

his injury, he had $532,000 in contracts with EPA and George Washington University.

In each of the cases relied upon by Plaintiff, there was some reasonable evidentiary foundation supporting the expert's opinion regarding the projection of future economic loss. In this case, decedent graduated with a 1.62 GPA, waited three years after her high school graduation to apply to UDC, and had only been enrolled at UDC for three weeks, as a part-time student, taking only the first set of remedial Math and English courses. Other then indicating a naked desire to major in nursing in the future, she had not yet taken, or successfully passed a single college level or nursing course. Nor was she remotely qualified to apply for, or be accepted to the School of Nursing. The opinions of her experts is therefore based upon "rampant speculation."

It is noteworthy that Plaintiff has maintained throughout this litigation that decedent's aspirations were in nursing only, not in security. See Def.'s Exhibits 1, 2, and 9, at p. 20. However, instead of having their experts opine initially on the alternative scenario that if decedent did not become a nurse, she would have continued working as a security guard, they did not do so. Only after realizing that their experts' opinions were impermissibly speculative, did they belatedly in rebuttal expert statements cause plaintiffs experts to assume a new economic scenario based upon decedent's continued employment as a security guard. See Exhibit 12. "The principal objective of rebuttal is to permit a litigant to counter new, unforseen facts brought out in the other side's case." Faigen v. Kelly, 184 F.3d 67, 85 (1st.

6

Cir. 1999). "Ordinarily, rebuttal evidence may be introduced only to counter new facts presented in defendant's case in chief. (citations omitted). Such new facts might include 'surprise' evidence presented by the defendants. Permissible rebuttal evidence also includes evidence unavailable earlier through no fault of plaintiff." Allen v. Prince Georges County, Md., 737 F.2d 1200 (4th Cir. 1984). "A change in litigation strategy is not normally permitted on rebuttal." Id. at 1305. The new opinions are not proper "rebuttal," but merely a belated attempt to do what Plaintiff was required to do initially, but failed to do as part of her original expert filing.[5] Therefore, the calculations based upon the new assumption of decedent continuing to work and receive generous promotions as a security guard for Admiral Security should be stricken. Alternatively, WMATA submits that the opinions predicated on

---

[5] See Fed. R. Civ. P. 26 (e)(1) and 37(c)  Plaintiff's expert witnesses Mr. Rose and Dr. Staller were deposed on February 19, 2008 and February 22, 2008 respectively. Neither offered opinions on the alternate scenario of decedent's continued career and promotions in the security business. Plaintiff's Rule 26(a)(2) expert statements were filed on November 12, 2007 without any reference to such assumptions or calculations. Plaintiff's supplemental reports from Joseph Rose and Dr. Staller opining on this new scenario were provided to WMATA too late, on April 5, 2008 and April 14, 2008.

the decedent receiving promotions to management in the security business are impermissibly speculative.

                                        **Respectfully submitted,**

                                        _____/s/_____
                                        **Fredric H. Schuster, #385326**
                                        **Associate General Counsel**

                                        _____/s/_____
                                        **David J. Shaffer, #413484**
                                        **Assistant General Counsel**
                                        **600 Fifth St., N.W.**
                                        **Washington, D.C. 20001**
                                        **(202)-962-2560**
                                        **Counsel for Defendant  WMATA**

Capital Reporting Company

Page 1

IN THE SUPERIOR COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------:

GLADYS CLAUDETTE SUTTON,      :

    Plaintiff,               :

v.                            : Civil Action No.:

WASHINGTON METROPOLITAN       : 07:1197

AREA TRANSIT AUTHORITY,       :

    Defendant.               :

------------------------------:

                                  Washington, D.C.

                    Tuesday, November 13, 2007

Deposition of:

                GLADYS SUTTON

called for examination by counsel for Defendant, pursuant to notice, at Carr Maloney, PC, 1615 L Street, Northwest, Suite 500, Washington, D.C., before Gervel A. Watts of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 1:10 p.m., when were present on behalf of the respective parties:

DEFENDANT'S EXHIBIT 13

**Capital Reporting Company**

Page 58

1    Q    Can you give me a sense of from when to when
2 constituting nighttime classes?
3    A    When she did leave work, I'd say probably
4 about 5:00 in the evening until about 9:00 at night.
5    Q    And you believe that was about three or four
6 times a week?
7    A    Yes.
8    Q    Do you know what kind of courses she was
9 taking at that time?
10   A    I don't know exactly.  I know one of them
11 was math. I know she was taking a math course.  I
12 remember that because she was doing her homework at
13 night at the house and she was saying she was having a
14 little problem with it.
15   Q    The records show she was taking three
16 courses, three remedial courses.  One was for math, one
17 for English and one for writing and grammar.
18   A    Right.
19   Q    Did she have trouble in high school with
20 reading, math and grammar?
21   A    She never did complain about having any type
22 of difficulties that she needed some help with, you

Capital Reporting Company

Page 72

1  she was making payments and they came in afterwards and
2  I think that might have been -- can I take a look at
3  those for a second?
4         MR. SCHUSTER:    Sure.
5         MR. MALONEY:     I think in fairness to the
6  witness, some of these that you've looked at were after
7  her death and there was a notice placed and I asked that
8  anyone who had a claim, to make a claim, and as part of
9  the process for the personal representative and I think
10 some of these came from there and some of these are much
11 older and go back to a period of time and I think in
12 providing information to you, we simply provided these
13 without checking to see if in fact any of these have
14 been paid.  In any event, it is what it is.  You can
15 continue to answer the questions.
16 BY MR. SCHUSTER:
17     Q    Before your daughter's death, had she ever
18 discussed with you any of her finances?
19     A    Nope.
20     Q    Have you heard of something called the Sanz
21 School?
22     A    Yes.

Capital Reporting Company

Page 73

```
 1      Q      S-A-N-Z?
 2      A      Yes.
 3      Q      What was that and how did it relate to
 4   Angel?
 5      A      It's a nursing school.
 6      Q      Is that located in the District?
 7      A      I believe so.
 8      Q      What period of time did she attend the Sanz
 9   school?
10      A      When she graduated from high school.
11      Q      How long of a course is it?
12      A      I believe it was a six-month course.
13      Q      Because in the tax form they sent, it says,
14   "Tuition: $50."
15      A      I believe she was paying the bill.  I
16   believe that's what she was paying.  I don't know how
17   much she was giving them.
18      Q      And you believe that she completed that
19   course?
20      A      No, she didn't complete the course.
21      Q      It was a six-month course but she didn't
22   complete it.
```

```
 1      A     No.
 2      Q     Do you know why she stopped taking the
 3 course?
 4      A     Well, I really don't know exactly.  I
 5 remember that course, but I can't say right now why
 6 exactly.
 7      Q     Did you or Angel's grandmother or any of her
 8 aunts, uncles, brothers and sisters, did any of them
 9 financially support Angel, other than the childcare that
10 you mentioned that yourself and her grandmother were
11 involved?
12      A     When you say support, support how?
13      Q     Give money to her.
14      A     They did, but it was just a common
15 relationship.
16      Q     Did Angel have a cell phone?
17      A     Yes.
18      Q     Do you know what service that was with?
19      A     It was Sprint, I believe.
20      Q     Do you know her cell phone number?
21      A     Not no more.
22      Q     Would that still be on your cell phone?
```