# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GLADYS CLAUDETTE SUTTON, Individually , and as Personal Representative of the Estate and Next of Kin of ANGEL CLAUDETTE WALTERS, Deceased,<br><br>    Plaintiff,<br><br>v.<br><br>WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 07-01197 (JDB) |

## DEFENDANT WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

Defendant Washington Metropolitan Area Transit Authority (hereinafter referred to as "WMATA") by and through undersigned counsel respectfully moves this Honorable Court, pursuant to Fed. R. Civ. P. 56 and LCvR 56.1, to enter judgment in favor of the defendant against the plaintiff for the reasons set forth in the attached Statement of Material Facts As To Which There Is No Genuine Issue and Memorandum of Points and Authorities.

Respectfully submitted,

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY**

**Mark F. Sullivan
Deputy General Counsel**

_____/s/_____
**Fredric H. Schuster, #385326**

**Associate General Counsel**
**(202) 962-2560**
**rschuster@wmata.com**

_____/s/_____
**David J. Shaffer #413484**
**Assistant General Counsel**
**(202) 962-2820**
**dshaffer@wmata.com**
**600 Fifth St., N.W.**
**Washington, D.C. 20001**

**Attorneys for Defendant**
**WMATA**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 14th day of July 2008, a true copy of the

foregoing Motion for Summary Judgment, Memorandum of Points and Authorities,

Exhibits, and proposed order was electronically served on Paul J. Maloney and Kelly M.

Lippincott, Carr Maloney, P.C., 1615  L Street, N.W.,Suite 500, Washington, D.C.,

20036-5652, counsel for Plaintiff.

_____/s/_____
**Fredric H. Schuster**

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GLADYS CLAUDETTE SUTTON, Individually , and as Personal Representative of the Estate and Next of Kin of ANGEL CLAUDETTE WALTERS, Deceased, <br><br> Plaintiff, <br><br> v. <br><br> WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> No. 07-01197 (JDB) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S WMATA'S MOTION FOR SUMMARY JUDGMENT

### I. FACTS[1]

On February 17, 2007, at approximately 11:09  p.m., Angel Walters (hereinafter "decedent") was a pedestrian struck and killed a WMATA bus in the travel lane of eastbound Congress Street, S.E. (in the 1300 block), Washington, D.C.  SMF 1.  Prior to the accident, decedent had spent the day shopping with her girlfriends and then 5 year old daughter Aubria in order to furnish her new apartment which was directly across the street from where she was struck and killed. Her intention was to cross to her residence. SMF 2.  Upon arrival at the1300 block of Congress Street, S.E., where decedent lived, she exited the left rear driver's side passenger door of  the Cadillac

---

[1]Record references supporting this statement of facts are contained in Defendant WMATA's Statement of Material Facts As To Which There Is No Genuine Issue.

Escalade in which she had been a passenger. The driver of the Escalade parked the vehicle in such a manner that its right rear was 2.5 feet from the right side curb. SMF 3. This resulted in the left rear driver's side of the vehicle being closer to the travel lane than it would normally be had the vehicle been parked closer to the curb.

Prior to the collision, decedent was a pedestrian standing in the travel lane of eastbound Congress Street, S.E., for a little over 5.33 seconds. She was standing 2-3 feet from the left rear side of the Escalade. She was not in a crosswalk. Her intention was to cross the street to bring the furnishings she had purchased that day to her new apartment. SMF 4. Decedent had no problems with hearing or sight, and was not disabled in any manner. SMF 5. WMATA's bus was 40 feet long, well lit, and had a diesel engine. Diesel engines are louder than normal automobile engines. SMF 6.

Decedent must have observed the bus approaching her from the left. As Plaintiff's accident reconstruction expert David Plant stated, "Ms. Walters could have seen the bus. Certainly." SMF 7. During the 5.33 seconds decedent was standing in the travel lane of Congress Street, S.E. before being struck by the bus, she took no evasive action to remove herself from the path of the bus. She did not retreat behind the Escalade, or otherwise move out of the buses path. SMF 8. In order to avoid being struck by the bus, decedent only had to move a "couple of feet." She could move 4-5 feet in one second. SMF 9. Decedent was facing the direction of the bus as it approached and at the time of the collision. SMF 10. The posted speed limit for Congress Street, S.E. was 25 miles per hour. At the time the bus struck decedent, it was traveling 15-20 miles per hour. SMF 11.

-2-

## II. ARGUMENT

**A.    PLAINTIFF WAS CONTRIBUTORILY NEGLIGENT IN VIOLATING 18 D.C.M.R. VEHICLES AND TRAFFIC § 2304.2.**

"The traffic laws of the District of Columbia and the decisions of this court impose on a pedestrian crossing a street in the middle of a block the duty of looking to avoid being hit." Roberts v. Capital Transit Co., 131 F.2d 871, 872 (D.C. Cir. 1942); District of Columbia v. Robinson, 644 A.2d 1004, n.1 (D.C. 1994).  In the District of Columbia, "[e]ach pedestrian crossing a roadway at any place other than within a marked crosswalk, or within an unmarked crosswalk at an intersection, shall yield the right-of-way to all vehicles upon the roadway." 18 D.C.M.R.  Vehicles and Traffic §2304.2 . Yielding the right-of-way requires that a pedestrian look carefully in the direction from which she may anticipate the approach of vehicles immediately before venturing into the pathway of traffic.  Law  v. Virginia Stage Lines, Inc., 444 F.2d 990, 993-994 (D.C. Cir. 1971). In that defendant's bus possessed the right-of-way, defendant's bus operator had a right to assume that plaintiff-decedent would obey the law and yield to him the right-of-way, including moving out of the way.  Scott v. Wilson, 77 A.2d 321, 322 (D.C. 1950); Lewis v. Shiffers, 67 A.2d 269, 271 (D.C. 1949).

It is undisputed that at the time decedent was struck by the bus she was intending to cross Congress Street in order to reach her apartment directly across the street, and that she had a clear view of the bus as it approached her from the left. As plaintiff's own accident reconstruction expert David Plant has testified:

> Q. In the same vein, with the visibility being as you just stated, would there have been anything that would have prevented Ms. Walters from having the same visibility of the bus?

-3-

A.  Ms. Walters could have seen the bus. Certainly.

Plant Dep. at 48.

Q.  She should be able to pretty much see the same distance as the bus operator as the bus is approaching the Escalade, the same sight or visibility distance that he could see. She should equally be able to see looking down the street to her left, shouldn't she?

A.  Yes.

Id. at 88.

It is undisputed that decedent: had no vision, hearing, or other physical

disabilities; was stopped standing in the travel portion of eastbound Congress Street 2-

3 feet from the left side of parked Escalade for in excess of 5.33 seconds prior

to being struck by the 40 foot, well lit, diesel engine bus;  and took no evasive action of

any kind to remove herself from the path of oncoming bus.

Q.  Are you aware of any evasive action that decedent took as she was standing in the street prior to impact to move out of the way of the path of the bus?

A.  I haven't seen anything in the video that would suggest that she's moving at the time just before the accident occurs.

Q.  You limited your answer to the video, of course, in your response. Had you had any other information, evidence from documents, from speaking to anyone that would indicate that the decedent , from the time she stopped in the street up to the time that she was struck by the bus that she made any movement or took any evasive action whatsoever?

A.  I haven't seen any testimony that described any movement on her part.

Id. at 87.

Moreover, Plaintiff acknowledges that decedent would have only had to move

a couple of feet in order to remove herself from the bus's path and could have

moved 4-5 feet in one seconds time.

Q. Do you have an opinion as to how far she would've had to move in order to remove herself away from the path of the bus?

A. No. It would have to be several feet. I don't even have an exact location on the front of the bus where she makes contact. It was right front, but exactly where, I don't know. I can say that its certainly a couple of feet.

Q. And she could've easily stepped back, right?

A. It may take more than one step, maybe a couple of steps.

Q. Okay. How many seconds would that be?

A. You can say taking a four or five foot per second speed, you know, whatever the distance, you divide it by that.

Id. at 89. There is no evidence, nor can Plaintiff explain why decedent failed to yield the right-of- way to the bus by stepping out of its path.

An "unexplained" violation of a traffic regulation enacted to prevent the type of accident that occurred constitutes negligence *per se*. Perkinson v. Gilbert/Robinson, Inc., 821 F.2d 686, 692 (D.C. Cir. 1987; Burns v. WMATA, 114 F.3d 219, 223 (D.C. Cir. 1997), and Robinson v. District of Columbia, 580 A.2d 1255 (D.C.1990) ("Robinson I").

### B.    THE DOCTRINE OF LAST CLEAR CHANCE DOES NOT APPLY TO THE FACTS OF THIS CASE

Because decedent's contributory negligence is a complete bar to Plaintiff's recovery, she will seek recovery under the doctrine of "last clear chance." Last clear chance is not available in this case. A plaintiff (decedent) who is otherwise barred by her own contributory negligence, may still recover if she can demonstrate by a preponderance of the evidence that: (1) plaintiff (decedent) was in a position of danger caused by the negligence of both plaintiff (decedent) and defendant; (2) that the plaintiff (decedent) was oblivious of the danger or unable to extricate herself from the position

of danger; (3) that defendant was aware, or by the exercise of reasonable care should have been aware of the plaintiff's (decedent)'s danger and obliviousness or inability to extricate herself from danger; and (4) the defendant with means available to him was by the exercise of reasonable care able to avoid striking plaintiff (decedent) after he became aware of the latter's danger and inability to extricate herself from danger, and failed to do so. Queen v. WMATA, 842 F. 2d 476, 481 (D.C. Cir.1988); Robinson, 580 A. 2d at 1258; District of Columbia v. Robinson, 644 A.2d 1004, 1005 (D.C. App. 1994). ("Robinson II").

The burden is on the plaintiff to present evidence on all four elements  before a last clear chance instruction may be given. District of Columbia v. Huysman, 650 A.2d 1323, 1326 (D.C. 1994); Felton v. Wagner, 512 A.2d 291, 296 (D.C. 1986). Plaintiff cannot prove, nor is there any evidence to support that decedent was oblivious of  the oncoming bus, or that she was unable to extricate herself from the position of danger as is required under element (2) of the last clear chance doctrine. Queen, 842 F.2d at 481. On the contrary, decedent had an unobstructed view of the 40- foot, well lit, diesel engine bus approaching from her left for at least 5.3 seconds, and was therefore not oblivious to the danger of remaining standing in the travel portion of the road. Additionally, she had at least 5.3 seconds to move from the bus path by moving backwards, retreating to behind the Escalade, or otherwise out of the bus' way. Plaintiff only had to move a couple of feet and had the ability to do so. She could move 4-5 feet in one second. Plaintiff therefore cannot prove decedent was unable to extricate herself from the position of danger.

Moreover, even assuming *arguendo* that decedent was somehow oblivious to

the danger of the oncoming bus, last clear chance still does not apply.  In <u>Robinson II</u>,

the District of Columbia Court of Appeals discussed the common sense principle of

"concurrent negligence," as an exception to the doctrine of last clear chance, as it

applies to a defendant who never actually becomes aware of the plaintiff's perilous

condition in time to avert the accident.  <u>Robinson</u>, 644 A.2d 1005-1006.   The appellate

court explained:

> In another group of cases, the plaintiff's situation is
> not one of true helplessness, and he is still in a position to
> escape, but his negligence consists in failure to pay
> attention to his surroundings and discover his own peril.

> * * * * *

> [In such a case, if] the defendant does not discover
> the plaintiff's situation, but merely might do so by proper
> vigilance, it is obvious that neither party can be said to have
> a "last clear" chance.  The plaintiff is still in a position to
> escape, and his lack of attention continues up to the point of
> the accident, without the interval of superior opportunity
> which has been considered so important.  The plaintiff may
> not reasonably demand of the defendant greater care for his
> own protection than that which he exercises himself.
> Accordingly, the nearly universal rule is that there can be no
> recovery.

<u>Id.</u> at 1006 quoting Prosser & Keeton, <u>The Law of Torts</u>, §66, at 466-67 (5th ed. 1984)

and noting 4 Harper, James, and Gray, <u>The Law of Torts</u>, §22.13, at 369 (2d ed. 1986)

("Where both plaintiff and defendant are negligently unaware of the impending peril but

plaintiff could have saved himself as long as defendant could have saved him, most

American courts and the American Law Institute rule out last clear chance.")

Therefore, as between decedent and the defendant's bus operator, decedent

may not reasonably demand of the defendant greater care for decedent's own

the danger of the oncoming bus, last clear chance still does not apply.  In <u>Robinson II</u>,

the District of Columbia Court of Appeals discussed the common sense principle of

"concurrent negligence," as an exception to the doctrine of last clear chance, as it

applies to a defendant who never actually becomes aware of the plaintiff's perilous

condition in time to avert the accident.  <u>Robinson</u>, 644 A.2d 1005-1006.   The appellate

court explained:

> In another group of cases, the plaintiff's situation is
> not one of true helplessness, and he is still in a position to
> escape, but his negligence consists in failure to pay
> attention to his surroundings and discover his own peril.
>
> * * * * *
>
> [In such a case, if] the defendant does not discover
> the plaintiff's situation, but merely might do so by proper
> vigilance, it is obvious that neither party can be said to have
> a "last clear" chance.  The plaintiff is still in a position to
> escape, and his lack of attention continues up to the point of
> the accident, without the interval of superior opportunity
> which has been considered so important.  The plaintiff may
> not reasonably demand of the defendant greater care for his
> own protection than that which he exercises himself.
> Accordingly, the nearly universal rule is that there can be no
> recovery.

<u>Id.</u> at 1006 quoting Prosser & Keeton, <u>The Law of Torts </u>, §66, at 466-67 (5th ed. 1984)

and noting 4 Harper, James, and Gray, <u>The Law of Torts</u>, §22.13, at 369 (2d ed. 1986)

("Where both plaintiff and defendant are negligently unaware of the impending peril but

plaintiff could have saved himself as long as defendant could have saved him, most

American courts and the American Law Institute rule out last clear chance.")

Therefore, as between decedent and the defendant's bus operator, decedent

may not reasonably demand of the defendant greater care for decedent's own

protection than that which she should have exercised herself.

## IV. <u>CONCLUSION</u>

Based on the foregoing, defendant Washington Metropolitan Area Transit

Authority requests this Court to enter judgment in its favor against the plaintiff Gladys

Claudette Sutton pursuant to Fed. R. Civ. P. 56.

**Respectfully submitted,**

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY**

**Mark F. Sullivan
Deputy General Counsel**

_____/s/_____
**Fredric H. Schuster, #385326
Associate General Counsel
(202) 962-2560
rschuster@wmata.com**

_____/s/_____
**David J. Shaffer #413484
Assistant General Counsel
(202) 962-2820
dshaffer@wmata.com
600 Fifth St., N.W.
Washington, D.C. 20001**

**Attorneys for Defendant
WMATA**

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GLADYS CLAUDETTE SUTTON,**<br>**Individually , and as Personal**<br>**Representative of the Estate and**<br>**Next of Kin of**<br>**ANGEL CLAUDETTE WALTERS,**<br>**Deceased,**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**WASHINGTON METROPOLITAN**<br>**AREA TRANSIT AUTHORITY,**<br><br>      **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **No. 07-01197 (JDB)**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Defendant Washington Metropolitan Area Transit Authority (hereinafter referred to as "WMATA") pursuant to Fed. R. Civ. P. 56 and LCvR 56.1 submits the following Statement of Material Facts upon Which There Is No Genuine Issue:

1.    On February 17, 2007, at approximately 11:09 p.m., Angel Walters (hereinafter referred to as decedent) was a pedestrian struck and killed by defendant WMATA's bus in the travel lane of eastbound Congress Street, S.E. (in the 1300 block), Washington, D.C.  Plaintiff's Complaint.

2.    Prior to the accident, decedent had spent the day shopping with her friends and 5- year old daughter in order to furnish her new apartment which was directly across the street from where she was struck and killed. Prior to arriving home, decedent and her friends and daughter had dinner at a restaurant. Decedent and her friends also drank several alcoholic beverages.  Nov. 14, 2007 Dep. of  Latitia Kirkland

at 38-51, 55-61; Oct. 16, 2007 Dep. of Quintenette Ramseur at 16-23,27-30; Nov. 16, 2007 Dep. of Garnisha Valentine at 84 -112; and Dec. 14, 2007 David Plant Dep. at 57-58.

3.    Upon arrival at the 1300 block of Congress Street, S.E., where decedent lived, she exited the left rear, driver's side passenger door of the Cadillac Escalade in which she was a passenger. The driver of the Escalade parked the vehicle in such a manner that the right rear of the Escalade was 2.5 feet from the right-side curb. 12/14/07 Plant Dep. at 52-54, 57. This resulted in the left rear driver's side of the car being closer to the travel lane of the street than it would normally be had the vehicle been parked closer to the curb.

4.    Prior to the collision, decedent was a pedestrian standing in the travel lane of eastbound Congress Street, S.E., for approximately 5.33 seconds. She was standing 2-3 feet from the left rear side of the Escalade, within the eastbound traffic portion of roadway. She was not in a crosswalk. Her new apartment was directly across the street and she was intending to cross the street to go to her new apartment.  David Plant Nov. 9, 2007, Report at 6, 8. Dec. 14, 2007 Plant Dep. at 57-58,79.

5.    Decedent had no problems with her hearing or sight, and was not disabled. Dec. 17, 2007 David Plant Dep. at 58, Nov. 13, 2007 Gladys Sutton Dep. at 33.

6.    WMATA's bus was 40 - feet long, well lit, and had a diesel engine. Diesel engines are louder than normal automobile engines. Nov. 16, 2007 Garnisha Valentine Dep. at 137, Nov. 14, 2007 Dep. of Latitia Kirkland at 78-80, David Plant Dec. 14, 2007 Dep. at 85.

2

7.    Decedent was able to observe the bus approaching from her left as she stood in the roadway. 12/14/07 David Plant Dep. at 48, 88-90. "Ms. Walters could have seen the bus. Certainly." Will Partenheimer Mar. 7, 2008 Dep. at 72-73.

8.    During the 5.33 seconds decedent was standing in the travel lane of Congress Street, S.E. before being struck by the bus, she took no evasive action to remove herself from the path of the bus by stepping backward to a location to the side or rear of the Escalade. There was no impediment to stepping backwards. Dec. 14, 2007 David Plant Dep. at 86-90. Will Partenheimer Mar. 7, 2008 Dep. at 73. Feb. 4, 2008 Will Partenheimer/Stephen B. Chewning Report at 8.

9.    In order to avoid being struck by the bus, decedent had to move a "couple of feet." She could have moved  4-5 feet within one second, and could have stepped out of the travel portion of the roadway. Dec.14, 2007 David Plant Dep. at 89.

10.    Decedent was facing the direction of the bus at the time of the collision. Wojcik Nov. 5, 2007 Report at 4.  David Plant November 7, 2007 Accident Re-Enactment photographs, Exh. 9, photos 4 &5 showing exemplar decedent facing oncoming bus.

11.    The posted speed limit for Congress Street, S.E. was 25 miles per hour. At the time the bus struck decedent, it was traveling 15-20 miles per hour.  Plant Nov. 9, 2007 Report at 8.

12.     At the time of accident, decedent, who was Afro-American, was wearing a black coat, gray tee shirt, blue jeans, bluish-gray sneakers, multi-pastel color scarf, and lavender winter wool knit cap. The Escalade she was standing adjacent to in the roadway was black.  There was white snow on the ground. The shopping bags

3

decedent had were also white. Plaintiff's autopsy photographs of decedent's clothing.

Post-accent scene photographs.

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY**

**Mark F. Sullivan
Deputy General Counsel**

_____/s/_____
**Fredric H. Schuster, #385326
Associate General Counsel
(202) 962-2560
rschuster@wmata.com**

_____/s/_____
**David J. Shaffer #413484
Assistant General Counsel
(202) 962-2820
dshaffer@wmata.com
600 Fifth St., N.W.
Washington, D.C. 20001**

**Attorneys for Defendant
WMATA**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of July 2008 true copy of the foregoing

Statement of Material Facts As To Which There Is No Genuine Issue was

electronically served on Paul J. Maloney and Kelly M. Lippincott, Carr Maloney, P.C.,

1615  L Street, N.W.,Suite 500, Washington, D.C., 20036-5652.

_____/s/_____
**Fredric H. Schuster**

4

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **GLADYS CLAUDETTE SUTTON, Individual , and as Personal Representative of the Estate and Next of Kin of ANGEL CLAUDETTE WALTERS, Deceased,** )<br>)<br>)<br>)<br>)<br>)<br>) | |
| **Plaintiff,** ) | **No. 07-01197 (JDB)** |
| )<br>**v.** )<br>) | |
| **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,** )<br>)<br>) | |
| **Defendant.** )<br>) | |

## DEFENDANT WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT EXHIBIT LIST

Exhibit 1. 11/14/07 Excerpts Deposition of Latitia Kirkland.

Exhibit 2. 10/1606 Excerpts Deposition of Quintenette Ramseur.

Exhibit 3.  11/16/06 Excerpts Deposition of Garnisha Valentine.

Exhibit 4.  11/13/05 Excerpt Deposition of Gladys Sutton.

Exhibit 5.  12/14/07 Excerpts Deposition of David Plant.

Exhibit 6.  11/9/07 Excerpt David Plant Expert Report.

Exhibit 7.  11/5/05 Excerpt Laura Wojcik Expert Report.

Exhibit 8.  3/07/08 Excerpt Will Partenheimer  Deposition.

Exhibit 9.   2/04/08 Excerpt Will Partenheimer Expert Report.

Exhibit 10.    11/07/08 David Plant Accident Re-Enactment Photos.

Respectfully submitted,

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY**

**Mark F. Sullivan
Deputy General Counsel**

_____/s/_____
**Fredric H. Schuster, #385326
Associate General Counsel
(202) 962-2560
rschuster@wmata.com**

_____/s/_____
**David J. Shaffer #413484
Assistant General Counsel
(202) 962-2820
dshaffer@wmata.com
600 Fifth St., N.W.
Washington, D.C. 20001**

**Attorneys for Defendant
WMATA**

-2-

Page 1

IN THE SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA

-----------------------------------:
GLADYS CLAUDETTE SUTTON,          :
                                   :
          Plaintiff                :
                                   :
     vs.                           :   07:1197 (JBD)
                                   :
WMATA,                             :   ORIGINAL
                                   :
                                   :
          Defendant                :
-----------------------------------:

Washington, D.C.

Wednesday, November 14, 2007

Deposition of:

    LATITIA KIRKLAND

called for oral examination by counsel for

Defendant, pursuant to notice, at 1615 L Street,

N.W., Suite 500, transcribed by Monica A.

Voorhees, of Capital Reporting, RPR/CSR, a Notary

Public in and for the District of Columbia,

beginning at 10:02 a.m., when were present on behalf

of the respective parties:

DEFENDANT'S
EXHIBIT
1

**Capital Reporting Company**

Page 38

```
 1       Q.      And you and Ms. Ramser basically on the

 2  same level --

 3       A.      Right.

 4       Q.      -- as far as the contact?

 5       A.      Right.

 6       Q.      Okay, got it.

 7               When did you first see Angel the day of

 8  the 17th, the day of the tragic accident?

 9       A.      When did I first see her?

10       Q.      Right.

11       A.      At her apartment.

12       Q.      Okay.  And so right now we're talking

13  about the day of the accident, so --

14       A.      Okay.

15       Q.      Just so we're both on the same

16  wavelength, okay.

17       A.      Okay.

18       Q.      Did you drive over there?

19       A.      Yes.

20       Q.      Okay.  Who did you drive over there

21  with?

22       A.      No one.
```

**Capital Reporting Company**

Page 39

```
 1       Q.      Okay.  And the reason for driving over
 2   there?
 3       A.      So we can go shopping.
 4       Q.      Okay.  And what was your intention at
 5   that time of going shopping, where, for what?
 6       A.      Wal-Mart for stuff for the apartment.
 7       Q.      Okay.  And what time did you go to
 8   Wal-Mart?
 9       A.      It was in the afternoon, I believe, not
10   quite sure of the time.
11       Q.      Well was there any, when you went there,
12   you went there in the morning?
13       A.      Not sure if it was the morning or early
14   afternoon.
15       Q.      Well did you go, did you go shopping
16   early with Angel that morning to purchase a
17   mattress?
18       A.      No.
19       Q.      Okay.  So when you, when you speak about
20   going shopping at Wal-Mart, was that the later
21   shopping spree when all the girls went together?
22       A.      Yes.
```

**Capital Reporting Company**

Page 40

1      Q.      Okay, you, Ms. Ramser and Ms. Valentine

2   and Angel?

3      A.      Yes.

4      Q.      Okay.  Were you involved in the earlier

5   shopping --

6      A.      No.

7      Q.      -- with Angel and I think Ms. Valentine,

8   if I'm not mistaken?

9      A.      No, I wasn't.

10     Q.      Because there was some testimony from

11  your cousin that apparently they did some shopping

12  for some, a mattress I think for Aubria or Aubria's

13  room --

14     A.      Right.

15     Q.      -- and some paint, I believe, so a

16  painter could, you know, paint the inside of the

17  house, do you know anything about that?

18     A.      I know about it but I wasn't with them.

19     Q.      Okay.  So after they come back, you at

20  some later time come over the house?

21     A.      Yes.

22     Q.      And who's at the house at the time you

**Capital Reporting Company**

Page 41

1    arrived?

2         A.       The painter.

3         Q.       The painter, okay, did you know the

4    painter?

5         A.       No.

6         Q.       Okay, was he actually painting?

7         A.       Yeah.

8         Q.       Good, doing a good job?

9         A.       Yes.

10        Q.       Had he put up the mattress, the bed yet?

11                 Did you see a bed that had been

12   purchased?

13        A.       I helped them bring it in the house.

14   No, it wasn't up then.

15        Q.       Okay.  When you arrived, other than the

16   painter, who else was there?

17        A.       No one was there, no one, just the

18   painter.

19        Q.       All right, so you were there alone with

20   the painter at that point?

21        A.       I didn't go into the apartment with him,

22   I knew he was there.  I was sitting outside in my

**Capital Reporting Company**

Page 42

1    truck waiting for Garnisha and Angel to come back.

2        Q.    Okay, I'm corrected, okay.

3              So you were just waiting for them to

4    return?

5        A.    Yes.

6        Q.    Okay.  And then they subsequently

7    return, how long do you stay at the house before you

8    then go out?

9        A.    Before we went shopping?

10       Q.    Right.

11       A.    Around 30 minutes.

12       Q.    30 minutes, okay.

13             All right, so then you leave Angel's

14   home?

15       A.    Uh-huh.

16       Q.    You were driving?

17       A.    Yes.

18       Q.    And now what kind of vehicle do you

19   have?

20       A.    A 1999 Cadillac Escalade.

21       Q.    Okay.  Is that an automatic or a manual?

22       A.    Automatic.

**Capital Reporting Company**

Page 43

1    Q.    Okay.  Once, once you left, and I assume

2    since it's your car you were driving?

3    A.    Yes.

4    Q.    Who was sitting, when you left Angel's

5    house, who was sitting to your immediate right in

6    the front seat?

7    A.    Garnisha.

8    Q.    Okay, your cousin, right?

9    A.    Yes.

10    Q.    Who was seating -- sitting directly

11    behind Garnisha in the back seat?

12    A.    I believe it was Aubria.

13    Q.    Okay, against the door?

14    A.    I'm not sure.

15    Q.    I say that because she's five years old.

16    A.    Right.

17    Q.    The seat directly behind your cousin in

18    the back?

19    A.    I'm trying to picture it.

20    Q.    All right, close your eyes.

21    A.    I'm not sure if she was sitting by the

22    door, but I know she was in the back.

**Capital Reporting Company**

Page 44

| 1 | Q. | Okay. And where was Ms. Ramser sitting? |
|---|----|-----|

1    Q.    Okay. And where was Ms. Ramser sitting?

2    A.    She wasn't in the vehicle yet.

3    Q.    Okay, where was she?

4    A.    She was at home.

5    Q.    Okay, she was at home, okay.

6        And then what about Angel?

7    A.    She was behind me, sitting behind me.

8    Q.    Okay. She was on the left driver's side

9 directly behind you?

10    A.    Yes.

11    Q.    Okay. Did you wait for Ms. Ramser?

12    A.    No, we went to pick her up.

13    Q.    Oh, you went to pick her up, okay.

14        And how far was her house or home?

15    A.    Well we had to go get her from, she was

16 actually at her brother's house at that particular

17 time, so we had to ride out to Forestville to pick

18 her up.

19    Q.    Okay. All right. So you went and then

20 went to Forestville to pick Quinette up.

21    A.    Uh-huh.

22    Q.    Where did she sit in the car?

Page 45

1       A.      Behind Garnisha.

2       Q.      Okay, and would that have put the five

3    year old, Aubria, between her mother and Ms. Ramser,

4    right?

5       A.      Yes.

6       Q.      In the middle?

7       A.      Yes.

8       Q.      Okay.  All right, so once you picked

9    Ms. Ramser up, where did you directly go?

10       A.      We went to Bowie to the Wal-Mart.

11       Q.      Okay.  And the purpose of going to Bowie

12    was to purchase articles for furnishing

13    Ms. Valentine's and Angel's apartments?

14       A.      No, Angel and Quinette's apartment.

15       Q.      Okay, thank you.

16               All right, so you went to Wal-Mart.

17    Before you went to Wal-Mart, after you picked

18    Ms. Ramser up, did you stop anyplace to eat?

19       A.      No.

20       Q.      Okay.  So you went to Wal-Mart.

21               How long were you at Wal-Mart?

22       A.      Some hours.  Probably a good two to

Page 46

1    three hours, I'm not sure.

2         Q.    Give me a sense what time it was then

3    that you finally left?

4         A.    It was still day time when we got there,

5    it was getting a little dark when we left, so.

6         Q.    Okay.  Are we talking about 5 or 6:00 or

7    something, by the time you left?

8         A.    I guess.  I'm not sure of the exact

9    times.

10        Q.    Okay.  Did any of you have anything to

11   eat while you were at Wal-Mart?

12        A.    No.

13        Q.    Okay.  Was Aubria just walking with you

14   all or was she being carried or was she in a

15   stroller or whatever the case may be?

16        A.    She was walking.

17        Q.    Okay.  And what kind of, what items were

18   purchased at Wal-Mart?

19        A.    There was a lot of items purchased,

20   trash cans, sheets, bathroom things, kitchen things,

21   it was a lot of stuff purchased.

22        Q.    Okay.  Other than Angel purchasing

Page 47

1     things for her own new apartment on Congress Street,

2     did any other of you purchase things for her

3     apartment, either as a gift or, you know, or a

4     welcoming?

5          A.     I know I didn't.  I'm not sure if

6     anybody else did.

7          Q.     Okay.  And do you remember a purchase of

8     a kitchen garbage can?

9          A.     Yes.

10          Q.     Okay.  And that was in like a box,

11     right?

12          A.     Yes.

13          Q.     One of those ones that you step on the

14     bottom and the top flips up?

15          A.     Yes.

16          Q.     And what about a lamp?

17          A.     Yes.

18          Q.     A base and a pole and that was in a box,

19     also?

20          A.     Yes.

21          Q.     Can you think of anything else that

22     Angel purchased?

Page 48

1      A.      I know she got some stuff for her

2  bathroom because I helped her pick out her bathroom

3  stuff, like the shower curtains and little, like the

4  things you hold your toothbrushes in, soaps and

5  stuff in.

6      Q.      And were they all in bags?

7      A.      Yes.

8      Q.      So how many items did Angel

9  approximately have between the garbage can, the

10 light, the, you know, the lamp and the --

11     A.      I don't know.  It was a lot of stuff, so

12 I'm not sure.

13           COURT REPORTER:  It was a what?

14           THE WITNESS:  It was a lot of stuff, so

15 I'm not sure.

16           BY MR. SCHUSTER:

17     Q.      All right, once you, once you left the

18 Wal-Mart, where did you go then?

19     A.      We went to Lowe's.

20     Q.      Went to Lowe's, okay.

21           And how far is Lowe's from Wal-Mart?

22     A.      About a 5-, 10-minute ride around the

**Capital Reporting Company**

Page 49

1    corner.

2        Q.      Okay, I assume it was dark out by then?

3        A.      Yes.

4        Q.      Okay.  Do you have any sense about what

5    time it was?

6        A.      No.

7        Q.      Okay.  What did you, what was purchased

8    at Lowe's?

9        A.      Garnisha got some tile for her bathroom

10   floors and Angel bought her a broom or a mop, a

11   broom, a broom.

12       Q.      For her apartment?

13       A.      Yes.

14       Q.      Okay.  Anything else?

15       A.      Not that I can remember.

16       Q.      Okay.  By that time had you stopped for

17   anything to eat?

18       A.      We was on our way to get something to

19   eat after we left Lowe's.

20       Q.      Okay.  And where did you first attempt

21   to eat?

22       A.      Friday's.

Page 50

1      Q.      Okay.  This was a Saturday night, so,

2  did you eat at Friday's?

3      A.      No.

4      Q.      Okay.  And I understand the reason why,

5  it was just too crowded?

6      A.      The wait was too long.

7      Q.      Wait was too long, okay, and you guys

8  were hungry?

9      A.      Right.

10     Q.      Okay.  So did you go someplace else?

11     A.      Yes.

12     Q.      Where?

13     A.      Uno's.

14     Q.      Okay, how far is Uno's from Friday's?

15     A.      Two minutes away.

16     Q.      Okay.  And all right, you got to Uno's,

17  I assume you got a table?

18     A.      Not right away.

19     Q.      Do I understand you had to wait a while?

20     A.      Yes.

21     Q.      Were you given one of those like beeper

22  things, you know, when you come in and there's a

**Capital Reporting Company**

Page 51

1    long line, they give you this beeper so when the

2    table is ready it --

3        A.    Yeah, we did.

4        Q.    You got one of those beepers, okay.

5              How long did you have to wait,

6    approximately?

7        A.    Approximately 10, 15 minutes.

8        Q.    10, 15 minutes, okay.

9              Was it crowded also?

10       A.    Not as crowded as Friday's.

11       Q.    Okay.  And did you all order dinner?

12       A.    Yes.

13       Q.    All right.  What did Angel have, do you

14   recall?

15       A.    I believe it was pasta, I'm not sure,

16   though.

17       Q.    Okay, and what did the other ladies

18   have?

19       A.    Quinette have a steak, I had pasta and

20   Garnisha, she might have had pasta, also, and Aubria

21   had a kids meal, probably chicken fingers or

22   something like that.

**Capital Reporting Company**

Page 55

1    Q.    Nasty that it was too strong or nasty

2    that it was too weak?

3    A.    Too weak.

4    Q.    Okay.  She sent it back, did they give

5    her a new drink?

6    A.    Uh-huh, yes.

7    Q.    That was not nasty, that was drinkable?

8    A.    It was drinkable, but she still didn't

9    like it.

10         MS. LIPPINCOTT:  Off the record for a

11   second.

12         (Discussion off the record)

13         BY MR. SCHUSTER:

14   Q.    How about Ms. Ramser?

15   A.    I believe she just had the shots of

16   Petrone.  She didn't have any money, so we were

17   treating.

18   Q.    Okay.  Like friends do.

19         Once, so how long were you at Uno's?

20   A.    It seemed like forever.

21   Q.    Is that because the service was slow?

22   A.    Yeah.  Approximately an hour and a half.

**Capital Reporting Company**

Page 56

```
 1        Q.      Okay.

 2        A.      Two hours.

 3        Q.      And when you left, where did you go to

 4   then?

 5        A.      We went to Quinette's house.

 6        Q.      Okay.  For the purpose of dropping her

 7   off or dropping something else off?

 8        A.      Dropping her packages off.

 9        Q.      Her packages off, okay.  And were

10   people, before you got there, in other words, you

11   went from Uno's to Quinette's home, my understanding

12   is to drop Quinette's packages that she had

13   purchased that day off at her new apartment,

14   correct?

15        A.      Correct.

16        Q.      I assume that in that trip you were

17   again the driver?

18        A.      Yes.

19        Q.      Your cousin, Ms. Valentine, was to your

20   immediate right in the front seat?

21        A.      Yes.

22        Q.      Angel was immediately, directly in back
```

**Capital Reporting Company**

Page 57

```
1    of you in the back seat, right?

2         A.    Yes.

3         Q.    And Ms. Ramser was in back of

4    Ms. Valentine?

5         A.    Yes.

6         Q.    And then Aubria, the five year old, the

7    baby was probably seated in the back seat between

8    the two adults, right?

9         A.    Yes.

10        Q.    Angel and Ms. Ramser?

11        A.    Yes.

12        Q.    Okay.  And was Aubria sleeping?

13        A.    By the time we got to Quinette's house,

14   yes.

15        Q.    Okay.  And how long had she been

16   sleeping at that point?

17        A.    I'm not sure.

18        Q.    Okay.  Where had Quinette's packages

19   been placed in your car?

20              You went from Uno's to her house to

21   leave these packages off, where did she retrieve

22   them from, were they in the front seat, were they in
```

**Capital Reporting Company**

Page 58

1    the back seat, were they on the floor, were they on,

2    in your trunk?

3        A.      They was in the trunk.

4        Q.      Okay.  And how big of a trunk does that

5    Escalade have?

6        A.      It's kind of big.

7        Q.      Was the trunk full of packages?

8        A.      Yes.

9        Q.      Okay.  How was that trunk released?

10              As the driver, is there something on the

11    console that you can press that makes the trunk pop

12    up?

13        A.      On the front, yes.

14        Q.      On the dashboard you mean?

15        A.      Yes.

16        Q.      Okay.  And then can it also be opened up

17    by having it unlocked and someone from the outside

18    pulling up some kind of lever or lever?

19        A.      That's, yeah, you push the button inside

20    on the dashboard and they pull it up from the back.

21        Q.      All right, so by pushing the thing on

22    the dashboard, it basically unlocks it?

**Capital Reporting Company**

Page 59

1      A.      Yeah.

2      Q.      So you can then pull it up from the

3  outside and just lift it up?

4      A.      Yes.

5      Q.      Okay.  Does it have any, when that opens

6  up, is there any kind of noise or buzzer or --

7      A.      No.

8      Q.      -- anything like that?

9      A.      No.

10     Q.      Okay.  Is it lighted?

11     A.      Yes.

12     Q.      Okay.  All right.

13             You get to, you leave Quinette's house

14  after dropping off her packages.  You then proceed

15  where?

16     A.      To Angel's house.

17     Q.      To Angel's house, okay.

18             Which is approximately how far away?

19     A.      Around the corner.

20     Q.      Around the corner, okay.

21             So what street would you have been on --

22  you would have been on what street and then, what,

**Capital Reporting Company**

Page 60

1   made a right somewhere on to Congress Street?

2       A.      I believe Quinette lives on 13th Street,

3   13th Place and yes, I would have made a right on to

4   Congress Street.

5       Q.      And the, the intention was to park and

6   to unload the packages at Angel's apartment?

7       A.      Yes.

8       Q.      Was there a plan, after the packages

9   were all delivered to the apartment?

10      A.      Yes.

11      Q.      That you were going to go out again?

12      A.      We were going to Garnisha's house.

13      Q.      You were going to go to Garnisha's

14  house, okay, for what reason, just basically to hang

15  out?

16      A.      Yes.

17      Q.      Okay.  You proceed down Congress Street,

18  the 1300 block of Congress Street and you proceed to

19  park the car?

20      A.      Yes.

21      Q.      Okay.  And on what side of the street do

22  you park the car?

**Capital Reporting Company**

Page 61

1      A.      The right side.

2      Q.      Okay.  Is there a reason you didn't park

3   it on the left side?

4      A.      No reason, just saw an empty space and

5   pulled up.

6      Q.      Okay.  And Angel's apartment was on the

7   opposite side --

8      A.      Yeah.

9      Q.      -- of the street?

10     A.      Yes.

11     Q.      And that side of the street was clear,

12  wasn't it?

13     A.      Yes.

14     Q.      Okay.  Okay, let me show you what's been

15  marked as Kirkland Exhibit 4A through C, 4A through

16  C, ask you if you could take a moment to look at

17  that.

18             And tell me when you're --

19     A.      (Witness examining documents.)

20             I'm done, uh-huh.

21     Q.      Okay.  Does the photographs reflected in

22  this exhibit show your car --

**Capital Reporting Company**

Page 78

1    next you didn't see her?

2        A.      Right.

3        Q.      Right, then your cousin started

4    screaming?

5        A.      Right.

6        Q.      And that would have been Ms. Valentine?

7        A.      Yes.

8        Q.      Did, prior to that time, did you see the

9    bus?

10       A.      No.

11       Q.      Did you hear the bus?

12       A.      No.

13       Q.      As a bus operator who has driven 40- and

14   60-foot buses, those buses have a distinct sound,

15   don't they?

16       A.      Yes.

17       Q.      I mean they have, basically most of them

18   have diesel engines?

19       A.      Yes.

20       Q.      And they make a good bit of noise, don't

21   they?

22       A.      Yes.

**Capital Reporting Company**

Page 79

```
 1      Q.     Okay.  And at night of course the lights

 2  are on, right?

 3      A.     Yes.

 4      Q.     In your opinion is the bus easily

 5  seeable?

 6             MS. LIPPINCOTT:  Objection, calls for

 7  speculation.

 8             You may answer.

 9             THE WITNESS:  Yes.

10             BY MR. SCHUSTER:

11      Q.     I mean as a bus operator.

12      A.     Uh-huh.

13      Q.     And you, and you, have you lived in

14  Washington most of your life or all of your life?

15      A.     All my life.

16      Q.     All your life.

17             And you're familiar with public

18  transportation?

19      A.     Yes.

20      Q.     Buses and railing, you've taken buses?

21      A.     Yes.

22      Q.     You'd agree if you have a 40-foot bus
```

**Capital Reporting Company**

Page 80

1   it's a little difficult not to see?

2           MS. LIPPINCOTT:  Objection, you may

3   answer.

4           THE WITNESS:  Yes.

5           BY MR. SCHUSTER:

6       Q.      So what, what happens next once you

7   don't see Angel anymore?

8       A.      My, I hear Garnisha say where Angel go

9   and then the next thing I hear her screaming the bus

10  hit her, the bus hit her.  And I looked out my

11  window and I jumped out the truck because I saw --

12      Q.      You looked out which window?

13      A.      My driver's window, side window.  I see

14  her --

15      Q.      Was the window closed or open?

16      A.      It was closed.

17      Q.      Okay.  So you looked through it, okay.

18      A.      Looked through the window.

19      Q.      Okay.

20      A.      And I saw Angel in the street and I

21  jumped out the truck and ran over to her.

22      Q.      How far down the street was she from

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLUMBIA

3

4    _____

# ORIGINAL

)

5    GLADYS CLAUDETTE SUTTON,      )    Civil Action

Individually and as Personal )

6    Representative of the Estate )    No. 07-01197 (JDB)

and Next of Kin of ANGEL     )

7    CLAUDETTE WALTERS, Deceased, )

)

8        Plaintiff,            )

)

9    vs.                          )

)

10   WASHINGTON METROPOLITAN AREA )

TRANSIT AUTHORITY,           )

11                                )

Defendant.            )

12   _____    )

13

14

15            DEPOSITION OF

16         QUINTENETTE RAMSEUR

17           Washington, D.C.

18        Tuesday, October 16, 2007

19             3:00 p.m.

20

21   Job No.:  114495

Pages 1 through 61

22   Reported by:  John L. Harmonson, RPR

**DEFENDANT'S EXHIBIT**
2



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW  •  Suite 850, Washington, D.C. 20036
Tel: 202.861.3410  •  800.292.4789  •  Fax: 202.861.3425
Web: ladreporting.com  •  E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD  •  Baltimore, MD  •  Greenbelt, MD  •  McLean, VA

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

16

1    over the years there have been cookouts and they

2    may have been there, they may not have been there.

3    You know, I can't really pinpoint exactly when and

4    where we hung together.

5        Q.    Sure.  But what type of events would

6    you go to together?

7        A.    Probably baby showers.  I know that I

8    wasn't at Garnesha's baby shower, but then a lot

9    of girls have had babies over the years, and so I

10   may have seen her at one of those.

11            Cookouts.  I can't say which one

12   exactly, I just know her through Garnesha and

13   being around Garnesha.

14            And then she would come over to

15   Garnesha's house and I would be there.  And so

16   more of like a friendship environment, you know,

17   family environment, home, things like that.

18       Q.    Okay.

19       A.    Or over at Latitia's house or my

20   cousin's house.  So it's really hard to say like

21   where.

22       Q.    Okay.  Now, let me take you through the

17

1    day of the accident.

2          A.    Okay.

3          Q.    February 18th, 2007.

4          A.    Yes.

5                MR. MALONEY:   Is it February 18th or

6    February 17th?

7                THE WITNESS:   I was about to ask.  Are

8    you sure it's not the 17th?

9    BY MR. SHAFFER:

10         Q.    I think you're right, it was the 17th.

11         A.    It was a Saturday, and I believe it was

12   two days before my birthday, so it's the 17th.

13         Q.    Yeah.  You're right and I'm wrong.

14         A.    Yeah.  Because the first time you said

15   the 16th, and so I was like, I'm sure we'll get

16   back around to that.

17         Q.    Dates are not one of my strong points.

18         A.    I understand.

19         Q.    I want you to describe that day for

20   me --

21         A.    Okay.

22         Q.    -- from the time you got up in the

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

18

1    morning until the point of the accident, what you

2    did.

3        A.    Okay.    That morning I woke up at my

4    brother's residence where I resided at the time.

5    Would you like that address?

6        Q.    Sure.

7        A.    That address was 6423 Hilmar Drive,

8    Apartment -- that's funny.    404, I think, because

9    my dad's number is 304, mine is 104, and I think

10   his is 404.    But it's Forestville, Maryland, and

11   the zip code is 20047.

12       Q.    Okay.    And then what happened next?

13       A.    I just lounged around.    It was a

14   Saturday, and so I had prepared at some point to

15   meet with Garnesha and Latitia that day.    But we

16   was just trying to work out the detail, like where

17   we was going to meet, like whether I was going to

18   catch the train to Garnesha's or to Latitia's and

19   where we were going to meet at.    Because we were

20   going to meet up just to be around each other that

21   day.

22           And so as the day progressed, I would

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

19

1  say about 2:00 o'clock was when I started to dress

2  to go out for that afternoon.  Latitia contacted

3  me and told me to stay put, they're going to come

4  and pick me up.  So I was like, no train, whoopee.

5  On a Saturday, no bus, no train, okay, I can do

6  that.  So I waited for them to arrive to pick me

7  up.

8          She had explained to me that she had

9  met with Garnesha and Angel and that we were going

10  to go shopping.  Because we had both gotten our

11  apartments, and we was just going to go shopping.

12  I hadn't bought anything for the apartment to

13  actually move in, and maintenance was still

14  working on my unit, little things.  So we were

15  going to go shopping for our apartments that day.

16  So I was like, okay, good.

17      Q.    So you and Ms. Walters were both having

18  new apartments?

19      A.    Yes, that's correct.

20      Q.    Where was your new apartment going to

21  be?

22      A.    My current address.

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

20

1    Q.    Okay.  And how close is that to where

2  Ms. Walters' apartment is?

3    A.    Right around the corner.  I will say a

4  block and a half.

5    Q.    So what time did they pick you up?

6    A.    I would say approximately 3:00 o'clock.

7    Q.    Okay.  And where did you go next?

8    A.    If my memory serves me correctly, we

9  went to, I think, Wal-Mart first.  I can't be

10  certain if we went anywhere before that, but I

11  know we definitely went to Wal-Mart.  And

12  actually, I think we went straight to Wal-Mart.

13  And that's where we were for a few hours in the

14  evening, just shopping and doing things in the

15  store.

16    Q.    What did you get at Wal-Mart?

17    A.    I purchased a very nice bed that I

18  never got to use, a Swiss Army blow-up bed.  This

19  is my first apartment, so I just bought a bed.  I

20  attempted to purchase some lamps.  I also

21  purchased that night -- What else did I get?  Some

22  washcloths, some towels.  Just a few household

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

21

1    items.

2          But exactly what I purchased that

3    night, I'm sure there are receipts that can

4    corroborate that.  But just some small things, not

5    a lot of stuff.

6          Q.    What did Ms. Walters purchase?

7          A.    Ms. Walters purchased a lot of stuff.

8    She had purchased -- I specifically remember a

9    trashcan, a comforter, lamps, a lot of household

10   items.  Exactly all what she purchased -- an

11   ironing board, iron I think, a broom that night.

12   But that wasn't out of Wal-Mart, that was out of

13   Lowe's.  Household items, things you would take

14   into a new apartment.

15         Q.    Okay.  And did the two of you load your

16   purchases into the Cadillac SUV?

17         A.    Yes.  As a matter of fact, in the

18   store, just like women shopping, we were all at --

19   I went through the checkout first because I didn't

20   have a lot of money, and so I knew that I was

21   going to have to get my things.  And so I had my

22   thing.  And as I had my things, I retrieved her

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

22

1    daughter Aubria, and I just took her to the toy

2    section while Angel and Garnesha continued to

3    shop.   Then we all met up and went through the

4    check-out together, and yes, we did load all of

5    the items into the vehicle.

6        Q.    And who all was in the vehicle?

7        A.    Myself; Latitia Kirkland was the

8    driver; Garnesha Valentine was the passenger in

9    the front; Angel Walters and her daughter Aubria.

10       Q.    How do you spell her daughter's name?

11       A.    I believe it's A-u-b-r-i-a.

12       Q.    How old is she?

13       A.    Five.

14       Q.    Was her daughter with you the entire

15   day?

16       A.    Yes.

17       Q.    Did her daughter reside with her?

18       A.    Yes.  To my knowledge, yes.

19       Q.    Okay.  Now, what did you do after --

20   About what time did you finish shopping at

21   Wal-Mart?

22       A.    It's hard to say.  It could be around

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

23

1    maybe 7:00, 8:00 o'clock, somewhere around then.

2        Q.    Okay.

3        A.    I can't be exactly certain.  It was

4    February, and everything that happened after that,

5    it was like --

6        Q.    Okay.  Did you say you also went to

7    Lowe's?

8        A.    Yes, we did.  And she purchased a

9    broom.  She told me, she said, "Quintenette, these

10   brooms are $9."  So she was really excited about

11   that broom.

12       Q.    Okay.  And did you go out to dinner

13   after that?

14       A.    Yes.  As we were leaving Lowe's, Angel

15   handed me $10.  And so I asked her what was this

16   for.  Because they had discussed going out to eat,

17   but I kept telling them, "I don't have any more

18   money."  And so she gave me $10, and she told me

19   that Garnesha was going to have $10 for me and

20   that we were going out to eat.  So I was like,

21   "Let's go."  After a day of shopping, a nice way

22   to top the evening off.

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

27

1    you up at 3:00 o'clock that day?

2        A.    I do not know that, no.  I really can't

3    say.  I just know that day there was no marijuana.

4        Q.    After they picked you up?

5        A.    That day, yes.

6        Q.    Okay.

7        A.    And I spoke with Garnesha, and they

8    were shopping for furniture, and so I know there

9    was no marijuana that day.

10       Q.    Okay.  Now, how long did you stay at

11   Uno's?

12       A.    Oh, it's hard to say.  Probably

13   about -- it's really hard to say.  I know we were

14   there for a long time.  The times is really hard.

15   We actually complained about the food, so we had

16   to have arrived there before 9:00, if my memory

17   serves me right.  It's really hard, because we

18   were there -- We were at each store for a certain

19   period time, maybe more, maybe less.  So I know we

20   complained about our food taking so long.  And the

21   people behind us complained about their food

22   taking so long.  And the people across from us

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

28

1    complained about theirs; they actually walked out.

2            And so by the time our food arrived, I

3    would say we stayed there probably about two

4    hours.  Not even two hours.  Probably about an

5    hour and a half.  But it had to have been longer.

6    It seemed like it was longer, because I know that

7    was one of the complaints that night, that the

8    food had taken so long after we had ordered it.

9    Actually, it took long to even place the order for

10   food.  And so then the food finally came and we

11   ate, and then we left.  So I really can't say.

12       Q.    Where did you go after you left Uno's?

13       A.    We left.  We went to my apartment

14   because I already had the keys, and Angel wanted

15   to see my apartment.  I was anxious to see her

16   apartment.  And we were going to drop my items off

17   in my apartment, and then we were going to her

18   house and drop her items off at her apartment, and

19   then we were all going to go to Garnesha's house.

20       Q.    So you went to your apartment and

21   dropped off your things; is that correct?

22       A.    Yes, that is correct.

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

29

1      Q.     About what time did you arrive at your

2  apartment?

3      A.     I want to say probably about 10:45,

4  maybe.

5      Q.     How long did it take you to drop off

6  your things?

7      A.     Not long.  We walked in.  Angel made a

8  few comments to me, because I wasn't anxious to

9  stay in my apartment.  This is my first apartment,

10  and so I'm like (indicating).  And so she was like

11  anxious to see my unit, because she had already

12  seen her unit, and she told me, "You're crazy.  If

13  this was my apartment, I would have been staying

14  in here, I would have slept on the floor."

15          So it didn't take long.  We just sat

16  the items down, walked through, and then left and

17  got back into the truck.

18      Q.     Okay.  And where did you go after that?

19      A.     We drove around the corner and

20  proceeded to get out of the truck to take Angel's

21  items into her car.  I was anxious to see her unit

22  because I hadn't seen hers and this would have

DEPOSITION OF QUINTENETTE RAMSEUR
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

30

1    been my first time seeing her unit.

2        Q.    Okay, let me stop you there.  Let's go

3    into detail now about what happened --

4        A.    Okay.

5        Q.    -- when you pulled up to park.

6        A.    Okay.

7        Q.    Now, can you tell me where you parked?

8        A.    We parked across the street from her

9    unit.  Her unit was to our left.  We pulled up

10    right in between -- It's like a parking lot that

11    you could drive up in here, and I'm not sure if

12    there's like a driveway right there.  But then

13    there's a spot right in between there with curb,

14    and we pulled right up over the ice and parked

15    right there.

16            It was under two lamps.  I know one

17    lamp was in front of us and one was directly

18    behind us.

19        Q.    Two street lamps, you mean?

20        A.    Yes.

21        Q.    Okay.  Go ahead.

22        A.    I know that there was a bus stop in

**Capital Reporting Company**

Page 1

IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

------------------------------------+

GLADYS CLAUDETTE SUTTON,                 :

        Plaintiff,                       :

                        : CASE NO.

vs.                                      : 07:1197

                        :

WASHINGTON METROPOLITAN AREA TRANSIT :

AUTHORITY,                               :

        Defendant.                       :

------------------------------------+

Washington, D.C.

Friday, November 16, 2007

Deposition of:

GARNISHA VALENTINE

called for oral examination by counsel for Defendant,

pursuant to notice at Carr Maloney, PC, 1615 L Street,

Northwest, Suite 500, Washington, D.C., 20036, before

Janie Arriaga of Capital Reporting Company, a Notary

Public in and for the District of Columbia, beginning at

5:30 p.m., when were present on behalf of the respective

parties:

DEFENDANT'S
EXHIBIT
3

**Capital Reporting Company**

Page 84

```
 1   seat hold?

 2        A    Four.

 3        Q    All right.  So your cousin comes to Angel's

 4   house at noon, after you pick up Angel's daughter and

 5   your daughter?

 6        A    No, just Angel's daughter.

 7        Q    So your daughter was staying with the neighbor

 8   or friends --

 9        A    Yes.

10        Q    -- while you go out shopping or whatever?

11        A    Yes.

12        Q    Ms. Kirkland drops by for what purpose?  Just

13   to say hi?

14        A    No, to pick up -- to get us.  To pick up me

15   and Angel and Aubria.

16        Q    To do?

17        A    Shopping.

18        Q    We are back to the original plan that was

19   going to happen earlier, but you needed to do a few

20   things before you started on the big shopping spree?

21        A    Yes.

22        Q    What time did you leave for the shopping
```

**Capital Reporting Company**

Page 85

1   spree?

2       A    You mean the end of the day?

3       Q    No.  Once you got back to Angel's house from

4   Doran's and making the payment at the bed place and

5   dresser place and Ernest is painting away and setting up

6   Aubria's bed, your cousin then shows up with the

7   Cadillac and you're going to go shopping?

8       A    Yes.

9       Q    So what time did you then leave Angel's house

10  to go do the second spree, so to speak, of shopping?

11      A    I'm not sure of the timing-wise.  I never paid

12  attention to the time.  Probably 1:00ish, about 1:00,

13  12:00, I don't know.

14      Q    Before you jumped into the actual shopping,

15  did you stop for lunch?

16      A    No.  We stopped to get Quintinette.

17      Q    So you went from Angel's house to pick up

18  Quintinette?

19      A    Yes.

20      Q    And Quintinette lived where in relationship to

21  Angel?

22      A    She was not there.  She was in Forestville,

**Capital Reporting Company**

Page 86

1   Maryland.   She was at her brother's.

2          Q     So it was a way?

3          A     Yes.

4          Q     So you picked up Quintinette?

5          A     Yes.

6          Q     Did you pick up anyone else?

7          A     No.

8          Q     So it's Ms. Kirkland, you, Angel, Ms. Ramsor,

9   and Aubria, her daughter?

10         A     Yes.

11         Q     All right.   So from Forestville, where do you

12  go?

13         A     We went to Wal-Mart.

14         Q     Wal-Mart.   Which Wal-Mart would that be?

15  There's a lot of them.

16         A     Bowie.

17         Q     The one out near where you picked up --

18         A     No.   Quintinette?   No, it wasn't near there.

19  It was in Bowie, if I'm not mistaken.   I think it was in

20  Bowie.

21         Q     Okay.   And the goal was to go shopping for

22  items for Angel's new apartment, to furnish it?

**Capital Reporting Company**

Page 87

1     A    Yes.

2     Q    Other than Angel, were you doing your own

3  personal shopping?

4     A    Yes.

5     Q    Stuff you needed?

6     A    Yes.

7     Q    So you're out at Wal-Mart in Bowie.  How long

.8  did that last?

9     A    Probably like an hour, hour-and-a-half, two

10  hours.  We was in there for a while.

11     Q    Okay.  And was Aubria like in a carriage or

12  cart or was she walking?

13     A    She was walking.  She was riding a bicycle

14  around the store.  She was walking, and she had rode on

15  a little bike around the store for a little while.

16     Q    Any whining?

17     A    No.  She was happy.

18     Q    Okay.  What does Angel buy at Wal-Mart?

19     A    She bought stuff for her bathroom, I think her

20  kitchen, and she bought Aubria some sheets and blanket

21  and stuff for her bed, a bag of accessories.

22     Q    Did she buy a kitchen garbage can?

**Capital Reporting Company**

Page 88

1      A      Yes.

2      Q      One of those cylinder ones where you step on

3   the bottom and the top flips up?

4      A      Yes.

5      Q      Did she buy a lamp with a pole and base and

6   everything?

7      A      Yes.

8      Q      Then she bought bathroom utensils, like rugs

9   and towels and stuff like that?

10     A      Yes.

11     Q      Sheets?

12     A      Yes.

13     Q      Did any of you buy anything for her apartment?

14     A      No.

15     Q      So she was the only one buying stuff for her

16   apartment?

17     A      Yes.

18     Q      What kinds of things did you buy and

19   Ms. Kirkland buy and Ms. Ramsor?  You told me what

20   Angel -- the kinds of things that she purchased for her

21   apartment.  What kinds of stuff did you buy?

22     A      I bought stuff for my daughter's bathroom,

**Capital Reporting Company**

Page 89

1   Dora stuff.

2       Q     Hanging stuff?

3       A     Dora soap dish, curtains.  I bought me a trash

4   can like Angel's.

5       Q     Identical one?

6       A     Yes.  It was a different color.

7       Q     What color was yours?

8       A     Red.

9       Q     What about Ms. Kirkland?

10      A     I don't know.  I don't remember her buying

11  anything.

12      Q     What about Ms. Ramsor?

13      A     She bought a couple of items.

14      Q     So the shopping spree at Wal-Mart lasted two

15  hours or a couple of hours?

16      A     Or less than that.

17      Q     Okay.  After you left Wal-Mart -- I assume you

18  left Wal-Mart at some point; right?

19      A     Yes.

20      Q     Where did you go from there?

21      A     Friday's.

22      Q     TGI Friday's?

Page 90

1       A       Yes.

2       Q       Which location?

3       A       Around the same area.

4       Q       Okay.  The purpose of going there was to --

5       A       It was dinner, late.

6       Q       What is your sense of time?  Was it 4:00,

7    5:00, or later?

8       A       Later.

9       Q       Give me a sense.

10      A       8:00 or 9:00.

11      Q       You were at Wal-Mart for a long time then.  It

12   was not one or two hours.

13      A       It probably was one or two hours.

14      Q       What did you do between the time you went to

15   Wal-Mart and TGI Friday's, because it seems like there

16   is some missing time?

17      A       We went to Friday's.  We left Friday's

18   because, I think, it was too crowded and we went to

19   Uno's.

20      Q       Uno's, okay.  The pizza place?

21      A       Yes.

22      Q       Italian place.  Did you go to any other stores

## Capital Reporting Company

Page 91

1    other than Wal-Mart?

2         A    Lowe's.

3         Q    You went to Lowe's after Wal-Mart?

4         A    We went to Lowe's after Uno's.

5         Q    You go to Wal-Mart, and then Friday's, you bag

6    that idea, and you go to Lowe's to do --

7         A    No, we go to Uno's and --

8         Q    You had dinner?

9         A    Yes.

10        Q    How long did it take you to have dinner?

11        A    For a while.  Our food took a while to get to

12   us.  Our food took a long time to come to us.  We were

13   in Uno's for probably like almost two hours.

14        Q    I assume Aubria was with you during that time?

15        A    Yes.

16        Q    She is five years old.  It is a fairly long

17   day by then?

18        A    Yes.

19        Q    She was getting cranky and tired?

20        A    No, hungry.

21        Q    What did you do waiting for the food?

22        A    We sat at the table and complained about the

Page 92

1    food.

2        Q    Any drinking?

3        A    Yes.

4        Q    Is that each of the young ladies were

5    drinking?  I mean, Angel was drinking, you were

6    drinking, Ms. Kirkland was --

7        A    Ms. Ramsor, she took a minute before she --

8    she did not drink.  She had like -- she did not drink

9    like -- she did not want to drink.

10       Q    She had no drinks or she drank less than you?

11       A    She had like a little shot, but she did not --

12   she did not really want to drink.  She was upset that

13   day.

14       Q    What was she upset about?

15       A    She was going through something.

16       Q    You said she had --

17       A    A little.

18       Q    -- like a shot glass?

19       A    Yes.

20       Q    Like a shot of whiskey or vodka?

21       A    Petron.

22       Q    I'm not much of drinker.  Enlighten me, what

Page 93

1      is Petron?  Is that a --

2              A     It's a white liquor.

3              Q     Fairly strong white liquor, alcohol speaking?

4              A     Yes, it's a strong liquor.

5              Q     So she had one shot?

6              A     Yes.

7              Q     How long did you wait for the food to come?

8      You are sitting in there.  It's crowded.  And you were a

9      little annoyed.

10             A     I would say like 45 minutes.  We waited a

11     while.

12             Q     What time do you think it was, generally, by

13     then?

14             A     Probably like -- probably like 9:30 or 9:45.

15             Q     You hadn't eaten yet?

16             A     No.

17             Q     And what did you have to drink?

18             A     I think a little fruit drink.

19             Q     Like a daiquiri or something?

20             A     Yes.

21             Q     With rum?

22             A     I don't know what was in it.

Page 94

```
 1       Q    It was alcohol?

 2       A    Yes.

 3       Q    How many did you have?

 4       A    I had one.

 5       Q    Did you have anything else?   Champagne?

 6       A    A shot of Petron.

 7       Q    The one you told me before?

 8       A    Yes.

 9       Q    Is that considered a liqueur?

10       A    Liquor.

11       Q    Do you know what proof it is?

12       A    No.

13       Q    So you had one of those fruity drinks with

14  alcohol and a Petron.   Did you have anything else?   Beer

15  or anything?

16       A    No.

17       Q    You had two drinks?

18       A    Yes.

19       Q    You hadn't eaten by then?   The complaint was

20  that they hadn't brought your food.   You were all

21  annoyed about that; right?

22       A    Yes.
```

**Capital Reporting Company**

Page 95

1    Q    The service wasn't very good?

2    A    No.

3    Q    Basically you hadn't really eaten all day; had

4    you?

5    A    No.  I ate at home.

6    Q    That was in the morning, though, breakfast;

7    right?

8    A    Yes.

9    Q    So other than that meal at Uno's, that was the

10   only meal, other than what you had in the morning at

11   home, throughout that day?

12   A    I'm trying to think.

13   Q    Because you told me you didn't stop for lunch?

14   A    Yeah.  I'm thinking.  I don't think we

15   stopped.  We might have.  I don't know if we stopped for

16   something to eat.  I can't recall that.  I'm not for

17   sure.  I don't remember that.  I'm trying to think hard.

18   I don't remember us stopping for anything else to eat.

19   Q    What about Ms. Kirkland, what did she have to

20   drink?

21   A    I think two drinks.

22   Q    And what's her drink of choice?

Page 96

1      A    She's not a drinker.  She had a fruity drink

2   and a shot of Petron, too.

3      Q    So she basically had two drinks.  And Angel?

4      A    Fruity drink and a shot of Petron.

5      Q    Is there a reason that you all got the same

6   drinks?

7      A    No.

8      Q    Do you always do everything together like

9   that?

10      A    They ran out around the same time.  We did the

11   shot to celebrate, you know.

12      Q    What were you celebrating?

13      A    Them moving and getting a new apartment and

14   sharing for a long lasting life for all of us.

15      Q    So did you finally get served?

16      A    Yes.

17      Q    What did you all have to eat?  Strictly

18   hamburger crowd or a salad crowd?

19      A    I don't remember what I had to eat.  I could

20   not tell you.  I cannot remember what I ate that day.

21      Q    Pizza?

22      A    I don't know if I had pizza or wings, but I

**Capital Reporting Company**

Page 97

1    know I had one -- I had pizza or wings.  I'm not sure.

2    I forgot what I had, because that's what I order there.

3        Q    Was anyone feeling sick at all that day?

4        A    No.

5        Q    So what time did you finally finish dinner?

6        A    Probably like at 10:00.  Probably like we got

7    out of there like 10:00, about 10:15, 10:00 or 10:15,

8    something like that.

9        Q    Okay.  Where did you go from there?

10       A    Lowe's.

11       Q    Where was Lowe's in relationship to Uno's?

12       A    Down the street.

13       Q    And the purpose of going to Lowe's was

14   obviously to buy something, but --

15       A    Because I wanted to get my daughter tile for

16   her bathroom.

17       Q    Towels?

18       A    Tile.

19       Q    Tile?

20       A    Tile for the floor.

21       Q    Oh, I'm sorry.  Do you do that?

22       A    Yes.

**Capital Reporting Company**

Page 98

1    Q    For how long were you at Lowe's?

2    A    No more than 20 minutes.

3    Q    Did you go shopping anyplace else?

4    A    No.

5    Q    When you were at Uno's, how was it paid for?

6    Did somebody put it on their credit card?  Did someone

7    pay cash?

8    A    We did it separate.  They were -- I know I

9    paid cash.  Angel, I think she paid with her check card.

10   I don't know how the rest of them paid.

11   Q    Did you get separate checks or did you have

12   one check?

13   A    I don't think we had to pay that much because

14   they discounted our food.

15   Q    Because you were unhappy, because --

16   A    We did not pay a lot.  So it was paid

17   separately.

18   Q    Okay.  So you leave Lowe's.  You get tile for

19   your daughter's bathroom?

20   A    Uh-huh.

21   Q    Where did you go after Lowe's?

22   A    To Quintinette's house.  Quintinette's new

**Capital Reporting Company**

Page 99

1    apartment.

2         Q    Which is where?

3         A    Around the corner from Angel.

4         Q    Around the corner from Angel?

5         A    Uh-huh.

6         Q    How long did you stay at Quintinette's house?

7         A    Two minutes.  Five minutes at the most.

8         Q    Did you all go in?

9         A    No, just me, Angel, and Quintinette.

10        Q    Where was Ms. Kirkland and Aubria?

11        A    In the car.

12        Q    Any reason they stayed in the car?

13        A    Because Aubria was sleeping.

14        Q    How long had Aubria been asleep?

15        A    I cannot recall when she fell asleep, but I

16   know it was after Lowe's.

17        Q    After Lowe's?

18        A    From the ride, she went to sleep.  She was

19   tired.

20        Q    It was a long day?

21        A    Yeah.

22        Q    And Quintinette's apartment was fairly close

**Capital Reporting Company**

Page 100

1    to Angel's new apartment?

2        A    Yes.

3        Q    What did you -- what did you three do during

4    that few minutes at Quintinette's house?

5        A    Dropped the bags, and Angel walked through to

6    look at it.

7        Q    Angel had not been in Quintinette's apartment

8    before?

9        A    No, she had not.

10       Q    When you say dropping the bags off, dropping

11   whose bags off?

12       A    Quintinette's.

13       Q    How many bags did she have?

14       A    Not that many.

15       Q    And who had the most bags?  Who had done the

16   most shopping?

17       A    Angel.

18       Q    Because she was buying stuff for her

19   apartment; right?

20       A    Yes.

21       Q    Were her bags in the form of shopping bags,

22   plastic bags, boxes, or what?

**Capital Reporting Company**

Page 101

```
 1      A    Plastic bags.

 2      Q    Okay.  Did they -- for instance, did they

 3   contain boxes, for instance, you mentioned that she had

 4   bought a lamp?

 5      A    Right.

 6      Q    A flip up garbage can?

 7      A    Yes.

 8      Q    Was four adults in the car?

 9      A    Yes.

10      Q    Is there any reason that Quintinette -- why

11   did she come back out with you?

12      A    Because we were going to my house afterwards.

13      Q    So that was the plan, to drop the stuff off?

14      A    Uh-huh.

15      Q    What about Aubria?  I mean, you were all going

16   to go out?

17      A    We were going to my house, which was around

18   the corner.

19      Q    You were going to bring Aubria with you?

20      A    Yes.

21      Q    So the idea was to drop everything off and go

22   back to your house?
```

Page 102

```
1        A    Drop everything off and pick up McKenzy and go

2   to my house.

3        Q    Who was in the complex being babysat?

4        A    Yes.

5        Q    So once Quintinette dropped off her bags,

6   where were the other bags in the vehicle?

7        A    In the trunk.  And Angel had some on the seat

8   with her.

9        Q    When you say "the seat" --

10       A    Like on the floor part, probably.

11       Q    So Angel was sitting in the back seat?

12       A    Yes.

13       Q    On the driver's side, left side?

14       A    She was sitting in the driver's side behind

15  the driver.

16       Q    Behind Ms. Kirkland, who was the driver?

17       A    Yes.

18       Q    You were sitting in the front seat?

19       A    Yes.

20       Q    The front passenger's seat?

21       A    Yes.

22       Q    So the right side of the vehicle?
```

**Capital Reporting Company**

Page 103

1     A     Yes.

2     Q     To the right of Ms. Kirkland?

3     A     Yes.

4     Q     Ms. Ramsor was sitting in the back seat?

5     A     Yes.

6     Q     Again, the passenger's seat on the right?

7     A     Right.

8     Q     And Aubria was in the middle between

9     Ms. Ramsor and Angel?

10    A     Yes.

11    Q     The distance between Ms. Ramsor's home and

12    Angel's is, what, a couple of blocks?

13    A     It's probably like right there, as soon as you

14    make a left down the one street, it's Quintinette's, a

15    block.

16    Q     Short distance?

17    A     Real short.

18    Q     I was asking you where Angel's and the other

19    bags were or purchases were.  You mentioned that the car

20    had a trunk, obviously?

21    A     Yes.

22    Q     Is that one of those trunks that you can press

Page 104

1    the button on the inside and the trunk pops open?

2        A    No.  You can pull it from the back, the

3    back --

4        Q    From the outside?

5        A    The hood part, the little glass part, you can

6    pull it up, and then a little part you can pull down.

7        Q    Standing behind it on the outside -- you're

8    not talking about opening it from the inside; right?

9        A    No.

10        Q    I mean, as a passenger sitting in the back

11    seat, you can't open the back of it?

12        A    No.  It's a big trunk.

13        Q    Was the trunk full of the purchases that day?

14        A    Yes.

15        Q    Was it pretty much full, full?

16        A    Yes, it was full, full.  It was full.

17        Q    Did you have your purchases in the trunk also?

18        A    Yes.

19        Q    Did Angel have all of her purchases in the

20    trunk?

21        A    Besides the bag she had with her prior to

22    that -- I don't know what bag she had with her that was

Page 105

1    sitting up front.  I guess they was on the floor right

2    besides her, by her feet.

3        Q    Okay.  What about Ms. Kirkland, where were her

4    bags?

5        A    If she had any bags, it was in the trunk.

6        Q    Okay.  If I asked you this, I'm sorry, where

7    were your bags?

8        A    In the trunk.

9        Q    Did you have any in the car?

10       A    I think so.  I had little bags.  They were

11   probably in the front with me.  I know I had bags up

12   front with me.

13       Q    On the seat or floor?

14       A    On the floor.

15       Q    On your lap?

16       A    On the floor.

17       Q    On the floor.  Like next to your legs?

18       A    Yes.

19       Q    Did you have a pocketbook?

20       A    Yes.

21       Q    How would you describe that, a little one, a

22   big one, one that goes over to the shoulder or one that

**Capital Reporting Company**

Page 106

1    hangs on the wrist?

2         A    It was a big one that goes over my shoulder.

3         Q    Like a shoulder bag?

4         A    Yes.

5         Q    What shoulder would you have it on, the right?

6         A    Either one.  Not in the car.  If I carried it,

7    either one.

8         Q    For instance, are you right-handed or

9    left-handed?

10        A    Right.

11        Q    Would you typically carry it over your right

12   shoulder?

13        A    It varies.  I carried it either way.

14        Q    What about Ms. Ramsor, did she have a purse or

15   bag, backpack, or whatever you want to call it?

16        A    She probably did.  I cannot recall what she

17   had.

18        Q    Angel?

19        A    She didn't have a pocketbook  She had a

20   wallet.

21        Q    I see all sorts.  Some people have --

22        A    She had a little wallet, a little wallet.

Page 107

1     Q     She had no shoulder bag or backpack?

2     A     I do not recall her having a bag that day.  I

3   don't think she had a bag.

4     Q     Did she have any kind of bag for Aubria?  Was

5   Aubria still in diapers still at that point?

6     A     No.

7     Q     That's good; right?

8     A     Five?  No, she was not in diapers.

9     Q     Not everyone is that lucky, believe me.

10          But did she have any kind of baby bag with

11   Aubria, child kind of stuff?

12     A     No.

13     Q     What was the weather like that night?

14     A     Cold.

15     Q     It was February, which is definitely cold?

16     A     Yes.

17     Q     How were you all dressed?

18     A     Warm hat, coat, scarf.

19     Q     Do you remember what Angel was wearing?

20     A     I know she had on a purple hat and a black

21   coat.

22     Q     Purple hat and black coat?

Page 108

1      A     I don't know if it was a purple shirt, but

2   jeans and New Balance.

3      Q     Sneakers?

4      A     Yes.  I can't remember.  I think her shirt was

5   purple.  I'm not for sure, but --

6      Q     You mean the shirt inside her coat?

7      A     Yes.

8      Q     As you came from Quintinette apartment just a

9   short distance away, on your way to Angel's apartment,

10  what were the roads like?

11     A     Ice, snow.  It was snowing a little.  Snow

12  under the -- yeah, it was snowing a little.

13     Q     When was the last time it had snowed?

14     A     I'm not sure.  A couple of days before.  I

15  know the snow was hard.  I could remember us pulling up

16  on snow.

17     Q     It was very cold out?

18     A     Yes, it was cold.

19     Q     Had the snow like frozen over?

20     A     No, it was -- yeah, it was hard, but it wasn't

21  that -- it was not bad slippery snow.  It was just hard.

22     Q     It was crackly?

**Capital Reporting Company**

Page 109

1       A    It was rough.

2       Q    It wasn't short, puffy stuff; it was crackly?

3       A    Yes.

4       Q    Was there any ice?

5       A    Not that I can remember.  I don't remember

6    ice.

7       Q    And on Congress Street, on the direction you

8    were headed from Quintinette's apartment to Angel's

9    apartment, is that normally two lanes or -- were you

10   familiar -- how familiar were you with that area?

11      A    Not that familiar.  Two lanes, like it's hard

12   with two cars coming down that street.  It's a pretty

13   small street, but two cars, like you had to slow down to

14   pass each other.  They just can't go straight passed

15   each other.

16      Q    Are you saying that as a general principle

17   regardless of whether it was snowing out, just under

18   normal conditions?

19      A    Normal conditions.

20      Q    It was a narrow street?

21      A    Yes.

22      Q    Are there cars often parked on both sides of

Page 110

1    the street?

2        A    Yes.

3        Q    And cars can go north and south or east and

4    west, two different directions?

5        A    Yes, two different directions.

6        Q    Did the fact that it had snowed, did that in

7    any way effect the street there?

8        A    I mean, you would know to go extra slow than

9    going normal if there wasn't snow, like you would go

10   extra slow being the street was not that wide and big,

11   but with snow on the ground, a person would go slow

12   going down that street, period.

13       Q    Is that because of the narrowness of the

14   street?  Is that what you're saying?

15       A    Yes.

16       Q    Now, was the -- had the street been plowed?

17       A    The snow pushed?

18       Q    Yes.  In other words, you told me a few days

19   before there had been a snowstorm; right?

20       A    Right.

21       Q    And there was obviously snow on the ground;

22   right?

**Capital Reporting Company**

Page 111

1         A    Yes.

2         Q    Had the plows come by and at least plowed the

3    street so there was a travel lane?

4         A    Yes.

5         Q    Even though there was snow on the sides --

6         A    Right.

7         Q    -- you know, against the curb, extending out a

8    certain part into the street, there was a travel lane

9    that had been plowed and treated; right?

10        A    Yes.

11        Q    And how is the lighting in that area?

12        A    Actually, there's a light over where we were

13   at.  There was light right there.  There was a light on

14   some parts of the street, but I know there was a

15   light -- a light right there where we were at.  I know

16   there was a lamp right there.

17        Q    A street light?

18        A    Yes.

19             (Discussion off the record.)

20   BY MR. SCHUSTER:

21        Q    Like after you left Ms. Ramsor's house to go

22   to Angel's apartment, you come down Congress Street?

**Capital Reporting Company**

Page 112

1      A    Yes.

2      Q    At some point, did Ms. Kirkland park the SUV?

3      A    Yes.

4      Q    What side did she park it at, the side of the

5    street Angel's apartment was or the opposite side?

6      A    Opposite side.

7      Q    Do you know why?  Was the plan to unload the

8    packages and to bring them into Angel's new apartment on

9    the opposite side of the street?

10     A    Yes.

11     Q    Do you know why Ms. Kirkland decided to park

12   on the right side of the street or the side opposite

13   where the apartment was?

14     A    I'm not sure.  I'm not sure if it was on the

15   other side.  I'm not sure.  I don't know.  She just

16   pulled up.

17     Q    If she would have pulled up on the other side,

18   she would have been up on the same side of the street as

19   Angel's apartment?

20     A    Yes.

21     Q    So Angel would have been across the street?

22     A    Yes.

**Capital Reporting Company**

Page 137

1  reaching for the bags, I felt the bus, and instantly me

2  feeling the bus, how close the bus was, I instantly

3  looked like around the car looking for her, because I

4  knew she was just right there.

5      Q    Okay.  Could you hear the bus?

6      A    I can --

7      Q    You told me you could feel the bus as it

8  passed by because of either wind or some air circulating

9  or whatever the case may be; right?

10      A    Right.

11      Q    Now, you've been around buses.  Buses have

12  fairly loud engines; don't they?

13      A    Right.

14      Q    They're not quiet.  They have diesel engines;

15  right?

16      A    Yes.

17      Q    Now, at any time during that brief period that

18  you saw Angel standing at the side of the car, did you

19  ever see her take any evasive action to try to move out

20  of the way?

21      A    After I looked at her that one time, I didn't

22  see her no more until after the accident.  So I didn't

**Capital Reporting Company**

Page 1

IN THE SUPERIOR COURT

FOR THE DISTRICT OF COLUMBIA

----------------------------:

GLADYS CLAUDETTE SUTTON,          :

    Plaintiff,                    :

v.                                : Civil Action No.:

WASHINGTON METROPOLITAN          : 07:1197

AREA TRANSIT AUTHORITY,          :

    Defendant.                    :

----------------------------:

Washington, D.C.

Tuesday, November 13, 2007

Deposition of:

GLADYS SUTTON

called for examination by counsel for Defendant,

pursuant to notice, at Carr Maloney, PC, 1615

L Street, Northwest, Suite 500, Washington, D.C.,

before Gervel A. Watts of Capital Reporting, a

Notary Public in and for the District of Columbia,

beginning at 1:10 p.m., when were present on

behalf of the respective parties:

DEFENDANT'S
EXHIBIT
4

PENGAD-Bayonne, N.J.

**Capital Reporting Company**

Page 33

1         A     D.C.

2         Q     And the title was in her name?

3         A     Correct.

4         Q     Did Angel have any restrictions on her
5    license?

6         A     Not to my knowledge.

7         Q     I'm talking about, for instance, I have a
8    restriction for eyesight because I'm nearsighted.

9         A     No.

10        Q     No or not that you know of?

11        A     No.  She didn't wear glasses.

12        Q     Did she wear contacts?

13        A     No.

14        Q     Did she have any problem with her hearing at
15   all?

16        A     No.

17        Q     Was she on any kind of medications?

18        A     No.

19        Q     Whenever Angel felt ill, for instance, who
20   would she seek medical treatment with?

21              A     Washington Hospital Center.

22        Q     Did she have health insurance?

**Capital Reporting Company**

Page 1

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

---------------------------x

GLADYS CLAUDETTE SUTTON,        :

        Plaintiff,        :

v.        : Civil Action No.:

WASHINGTON METROPOLITAN        : 07:1197

AREA TRANSIT AUTHORITY,        :

        Defendant.        :

---------------------------x

Washington, D.C.

Friday, December 14, 2007

Deposition of:

DAVID PLANT

called for examination by counsel for Defendant, pursuant to notice, at Washington Metropolitan Area Transit Authority, 600 Fifth Street, Northwest, Suite 2D, Washington, D.C., before Gervel A. Watts of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 10:04 a.m., when were present on behalf of the respective parties:

DEFENDANT'S EXHIBIT
5

**Capital Reporting Company**

Page 48

1    We didn't have any snow or ice, but in my

2  opinion, those would not have an effect to what you

3  could see out the front window of the bus.

4    Q    In the same vain, with the visibility being as

5  you just stated, would there have been anything that

6  would have prevented Ms. Walters from having the same

7  visibility of the bus?

8    A    Ms. Walters could've seen the bus.  Certainly.

9    Q    In exhibit nine, which are these five enlarged

10 color photographs, if you turn to photo five, there is

11 an image of someone playing the role of Angel Walters.

12   A    Yes.

13   Q    And the person is holding two bags; one in

14 each hand.

15   A    Yes.

16   Q    To her side, that is, going toward the ground,

17 correct?

18   A    Yes.

19   Q    Is the location of this replica of Angel

20 Walters is standing, is that where you have determined

21 where Angel Walters was standing at the time she was

22 struck by the bus?

Page 52

1    not extend into the street any further than this

2    pavement crack.  There is some separation as you go

3    further back towards the back of the Escalade from

4    where this ice/snow ends to the pavement crack.

5        Q.  What is the distance between the side of the

6    Escalade and how far this ice or snow extends out

7    towards the street?

8        A   The position of the Escalade is shown in

9    exhibit two from my report, as is the pavement crack.

10   This is Plant Exhibit Number 3.

11       Q   In exhibit three, should be the Escalade.

12       A   Yes.

13       Q   Is it a foot or nine inches or is it 12

14   inches?

15       A   I would have to zoom into my scale drawing to

16   get that exact figure?

17       Q   To date, have you done that?

18       A   I'm sure I've looked at it, but I don't know

19   what that number is.  We can blow this up and get that

20   information.  I should also add that I placed the

21   Escalade using the police photographs and in having

22   done so, looked at the distance from the right rear of

Page 53

1  the Escalade to the curb and that's exactly two and a

2  half feet, which is what Detective Washington measured

3  at that distance.

4      Q   Two and a half feet between the right side of

5  the parked Escalade to the curb.

6      A   The Escalade is at an angle, so the distance

7  that I've determined from the right rear of the

8  Escalade to the curb is two and a half feet.

9      Q   Would this photograph be helpful?

10     A   Yes.

11     Q   Which I believe is one of the police

12 photographs.

13     A   I don't believe so.

14         MR. MALONEY:  Actually, it's a WMATA

15 photograph.

16         MR. SCHUSTER: Oh, it is?  Let's mark this

17 please.

18         (Plant Exhibit Number 10 was

19         marked for identification.)

20 BY MR. SCHUSTER:

21     Q   Looking at Plant Number 10, the left lower

22 photograph, does this depict where the Cadillac is

## Capital Reporting Company

Page 54

1  parked in relationship to the right curb?

2      A    Yes.

3      Q    You've determined that the rear wheel is

4  approximately two feet between the side of the car and

5  the curb.

6      A    Yes, approximately.

7      Q    As a result of parking the Cadillac

8  approximately two feet from the right curb, would that

9  not result of having the vehicle further out in the

10  street than it normally would be if in fact it would be

11  parked closer to the curb?

12          MR. MALONEY:   Objection; form and substance.

13  Go ahead.

14      A    The right side is the right rear that's

15  further out than the right front, but the right rear is

16  certainly two and a half feet from the curb.

17      Q    What about the right front?

18      A    The right front is closer.  I'd have to give

19  you that measurement off the scale drawing.  If you

20  were only six inches from the curb, the left side of

21  the vehicle would be closer to the curb than having the

22  right side of the vehicle two feet back.

Page 57

1      Q    Do you know why she paused?

2      A    I don't.

3      Q    I assume when you say pause, you mean stop or

4    did you mean something else.

5      A    If you look at the surveillance video, clearly

6    you can see Ms. Walters walking and then all of a

7    sudden the movement stops and she doesn't continue.

8      Q    Once she stops she remains in that position?

9      A    That's correct.  Maybe she's moving her arms

10   or something, but it's hard to tell from the

11   surveillance video, but there is no more movement.  You

12   can clearly see her moving and then she pauses, but

13   yes.

14     Q    Was there anything preventing her from

15   continuing to cross the street?

16     A    Not that I can tell from the surveillance

17   video.

18     Q    Is it your understanding that she apparently

19   had leased a brand new apartment that she was moving

20   into directly across the street?

21     A    That's my understanding.

22     Q    And that her and her girlfriends were

**Capital Reporting Company**

Page 58

1    basically shopping to furnish the apartment?

2        A    Yes.  Hence, the two lamps she was carrying.

3        Q    Do you have any information regarding whether

4    Ms. Walters had any problems with vision?

5        A    I don't know one way or the other.

6        Q    Either near-sighted or far-sighted?

7        A    I don't know one way or the other.

8        Q    Or hearing?

9        A    I don't know that.

10       Q    Are you aware of any distraction she might've

11   had at that moment as she was standing in the cleared

12   portion of the street adjacent to the truck?

13       A    There has been no such testimony.

14       Q    Okay.  You also made some speed calculations

15   regarding the bus.

16       A    Yes.

17            (Plant Exhibit Number 11 was

18            marked for identification.)

19       Q    Let me show you what's been marked as Plant

20   Number 11.  Do you recognize that?

21       A    I do.  Although, I have three sheets together

22   with that.

Page 79

1      Q    The difference between 5.6 seconds and --

2      A    Roughly a second.

3      Q    How long did you determine that Ms. Walters

4   was standing in the cleared portion of the street?

5      A    Well, she starts to walk onto the pavement 6.7

6   seconds before frame 1959.  So it is slightly longer

7   than 6.7 seconds that she is on the paved portion of

8   the roadway and she's stationary in what I call a pause

9   in the street, a little over 5.3 seconds to the time of

10  frame 1959.

11     Q    Once she walks off the iced portion onto the

12  pavement portion of the cleared section, she walks onto

13  the cleared section and is there for approximately two

14  seconds and then pauses or stops the remaining five

15  seconds?

16     A    No.  From frame 1934 she is essentially

17  crossing over from the ice/snow area to the pavement

18  and she pauses at frame 1939.  So she's walking from

19  the ice, whatever the difference is between those two,

20  1.3 seconds or something like that.

21     Q    At the time she pauses in the street, which

22  way is she facing, is she facing directly across the

# Capital Reporting Company

Page 85

1       A    Yes.  It's just after the impact and its

2   split-screen showing with two camera shots.

3       Q    It looks as though in these two camera shots

4   that one of the camera shots, the one to the left is

5   looking toward and one from the back of the bus.

6       A    The frame on the left is from the pivoting

7   camera, and the pivoting camera at this time happens to

8   be pointed in the direction looking at the area of the

9   accident.

10      Q    So it would be in the back of the bus.

11      A    That's correct.  We're seeing the back of the

12  bus in this view.

13      Q    And the one in the photo on the right from the

14  stationary camera shows it from the front.

15      A    The front and the left side of the bus.

16      Q    Does the Orion bus have a Diesel engine?

17      A    Yes.

18      Q    In your experience, do Diesel engines make a

19  louder sound than, for instance, a typical gasoline

20  engine?

21      A    I think it depends on the vehicle.  Certainly,

22  buses can be louder than automobiles.

Page 86

1      Q    Did you find any evidence, that is, the bus

2   was traveling down Conger Street in the direction it

3   was traveling when the incident occurred that the right

4   side of either the right wheels or the right side of

5   the bus in any way encroached upon the icy or snowy

6   area adjacent to the left side of the Escalade?

7      A    I don't think I can tell that one way or the

8   other from the video.  I don't know that.

9      Q    What about the photographs?  Did you see any

10  right side of the bus track marks on the iced portion

11  adjacent to the left side of the parked Escalade?

12          MR. MALONEY:  Objection to form and substance

13  but go ahead.

14     A    I don't see any tire marks in that icy area

15  adjacent to the Escalade.

16     Q    Did you find any evidence that the right side

17  of the bus contacted or collided with the left side of

18  the parked Escalade?

19     A    I haven't seen any such evidence that would

20  show that that occurred.

21     Q    Are you aware of any evasive action that the

22  decedent took as she was standing in the street prior

**Capital Reporting Company**

Page 87

1    to impact to move out of the way of the path of the

2    bus?

3        A    I haven't seen anything in the video that

4    would suggest that she's moving at the time just before

5    the accident occurs.

6        Q    Moving to her right or to her left or forward

7    or backwards.

8        A    That's correct.

9        Q    You limited your answer to the video, of

10   course, in your response.  Had you had any other

11   information, evidence from documents, from speaking to

12   anyone that would indicate that the decedent, from the

13   time she stopped in the street up to the time that she

14   was struck by the bus that she made any movement or

15   took any kind of evasive action whatsoever?

16       A    I haven't seen any testimony that described

17   any movement on her part.

18       Q    Do you know of anything which would've

19   prevented her from taking such evasive action?

20       A    Say that again.

21       Q    Do you know, as she's standing in the street,

22   do you know if anything that would've prevented her

Page 88

1    from taking such evasive action, that is, moving out of

2    the way of the oncoming bus?

3          MR. MALONEY:  Objection to form and substance

4    but go ahead.

5          A    I don't know.  It depends on where she's

6    looking.

7          Q    Do you know where she was looking?  Do you

8    have an opinion on that?

9          A    I don't have an opinion on that.

10         Q    How far down the road to the decedent's left

11   as she's standing in the road could she see the bus

12   down the road?

13         A    I mean, it's a hypothetical.  I mean, if she

14   looks to the left, you certainly can see down to 13th

15   Street standing at that position.

16         Q    She should be able to pretty much see the same

17   distance as the bus operator as the bus is approaching

18   the Escalade, the same sight or visibility distance

19   that he could see.  She should be equally be able to

20   see looking down the street to her left, shouldn't she?

21         MR. MALONEY:  Objection to form and substance.

22         A    Yes.

## Capital Reporting Company

Page 89

1      Q    Do you have an opinion as to how far she

2    would've had to move in order to remove herself away

3    from the path of the bus?

4          MR. MALONEY:  Objection to form and substance.

5      A    No.  It would have to be several feet.  I

6    don't even have a precise location on the front of the

7    bus where she makes contact.  It was the right front,

8    but exactly where, I don't know.  I can say that it's

9    certainly at least a couple of feet.

10     Q    And she could've easily stepped back, right?

11         MR. MALONEY:  Objection to form and substance.

12     A    It may take more than one step, maybe a couple

13   of steps.

14     Q    Okay.  How many seconds would that be?

15         MR. MALONEY:  Objection to form and substance.

16     A    You can say taking a four or five foot per

17   second speed, you know, whatever the distance, you

18   divide it by that.

19     Q    Do you know of any factor which prevented her

20   from seeing the oncoming bus to her left?

21     A    I'm sorry?

22     Q    Do you know of any factor which would have

**Capital Reporting Company**

Page 90

1  prevented her from seeing the oncoming bus coming from

2  her left?

3      A   I'm not aware of any factors.

4      Q   Your written report is dated November 9th.

5      A   Yes.

6      Q   Has there been any additions of this report of

7  November 9th based upon any additional information,

8  testing, conversations, reading of deposition

9  transcripts or whatever the case may be that

10  embellishes your report or clarifies your report or

11  bolsters your report or changes any opinions in your

12  report or makes no opinions?

13          MR. MALONEY:  Objection to form and substance.

14  Go ahead.

15      A   No.  There are no additions to the report that

16  would change my opinions.

17      Q   You make a reference in here to a surveillance

18  video on page five of your November 9th report.  "My

19  video along with the surveillance video, when obtained,

20  will be used to bolster the methodology that I have

21  used to determine the speed of the bus.  Upon

22  completion of this analysis, I will supplement my

D. P. Plant & Associates
1722 V Street, N.W.
Washington, D.C. 20009
Tel: (202) 232 - 8929
Fax: (202) 318 - 0663

November 9, 2007

Paul J. Maloney
Carr Maloney P.C.
1615 L Street, NW, Suite 500
Washington, DC 20036

pjm@carrmaloney.com

VIA EMAIL & US MAIL

Re:  Sutton, et al. v. WMATA

Dear Mr. Maloney:



Ms. Walters, at impact, was located in the street and was approximately 2 to 3 feet from the left side of the Escalade when she was struck by the front of the bus.

**Conclusions**

5.    At slightly greater than 5.33 seconds before the impact, Ms. Walters pauses in the street at the area of impact and the bus is approximately 110 feet from the area of impact.

7.    I have determined that the bus was traveling at between 15 to 20 mph (miles per hour) as it traveled northeasterly on Congress Street from 13th Place to the area of impact.

Report by:

David P. Plant, P.E., ACTAR



November 5, 2007

Ms. Kelly M. Lippincott
Carr Maloney P.C.
1615 L Street, NW, Suite 500
Washington, D.C. 20036-5652

      Re:    **Sutton, et al. v. WMATA**
                 **Packer Engineering File No. 105004**
                 **Your File No. 99007DC001**
                 **Case No. 1:07-cv-01197**

Dear Ms. Lippincott:



**DEFENDANT'S EXHIBIT**
1

Ms. Kelly M. Lippincott
November 5, 2007
Page 4

**Conclusions**

- Given the pattern of her injuries, it is most likely that Ms. Walters was struck from the front.

Sincerely,

PACKER ENGINEERING, INC.

Laura A. Wojcik, Ph.D., P.E.
Senior Director

1

1          UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF COLUMBIA

2

3   GLADYS SUTTON, As Mother    :

    and Next Kin of Deceased    :

4   Daughter, ANGEL WALTERS,    :

                                :

5              Plaintiff   :  Case No. 1:07cv1197(JDB)

                                :

6          v.                   :

                                :

7   WASHINGTON METROPOLITAN     :

    AREA TRANSPORTATION         :

8   AUTHORITY,                  :

                                :

9              Defendant   :

10

11          Deposition of WILL PARTENHEIMER

                  Richmond, Virginia

12             Friday, March 7, 2008

                    11:13 a.m.

13

14

15

16

17

18

19

20

21   Job No. 1-122528

     Pages 1 - 78

22   Reported by Tracy E. Barksdale, RPR




1100 Connecticut Avenue, NW • Suite 850, W[...]
Tel: 202.861.3410 • 800.292.4789 • Fa[...]
Web: ladreporting.com • E-mail: lisa@l[...]
Additional Offices: Rockville, MD • Baltimore, MD •

L.A.D
REPORTING &
DIGITAL VIDEOGRAPHY


DEFENDANT'S
EXHIBIT
8

VA

DEPOSITION OF WILL PARTENHEIMER
CONDUCTED ON FRIDAY, MARCH 7, 2008

72

1    recognize this?

2          A    Yes, sir.  Appears to be a copy of our

3    report.

4          Q    Did you prepare that in accordance

5    with this case?

6          A    I prepared the majority of it, and

7    then it was turned over to Steve, who's the

8    president of the company, and he prepared -- he

9    worded it the way he wanted it worded.

10          Q    And does that reflect the opinions of

11    you and Steve in this case?

12          A    Yes, sir.

13          Q    You and Mr. Chewning, excuse me.

14          A    Yes, sir.

15          Q    Now, for how long a period was the

16    decedent standing in the street?

17          A    5.3 seconds.

18          Q    Okay.  And do you have an opinion as

19    to, for that 5.3 seconds, do you have an opinion

20    regarding, was there anything blocking the view of

21    the decedent from seeing the bus?

22          A    No, sir.  There was nothing blocking

DEPOSITION OF WILL PARTENHEIMER
CONDUCTED ON FRIDAY, MARCH 7, 2008

73

1    her view.

2         Q    Do you have an opinion regarding

3    whether there was anything preventing the decedent

4    from moving out of the path of the bus to avoid this

5    accident?

6         A    No, sir.

7         MR. SCHUSTER:  That's all I have.

8         MR. MALONEY:  No other questions.

9         (Thereafter a discussion was held

10        off the record.)

11        MR. MALONEY:  Back on the record.  I've

12   just been told that Mr. Chewning may be the one to

13   testify at trial.

14        MR. SCHUSTER:  Both names are on the

15   report.

16        MR. MALONEY:  Right, but you've got to pick

17   one person and tell me who's going to be

18   testifying.  I'm not going to go through two

19   depositions, have two people say the same thing, and

20   have two depositions.  You have one who's going to

21   testify.  I'll move to strike one of them.  Who are

22   you going to have?



*Traffic Safety Consultants, Inc.*

1773 North Parham Road, Suite 205 • Richmond, Virginia 23229 • (804) 673-9100 • Fax: (804) 673-9133

February 4, 2008

Fredric H. Schuster, Esq.
Associate General Counsel
WMATA
600 Fifth Street, NW
Washington, DC 20001

RE:    SUMMARY LETTER OF ANALYSIS AND OPINIONS
       SUTTON v. WMATA
       DRIVER:   BRENTON L. FAIRNOT
       DATE OF CRASH:  2/17/07

Dear Mr. Schuster:



DEFENDANT'S
EXHIBIT
9

- 6 -

③ Ms. Walters would have had a better opportunity to view the large illuminated bus than Mr. Fairnot had to observe a non-illuminated pedestrian and could have moved out of a position of danger.

Respectfully submitted:

Will Partenheimer
ACTAR Certified Reconstructionist #1085
NATMI Certified Director of Safety #1770
Traffic Safety Consultants, Inc.

DEFENDANT'S
EXHIBIT
10 B



Photo 5  75 feet.jpg

DEFENDANT'S
EXHIBIT
10



photo 4 740 feet jlg

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **GLADYS CLAUDETTE SUTTON, Individually , and as Personal Representative of the Estate and Next of Kin of ANGEL CLAUDETTE WALTERS, Deceased,** | ) ) ) ) ) ) ) | |
| **Plaintiff,** | ) ) | **No. 07-01197 (JDB)** |
| **v.** | ) ) | |
| **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,** | ) ) ) | |
| **Defendant.** | ) ) | |

**O R D E R**

**UPON CONSIDERATION** of Defendant Washington Metropolitan Area Transit Authority's Motion for Summary Judgment, the memorandum points and authorities cited in support thereof, the opposition and reply, and a review of the exhibits and record herein, it is by the United States District court for the District of Columbia this ____ ___ day of _____ 2008, **ORDERED**, that Defendant Washington Metropolitan Area Transit Authority's Motion for Summary Judgment be and the same is hereby **GRANTED**; and, it is further,

**ORDERED**, that judgment be and the same is hereby entered in favor of the defendant Washington Metropolitan Area Transit Authority against the plaintiff Gladys Claudette Sutton, Individually and as Personal Representative of the Estate and Next of Kin of Angel Claudette Walters, Deceased, and, it is further

**ORDERED**, that the above-captioned matter be removed from this Court's trial

docket for September 15, 2008.

---

**JOHN D. BATES**
**UNITED STATES JUDGE**

Copies to:

Paul J. Maloney, Esquire
Kelly M. Lippincott, Esquire
Carr Maloney, P.C.
1615  L Street, N.W.,
Suite 500
Washington, D.C., 20036-5652

Fredric H. Schuster
Associate General Counsel-WMATA
David J. Shaffer
Assistant General Counsel-WMATA
Office of the General Counsel
Second Floor
600 Fifth St., N.W.
Washington, D.C. 20001