UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GLADYS CLAUDETTE SUTTON, | : | |
| Individually and as Personal | : | |
| Representative of the Estate and Next of Kin of | : | |
| ANGEL CLAUDETTE WALTERS, Deceased | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:07- 01197 (JDB) |
| | : | |
| v. | : | |
| | : | |
| WASHINGTON METROPOLITAN AREA | : | |
| TRANSIT AUTHORITY, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, by counsel, in Opposition to Defendant Washington Metropolitan Area Transit Authority's ("WMATA") Motion for Summary Judgment requests that this Honorable Court deny Defendant's Motion.  WMATA bus driver, Brenton Fairnot, struck and killed 21-year-old Angel Walters, and WMATA now wants judgment without any evidence being heard on what is a clear liability case against Mr. Fairnot.  For reasons set forth herein, and taking all inferences in plaintiff's favor as the Court must at this stage, WMATA's Motion must be denied.

**I.    Factual Background**

On February 17, 2007, at approximately 11:09 p.m., Angel Claudette Walters was struck and killed by Brenton Fairnot, a Metrobus driver, as she was standing next to a parked vehicle from which she had alighted on Congress Street, SE, Washington, DC.  (Plaintiff's Statement of Material Facts ("SMF") at ¶1).  A surveillance video located on the front the apartment building

across the street from the point of impact captured the incident. (Exhibit 1[1]; Exhibit 2). Approximately one minute and fifteen seconds before Ms. Walters was struck by the Metrobus, Ms. Walters, her five-year-old daughter, and three girlfriends returned from shopping and dinner in a black Cadillac Escalade, which parallel parked on the side of Congress Street, SE. (SMF at ¶2). Ms. Walters, who was a left rear passenger, got out of the vehicle and retrieved two large, white bags from the back of the vehicle. (SMF at ¶3).

Approximately 7.73 seconds prior to the impact, when the Metrobus was 167 feet away from the point of impact, Ms. Walters started to walk towards the point of impact. (SMF at ¶4). At least 6.67 seconds prior to the impact, when the Metrobus was 140 feet away from the point of impact, Ms. Walters stepped onto the non-ice portion of the pavement carrying the two white bags. (SMF at ¶5). At least 5.33 seconds prior to the impact, when the Metrobus was 110 feet away from the point of impact, Ms. Walters paused before beginning to cross the street. (SMF at ¶6).

At the time the Metrobus struck Ms. Walters, it was traveling 15-20 m.p.h. If the Metrobus operator would have applied his brakes while traveling at 15 m.p.h., he would have been able to stop the bus in less than 30 feet. If he was traveling at 20 m.p.h., he would have been able to stop the bus in less than 48 feet. (SMF at ¶8, ¶9).

The area of the accident was well illuminated. Congress Street was lined with street lights that illuminated the roadway. Ms. Walters was standing at a location that was between two street lights. (SMF at ¶10). The bus had its headlights on and the Escalade had its headlights, taillights, and an interior light on since the hatchback was up. According to one of WMATA's accident reconstructionist experts, Mr. Fairnot should have seen the Escalade taillights at a minimum of 500

---

[1] A copy of all Exhibits will be hand delivered to the Court, to include the surveillance video attached as Exhibit 1 and colored photocopies attached as Exhibits 2 and 6. WMATA's counsel already has a copy of these Exhibits.

feet prior to impact.  (SMF at ¶11; Exhibit 3, Chewning Deposition p. 16, l. 14-21).

Mr. Fairnot identified at his deposition certain training materials that he received from Metrobus' Standing Operating Procedures.  It was clear from these procedures that driver observation is critical to the safe operation of the bus, and that "the operator **must** survey the road, evaluate traffic conditions, and identify all hazards in the driving environment."  (Exhibit 5, p. 38) (emphasis added).  The operator should look at traffic 12-15 seconds ahead, or at least one block in city traffic.  WMATA trains its operators to drive defensively, which includes seeing the danger.  As part of seeing the danger, operators are to scan the road, observe all hazards, and evaluate accident potential to include anticipate movement.  Operators are trained to understand defensive driving, to include being prepared to stop smoothly, and being able to steer to avoid danger before emergency action is required.  Further, operators are trained to initiate immediate action and to react at the first possible perception of danger.  Metrobus operators, including Mr. Fairnot, were specifically trained with respect to pedestrian accidents.  This training was designed to help the operator recognize dangerous situations, and understand defensive actions required to avoid accidents.  With respect to pedestrians ahead of buses, the operator is to consider that the pedestrian might stand or walk in front of a moving bus.  The defensive action to be taken by the operator is to slow down or stop to permit the pedestrian to cross.  The operator is then to proceed only when certain that the pedestrian will stay clear of the bus.  WMATA bus drivers had struck and killed at least four pedestrians in the nine months prior to Angel Walters' death, including two individuals on February 14, 2007, three days before this accident.  On February 16, 2007, all WMATA bus drivers were given special handouts reminding them to pay particular care to pedestrians crossing streets.  (SMF at ¶¶12, 26; Exhibit 4, Fairnot Deposition p. 174, l. 12 to p. 176, l. 16; p. 180, l. 16 to p. 186, l. 12; Exhibit 5, Metrobus Standard Operating Procedures; Exhibit 8, WMATA article re: pedestrian safety).

3

In response to WMATA's contention in this litigation that Ms. Walters could not be seen on the night of the accident, plaintiff's accident reconstructionist, David Plant, performed visibility testing at the accident scene with the same WMATA Metrobus that struck and killed Ms. Walters on November 7, 2007.  The testing was done at night.  Mr. Plant positioned the same Escalade that was present the night of the incident in the same position it was on February 17, 2007.  Its headlights and taillights illuminated during the testing, as they had been the night of the incident.  He positioned the Metrobus at 75 feet, 110 feet, 140 feet, 167 feet, and 196 feet from the rear of the Escalade.  A five-foot two-inch tall, African-American female, clothed in jeans, a black coat, sneakers, purple hat, and carrying two white exemplar shopping bags participated in the study.  The clothing and positioning was virtually identical to that of Ms. Walters on the night of the incident.  With the bus in various positions, Mr. Plant observed the visibility from the driver's position of the bus and recorded the visibility with photographs.  The area of the impact was clearly visible from 196 feet away and Ms. Walters was clearly visible when the bus was 140 feet away, which is the distance the bus was from Ms. Walters when she stepped toward the area of the impact.  (SMF at ¶13; photographs from visibility study, Exhibit 6; Exhibit 2).

There is no dispute that Mr. Fairnot knew or should have known about activity in the area of the Escalade based on the brightness of the Escalade taillights at a distance of 500 feet prior to impact.  (SMF at ¶11).  Pursuant to the Standard Operating Procedures for Metrobus drivers, Mr. Fairnot should have been on a higher alert than he otherwise would have been based on this activity.  Pedestrian safety should have been even more clearly on his mind in view of the two fatal Metrobus/pedestrian accidents three days earlier, and the handout that he had received reminding him to give particular care to pedestrians crossing streets.  (SMF at ¶¶12, 26; and Exhibits 5 and 8).  WMATA's two accident reconstructionists, Stephen Chewning and Will Partenheimer, as well as

4

plaintiff's expert accident reconstructionist, David Plant, agree that Mr. Fairnot should have seen Ms. Walters at a point approximately 200 feet prior to impact. (SMF at ¶¶14, 16; Exhibits 3 and 7). In addition, Mr. Fairnot should have been able to see the inside light on the Escalade from 200 feet away. (SMF ¶15; Exhibit 3). Mr. Fairnot admitted that there are no obstructions to his line of sight for a substantial distance prior to impact with Ms. Walters, and he concedes that he should have seen Ms. Walters on the night in question, assuming that she was standing there for 5.3 seconds. (SMF at ¶¶24, 27; Exhibit 4). Clearly, by WMATA's own admissions in this case, Mr. Fairnot failed to pay time and attention, and his negligence began potentially 500 feet prior to impact, but clearly at least 200 feet prior to impact.

The Escalade was parked approximately 2½ feet away from the curb, and the Escalade itself was approximately 6 feet wide. According to WMATA's experts, Ms. Walters was standing in the roadway approximately 9.3 feet from the curb, and approximately 1.5 feet from the Escalade at the time of impact. The Escalade was between Ms. Walters and the curb. If Ms. Walters had backed up even one inch, she would have been standing on snow/ice, and if she had backed up 1.5 feet, she would have been in contact with the Escalade. (SMF at ¶¶17, 19, and 20; Exhibits 3 and 7). The width of Congress Street at the point of impact is approximately 34 feet. There were no cars parked on the opposite side of the street from the Escalade for at least 100 feet in the direction that the Metrobus was traveling. (SMF at ¶18; Exhibit 7).

It appears that Ms. Walters saw or heard the Metrobus because she made no effort to cross the street in the 7.73 seconds prior to impact. It may well be that Ms. Walters perceived the bus to be moving faster than it actually was, which may explain why she paused to allow it to pass. (SMF at ¶¶4, 6 and 7). Just as three accident reconstruction experts have concluded, and just as Mr. Fairnot concluded at his deposition, Ms. Walters likely concluded on the night of this accident that

Mr. Fairnot saw or should have seen her as she was standing next to the Escalade. Based on the assumption that Mr. Fairnot saw her or should have seen her, she reasonably anticipated that Mr. Fairnot would have steered slightly to his left, or taken some other evasive action in order to avoid hitting her. Unfortunately, Mr. Fairnot took no such action, despite having the ability to completely stop even up to 30 feet prior to impact. Ms. Walters reasonably expected Mr. Fairnot to take the appropriate actions as a bus driver, and as such she made no attempt to cross the road. In all likelihood, she did not appreciate the fact that Mr. Fairnot was not taking evasive action until it was too late for her to retreat to a position of safety. Even if she had taken some action at that point, according to plaintiff's expert, she only had 1.5 feet in which to maneuver, and this would have required her to step on to snow and ice. A retreat to the curb was blocked by the Escalade itself. (SMF at ¶¶17, 19 and 20).

A jury could easily conclude in this case that Ms. Walters did nothing wrong, and was not contributorily negligent in waiting for Mr. Fairnot to drive around her as she paused to cross the street. In any event, this is a fact question for the jury. Even if Ms. Walters is found contributorily negligent, it is clear that Mr. Fairnot, as a matter of fact and as a matter of law, had the last clear chance to avoid this accident, and he failed to do so.

## II.     Standard of Review

Pursuant to Fed. R. Civ. P. 56, summary judgment is appropriate when the moving party can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In determining whether a genuine issue of material fact exists, the court must view all facts and reasonable inferences in the light most favorable to the non-moving party." *Ezrin v. Stack*, 281 F. Supp.2d 67, 69

(D.D.C. 2003) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

### III.    Argument

A.    *WMATA Cannot Establish Contributory Negligence as a Matter of Law*

WMATA argues that Angel Walters is contributorily negligent as a matter of law in allegedly violating 18 D.C.M.R. §2304.2.[2]  It is clear, however, from the surveillance video that captured this incident that Ms. Walters acted in accordance with the regulation.  Although violation of traffic regulations may constitute negligence *per se*, "presumptive liability may be rebutted by proof of facts which tend to explain or excuse the violation."  *Lyons v. Barrazotto*, 667 A.2d 314, 323 (D.C. 1995) (citing *Leiken v. Wilson*, 445 A.2d 993, 1002 (D.C. 1982)).   "Whether the regulation has been violated and whether that violation is a proximate cause of the injury are within the province of the jury generally."  *Id.*  As discussed below, Ms. Walters is not contributorily negligent as a matter of law as she did not violate 18 D.C.M.R. §2304.2.

CDCR § 18-2304.2 states that "[e]ach pedestrian **crossing** a roadway at any place other than within a marked crosswalk, or within an unmarked crosswalk at an intersection, shall yield the

---

[2] The two cases that WMATA cites *Scott v. Wilson*, 77 A.2d 321, 322 (D.C.1950), and *Lewis v. Shiffers*, 67 A.2d 269, 271 (D.C. 1949), involve collisions between automobiles at intersections and do not seem to have any relevancy to this case, especially since WMATA's Metrobus operator admits that he did not see Ms. Walters at any point prior to the impact.

right-of-way to all vehicles upon the roadway." (Emphasis added). The surveillance video shows Ms. Walters, after alighting from a vehicle, pausing for at least 5.6 seconds next to the vehicle before she was struck by the Metrobus. She was not **crossing** the roadway as set forth in the regulation. Rather, Ms. Walters was standing close to the left rear of the Escalade, 9.3 feet from the curb, and on the right side of the roadway upon which the Metrobus had at least 24 feet to maneuver. There is no reason why Ms. Walters would have or should have thought that she was standing in the pathway of the bus or that the bus would strike her while she was waiting for it to pass. Ms. Walters had every right to believe, just as every expert has said and even as Mr. Fairnot has said, that Mr. Fairnot should have seen her on the night in question. Ms. Walters was yielding to the bus as the regulation requires. WMATA's argument that Ms. Walters was contributorily negligent as a matter of law is without merit.

Both the Metrobus and Ms. Walters were or should have been visible to one another. WMATA has presented no evidence to show that Ms. Walters was not visible to its Metrobus operator and the visibility study conducted by plaintiff's accident reconstruction expert, David Plant, conclusively demonstrates that the Metrobus operator should have seen Ms. Walters. Ms. Walters rationally believed that she was standing in a position of safety as she waited for the bus to pass. She was standing next to a parked vehicle that had its taillights on, hatch open, and she was standing between two well lit overhead street lights. There was also an open alleyway behind the Escalade that meant there was no parked cars for approximately 30 feet in that direction. Ms. Walters should have been visible to the bus operator for at least 200 feet according to WMATA's own experts. There was ample room for the bus to safely pass – there was no traffic coming from the opposite direction of the Metrobus and there were no vehicles parked on the opposite side of the roadway. As noted in the *en banc* decision of *WMATA v. Jones*, 443 A.2d 45, 50 (1982), which discussed, *inter*

*alia*, contributory negligence and last clear chance as a matter of law, "[i]t is only a case where the facts are undisputed and, considering every legitimate inference, only one conclusion may be drawn, that the trial court may rule as a matter of law on negligence, contributory negligence, or proximate cause." (citations omitted). Just as WMATA's request for a finding of contributory negligence as a matter of law was rejected as a matter of law in *Jones*, so must it be here.

B.    *Even If Ms. Walters Was Contributorily Negligent As A Matter Of Law, She Will Prevail On The Doctrine Of Last Clear Chance*

Even assuming that WMATA is able to establish that Ms. Walters was contributorily negligent as a matter of law, plaintiff may still recover under the doctrine of last clear chance. A plaintiff who is contributorily negligent may recover under the doctrine of "last clear chance" if she demonstrates:

> (1) the plaintiff was in a position of danger caused by the negligence of both plaintiff and defendant; (2) the plaintiff was oblivious to the danger, or unable to extricate herself from the position of danger; (3) the defendant was aware, or by the exercise of reasonable care should have been aware, of the plaintiff's danger and of her oblivion to it or her inability to extricate herself from it; and (4) the defendant, with means available to him, could have avoided injuring the plaintiff after becoming aware of the danger and the plaintiff's inability to extricate herself from it, but failed to do so.

*District of Columbia v. Robinson*, 644 A.2d 1004, 1005 (D.C. 1994) (citations omitted); *see also*, *WMATA v. Young*, 731 A.2d 389, 394-95 (D.C. 1999) (citations omitted). Here, Mr. Fairnot's negligence potentially began 500 feet before impact when he failed to observe the taillights of the Escalade. By 200 feet prior to impact, he failed to see what the accident reconstruction experts— and even he—admit should have been seen. Ms. Walters' was waiting to cross the street in a well lit area between two street lights. She was carrying two large white bags. She had no reason to expect that she was in danger and, in fact, it was reasonable for her to assume that Mr. Fairnot would see her.

As WMATA only refutes plaintiff's ability to establish the second element of the doctrine, plaintiff will solely address that element. Specifically, WMATA argues that there is no evidence that Ms. Walters was oblivious of the danger or that she was unable to extricate herself from the position of danger. Ms. Walters was aware of the approaching Metrobus as evidenced by the 5.3 seconds she waited by the Escalade prior to the bus striking her. She was, however, oblivious to the danger posed by the Metrobus.

Ms. Walters was standing next to a parked vehicle, which had its taillights illuminated, with an open hatch, and between street lights with ample room for the Metrobus to travel to the left of that parked vehicle without striking her. There was no reason for Ms. Walters to think that she was in a position of danger until the very last moment. By the time Ms. Walters realized that the Metrobus was going to strike her, it was too late for her to be able to extricate herself from the path of the bus.

In contrast, Mr. Fairnot should have been aware of the plaintiff's danger and her inability to extricate herself from it as Ms. Walters was clearly visible to and should have been seen by the bus driver, as demonstrated by the visibility study. If the bus driver had been paying attention to what was clearly there to be seen, he would have seen Ms. Walters and been able to move his bus the necessary distance to avoid killing her. Instead, the bus driver failed to pay full time and attention and he did not see Ms. Walters or realize he had even struck her until after he brought the bus to a stop.

Even if the jury concludes in this case that Ms. Walters "froze" as she saw the bus approaching, this would satisfy the second element for purposes of last clear chance. In the case of *Felton v. Wagner*, 512 A.2d 291 (1986), Ms. Felton was crossing Connecticut Avenue mid-block. As she crossed over the double yellow line, she at first did not see an oncoming car, but when she

looked a second time, she did see the car and then froze in place. This testimony, under a more difficult set of facts for plaintiff, was sufficient to satisfy the second element of last clear chance. *Id.* at p. 297.

*WMATA v. Young*, 731 A.2d 389 (1999), involved a turning Metrobus and a bicyclist riding along the right side of the bus. As the bus turned to the right, the bicyclist became trapped under the right rear wheel. The jury found negligence on the part of the bus driver, and contributory negligence on the part of the bicyclist. However, the jury awarded $925,000 in favor of plaintiff on the doctrine of last clear chance since it found the bus driver had the last opportunity to avoid the accident. The court in *Young* indicated that the question of last clear chance was a close one, but in affirming on appeal, held that there was sufficient evidence to go to the jury on the issue. In analyzing the second element, the Court determined that it was reluctant to conclude that the bicyclist was oblivious to the danger posed by the bus (the first prong of the second element). However, it did find that there was sufficient evidence to support that the bicyclist was in an "inextricable position of peril when he rode up alongside the bus." *Id.* at 396. In further discussing the second element, the Court noted that "[w]hile such an inference may not always be possible, one can reasonably infer from the circumstances presented here that if [the bicyclist] had been able to avoid the accident, he would have done so." *Id.* at 396.    The Court concluded that while the evidence was not strong, it was sufficient to support an inference that the bicyclist was unable to extricate himself from a position of peril, hence sufficient to prove the second element of last clear chance. *Id.* at 396.

At the very minimum, plaintiff here should be entitled to the same inference as the plaintiff is *Young*. Ms. Walters' 5-year-old daughter was asleep in the car approximately five feet from where she was standing at the point of impact. One can reasonably infer that if there was a way for her to

avoid the accident, she would have done so.  Since she was unable to do so, the second element of

the last clear chance doctrine is satisfied.

The jury should reasonably conclude in this case that either Ms. Walters was unaware of the

danger that she was in, or that when she fully appreciated the danger, she was unable to extricate

herself from it.  As such, and since she is entitled to every inference in her favor, WMATA's request

for summary judgment on this point must be denied.

C.    *Concurrent Negligence*

WMATA cites to the *Robinson* case for the proposition that "concurrent negligence" is an

exception to the last clear chance doctrine.  *Robinson*, 644 A.2d at 1005-1006 (holding that, even

assuming concurrent negligence is exception to last clear chance, evidence created jury question as

to whether pedestrian who paused in middle of a two-way street was negligent).  In *Robinson*, the

Court did **not** adopt the concurrent negligence standard and specifically upheld the trial court's

refusal to give a jury instruction on the issue.  In *Robinson*, the Court recognized the difficulty in

applying the exception of concurrent negligence to the last clear chance doctrine.

> We assume, for the sake of argument in this case, that concurrent negligence is an
> exception to the doctrine of last clear chance in this jurisdiction. We do so despite
> the conceptual difficulty of harmonizing the exception with the *disjunctive*
> treatment by our decisions of two classes of plaintiffs:  The plaintiff who is
> "oblivious to the danger"… and the plaintiff who is "unable to extricate herself"
> from that position of danger.

*Id.* at 1006.  Under the concurrent negligence exception, a plaintiff who is oblivious to the danger

may recover only if she was "non-negligently oblivious."  *Id.*  Since such a plaintiff would then be

conceptually indistinguishable from the plaintiff who is "unable to extricate" from the danger, it

would appear that the exception would delete "obliviousness" from the doctrine permitting recovery

if other requirements of last clear chance are met. The Court noted that "only an *en banc* court could affect such a change." *Id* at 1007.

Assuming, *arguendo*, that Ms. Walters was negligent in standing next to the vehicle from which she had just alighted, she moved to that position and then stopped for 5.3 seconds. In taking the inferences in Ms. Walters' favor, the evidence shows that Ms. Walters paused in waiting for the bus to pass her by. She was not in the center of traffic as was the plaintiff in *Robinson*. She could reasonably have assumed that Mr. Fairnot saw her, just as every expert in the case, and Mr. Fairnot himself, said should have occurred. As such, a jury could easily conclude that any "negligence" on the part of Ms. Walters ended when she paused before crossing the street, and that it was Brenton Fairnot who had the last clear chance to avoid this accident, and not her. She was either non-negligently oblivious to the danger from the bus, or at the last moment, was unable to extricate herself from the danger. Under either circumstance, and assuming the concurrent negligence is a viable doctrine (which plaintiff believes it is not), WMATA's Motion must be denied.

## IV.    Conclusion

Whether or not Ms. Walters was contributorily negligent is a determination that should be made by the fact finder in this case. Similarly, whether Mr. Fairnot had the opportunity to and should have avoided this accident on the basis of last clear chance is a question for the jury to decide. Therefore, for the reasons discussed above and the entire record in this case, plaintiff respectfully requests that this Court deny WMATA's Motion.

Respectfully submitted,

By:    /s/ Kelly M. Lippincott
       Paul J. Maloney, Esquire
       D.C. Bar No. 362533
       Kelly M. Lippincott, Esquire
       D.C. Bar No. 484610

13

Carr Maloney P.C.
1615 L Street, N.W., Suite 500
Washington, D.C.  20036
(202) 310-5500 (telephone)
(202) 310-5555 (facsimile)
pjm@carrmaloney.com
kml@carrmaloney.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing ***Plaintiff's Opposition to Defendant's Motion for Summary Judgment*** was e-filed and served electronically this 15th day of August, 2008, to:

> Fredric H. Schuster, Esq.
> David J. Shaffer, Esq.
> Assistant General Counsel
> Washington Metropolitan Area
>  Transit Authority
> 600 Fifth Street, N.W.
> Washington, D.C. 20001

> /s/ Kelly M. Lippincott
> Kelly M. Lippincott, Esquire
> D.C. Bar No. 484610
> Carr Maloney P.C.
> 1615 L Street, N.W., Suite 500
> Washington, D.C.  20036
> (202) 310-5500 (telephone)
> (202) 310-5555 (facsimile)
> kml@carrmaloney.com
> Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLADYS CLAUDETTE SUTTON,                   :
Individually and as Personal               :
Representative of the Estate and Next of Kin of   :
ANGEL CLAUDETTE WALTERS, Deceased          :
                                           :
          Plaintiff,                       :     Case No.:07- 01197 (JDB)
                                           :
     v.                                    :
                                           :
WASHINGTON METROPOLITAN AREA               :
TRANSIT AUTHORITY,                         :
                                           :
          Defendant.                       :

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

Plaintiff Gladys Sutton, pursuant to Fed. R. Civ. P. 56 and LCvR 56.1, submits the following Statement of Material Facts in Dispute:

1.     On February 17, 2007, at approximately 11:09 p.m., Angel Claudette Walters was struck and killed by a Metrobus as she was standing next to a parked vehicle on Congress Street, SE, Washington, DC from which she had alighted.  Surveillance Video.  (Exhibit 1)

2.     Approximately one minute and fifteen seconds before Ms. Walters was struck by the Metrobus, Ms. Walters, her five-year-old daughter, and three girlfriends returned from shopping and dinner in a black Cadillac Escalade, which parallel parked on the side of Congress Street, SE. (Report of David Plant, dated November 9, 2007, at p. 3 attached as Exhibit 2; Exhibit 1).

3.     Ms. Walters, who was a left rear passenger, got out of the vehicle and retrieved two large, white bags from the back of the vehicle.  (Exhibit 1; Exhibit 2).

4.      At least 7.73 seconds prior to the impact, when the Metrobus was 167 feet away from the point of impact, Ms. Walters started to walk toward the point of impact.  (Exhibit 1; Exhibit 2).

5.      At least 6.67 seconds prior to the impact, when the Metrobus 140 feet away from the point of impact, Ms. Walters stepped onto the non-ice portion of the pavement carrying the two white bags.  (Exhibit 1; Exhibit 2).

6.      At least 5.33 seconds prior to the impact, when the Metrobus was 110 feet away from the point of impact, Ms. Walters paused before beginning to cross the street.  (Exhibit 1; Exhibit 2).

7.      At the time the Metrobus struck Ms. Walters, it was traveling 15-20 m.p.h.  (Exhibit 2 at p. 8).

8.      If Brenton Fairnot, the Metrobus operator, would have applied his brakes while traveling at 15 m.p.h., he would have been able to stop the bus in less than 30 feet.  (Exhibit 2 at p. 9).

9.      If Mr. Fairnot was traveling 20 m.p.h., he would have been able to stop the bus in less than 48 feet.  (Exhibit 2 at p. 9).

10.     The area of the accident was well illuminated.  Congress Street was lined with street lights that illuminated the roadway.  Ms. Walters was standing at a location that was between two street lights.  (Exhibit 1; Exhibit 2 at p. 7).

11.     The Escalade headlights and taillights were both on prior to the time of impact.  Mr. Fairnot should have seen the taillights on the Escalade at a minimum of 500 feet prior to impact. Deposition of WMATA's accident reconstruction expert, Stephen Chewning, dated March 7, 2008, p. 16, l. 14-21 (Exhibit 3).

2

12.    At his deposition, Mr. Fairnot identified the Metrobus Standard Operating Procedures on which he was trained.  The procedures included the following:

**FOREWARD**

- This handbook has been designed and prepared to provide the Metrobus employee with clearly defined bus operating procedures….  (p. 1)

- Illustrated and explained in this manual are the standards for Metrobus operation under normal traffic conditions. (p. 1)

**OBSERVATIONS**

- Observations are critical to the safe operation of a bus. The way you drive is a direct response to what you see. Every person, object, or vehicle within the traffic patterns must be observed.  The operator must survey the road, evaluate traffic conditions, and identify all hazards in the driving environment…. (p. 38)

- Looking 12-15 seconds ahead:

   o At least one block ahead in city traffic… (p. 38)

**DEFENSIVE DRIVING**

- Accident prevention is a major goal of professional operators. The professional operator drives to avoid all accidents in spite of the actions of others or the presence of adverse driving conditions.  Defensive driving has three major concepts:

   (1) see the danger:
   - Scan the road
   - Observe all hazards in the driving environment
   - Establish the accident potential:
      - Anticipate movement
      - Be alert to changes in the traffic pattern

   (2) Understand the defense:

   - Be prepared to stop smoothly

3

- Steer to avoid danger before emergency actions is (sic) required

(3) Initiate immediate action:

- React to first possible perception of danger
- Provide maximum braking, steering time and distance
- Avoid passenger injury and vehicle abuse (p. 41)

**PEDESTRIAN ACCIDENTS**

| Position of Pedestrian | Possible Action of Pedestrian | Defensive Action of Operator |
|---|---|---|
| Pedestrian Ahead | Stand or walk in front of moving bus | Slow down or stop to permit pedestrian to cross. Proceed only when certain that pedestrian will stay clear of the bus. (p. 44) |

(Exhibit 4, Deposition of Fairnot, p. 174, l. 12 to p. 176, l. 16; p. 180, l. 16 to p. 186, l. 12; Exhibit 5, Metrobus Standard Operating Procedures, relevant portions only).

13.    On November 7, 2007, plaintiff's accident reconstructionist, David Plant, performed visibility testing at the accident scene with the same WMATA Metrobus that struck and killed Ms. Walters.   The testing was done at night.  Mr. Plant positioned the same Escalade that was present the night of the incident and had its headlights and taillights on during the testing, as they had been the night of the incident.  He positioned the Metrobus at 75 feet, 110 feet, 140 feet, 167 feet, and 196 feet from the rear of the Escalade.  A five foot two inch tall, African-American female, clothed in jeans, a black coat, sneakers, purple hat, and carrying two white exemplar shopping bags participated in the study.  The clothing and positioning was virtually identical to that of Ms. Walters on the night of the incident.  With the bus in various positions, Mr. Plant observed the visibility from the driver's position of the bus and recorded the visibility with photographs.  The area of the impact was clearly visible from 196 feet away and that Ms. Walters was clearly visible when the bus was 140 feet away, which is the distance the bus was from the point of impact when Ms. Walters stepped

4

to the area of the impact.  (Exhibit 1; Exhibit 2  at pp. 3; and 7; Photographs from Visibility Study (Exhibit 6).

14.     According to WMATA's expert witness, Stephen Chewning, Mr. Fairnot was incorrect in his deposition when he said that Ms. Walters was not visible on the night of the accident.  Mr. Fairnot should have seen her at approximately 200 feet prior to point of impact.  (Deposition of Stephen Chewning, dated March 7, 2008, p. 14, l. 7 to p. 16, l. 13 (Exhibit 3)).

15.     According to WMATA's accident reconstruction expert, Stephen Chewning, if the Escalade hatchback was up and the inside light was on, Mr. Fairnot should have been able to see that from approximately 200 feet away.  (Deposition of Stephen Chewning, dated March 7, 2008, p. 17, l. 18 to p. 18, l. 13 (Exhibit 3)).

16.     According to  WMATA's  accident  reconstructionst  expert  witness, Will Partenheimer, Mr. Fairnot should have seen Ms. Walters on the night of the accident.  (Deposition of Will Partenheimer, dated March 7, 2008, p. 9, l. 5-8 (Exhibit 7)).

17.     According to WMATA's accident reconstruction expert, Stephen Chewning, Ms. Walters was standing 9.3 feet into the roadway at the time of the accident, and the Escalade was 6 feet wide.  (Deposition of Stephen Chewning, dated March 7, 2008, p. 27, l. 5-12 (Exhibit 3)).

18.     The distance between the curbs at the point of impact was approximately 34 feet. There were no cars parked on the opposite side of the street from the Escalade for at least 100 feet in the direction that the Metrobus was traveling.  (Deposition of Will Partenheimer, dated March 7, 2008, p. 46, l. 16 to p. 47, l. 14 (Exhibit 7)).

19.     The Escalade was between Ms. Walters and the curb at the time of impact, and approximately 1.5 feet away from Ms. Walters.  If she were to have backed up, she would have

backed into the left rear corner of the Escalade.  (Deposition of Will Partenheimer, dated March 7, 2008, p. 49, l. 8-19 (Exhibit 7)).

20.    Between Ms. Walters and the Escalade was 1.5 feet of snow.  If Ms. Walters backed up even one inch, she would have been standing on snow and ice.  (Deposition of Will Partenheimer, dated March 7, 2008, p. 49, l. 20 to p. 50, l. 18 (Exhibit 7)).

21.    According to WMATA's accident reconstructionist expert, Will Partenheimer, Mr. Fairnot could have stopped or driven around Ms. Walters.  (Deposition of Will Partenheimer, dated March 7, 2008, p. 22, l. 15-22 (Exhibit 7)).

22.    There is a genuine issue of material fact whether Ms. Walters was attempting to cross the road prior to impact, or whether she had stopped to allow the bus to pass.  (The record herein).

23.    There is a question of fact when Ms. Walters saw and/or heard the bus prior to impact.  (The record herein).

24.    Mr. Fairnot admits that he should have seen Ms. Walters on the night in question. (Exhibit 4, p. 198, l. 20 to p. 199, l. 3).

25.    If Mr. Fairnot had seen Ms. Walters at a point shortly before impact, he could have taken evasive action, to include steering to the left, honking his horn, flashing his bright lights, or some other evasive type of activity.  (The record herein).

26.    WMATA bus drivers had struck and killed at least four pedestrians in the nine months prior to Angel Walters' death, including two people on February 14, 2007, three days before this accident.   On February 16, 2007, all WMATA bus drivers were given special handouts reminding them to give particular care to pedestrians crossing streets.  (Exhibit 8).

27.    There were no obstructions of sight for Mr. Fairnot for a substantial time before impact. (Exhibit 4, Fairnot Deposition, p. 115, l. 13 to p. 116, l. 13).

6

Respectfully submitted,


By:    /s/ Kelly M. Lippincott
       Paul J. Maloney, Esquire
       D.C. Bar No. 362533
       Kelly M. Lippincott, Esquire
       D.C. Bar No. 484610
       Carr Maloney P.C.
       1615 L Street, N.W., Suite 500
       Washington, D.C.  20036
       (202) 310-5500 (telephone)
       (202) 310-5555 (facsimile)
       pjm@carrmaloney.com
       kml@carrmaloney.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing **Plaintiff's Statement of Material Facts in Dispute** was e-filed and served electronically this 15th day of August, 2008, to:

Fredric H. Schuster, Esquire
David J. Shaffer, Esquire
Assistant General Counsel
Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, D.C. 20001


<u>/s/ Kelly M. Lippincott</u>
Kelly M. Lippincott, Esquire
D.C. Bar No. 484610
Carr Maloney P.C.
1615 L Street, N.W., Suite 500
Washington, D.C.  20036
(202) 310-5500 (telephone)
(202) 310-5555 (facsimile)
kml@carrmaloney.com
Attorneys for Plaintiff

# EXHIBIT 1

# EXHIBIT 1

# SURVEILLANCE VIDEOTAPE

# WILL BE HAND DELIVERED TO JUDGE'S CHAMBERS

# EXHIBIT 2

exhibits

D. P. Plant & Associates
1722 V Street, N.W.
Washington, D.C. 20009
Tel: (202) 232 - 8929
Fax: (202) 318 - 0663

November 9, 2007

Paul J. Maloney
Carr Maloney P.C.
1615 L Street, NW, Suite 500
Washington, DC 20036

pjm@carrmaloney.com

VIA EMAIL & US MAIL

Re:  Sutton, et al. v. WMATA

Dear Mr. Maloney:

I am investigating the fatal pedestrian accident that occurred on the night of February 17, 2007. Based upon the information available at this time and my accident reconstruction work, I am presenting my opinions via this report. I have reviewed the following information and performed the work listed below:

1.  Various documents, reports, and photographs prepared by or taken by the Metropolitan Police Department of Washington, D.C.

2.  Video taped interview of Brenton L. Fairnot by Detective Washington.

3.  Reviewed transcripts of the depositions of:
    Brenton L. Fairnot taken October 9, 2007
    Detective Wayne B. Washington taken October 16, 2007
    Quintenette Ramseur taken October 16, 2007

4.  Images from video taken by news organizations.

5.  Defendant WMATA's written discovery responses.

6.  Photographs of Ms. Walters' (the decedent) clothing.

7.  Documents regarding the Orion V bus, the weather conditions, the moon phase, and the W2 bus map and schedule.

8.  Surveillance video of the accident and information relating to the equipment used to record this video.

9.  Obtained specifications for the 1999 Cadillac Escalade.

10.   Inspected the 1997 Orion Metrobus.

11.   Inspected the accident scene.

## Police Report

According to the police report (Form PD 10), this accident occurred on February 17, 2007 at 11:10 a.m. on Congress Street 223 feet east of 13th Place, in South East, Washington, D.C. The police report listed Brenton L. Fairnot as the driver of the 1997 Orion Metrobus, VIN 1VH519P79V6033761, and Angel Claudette Walters as the pedestrian.

The police report stated "…pedestrian #2 was carrying items from the rear of a parked vehicle when she stepped out into the roadway and was struck by a passing Metro Transit Bus. The pedestrian was transported to the Washington Hospital Center Medstar Unit where she was pronounced dead at 2349 hours by Dr. Sava." The police report indicated that the speed limit on Congress Street was 25 mph.

## Accident Scene Inspections

I inspected the accident scene on February 28, 2007 and October 29, 2007. During these inspections, I took measurements and photographs of the accident scene. I located paint marks on the roadway. These paint marks were made by the police and located the rest position of the WMATA bus and location of physical evidence, such as where Ms. Walters came to rest. I measured the locations of these paint marks. In addition, I measured the locations of two surveillance cameras. Using my measurements, I have prepared a scale drawing of the accident scene, which includes the paint marks that I measured. I have overlaid my scale drawing over an aerial photograph of the accident scene. My scale drawing of the accident scene with aerial photograph is attached to this report as Exhibit 1. At the time of the accident, the WMATA bus was traveling northeasterly on Congress Street. Congress Street is slightly uphill in this direction. I measured the uphill grade and it varied from 0.6 to 1.2 degrees.

## WMATA Metrobus Inspection

I inspected the WMATA Metrobus on October 8, 2007. During this inspection, I took measurements and photographs of the subject bus. The bus is a 1997 Orion V transit bus, is numbered by WMATA as bus number 3941 and has a GVWR (gross vehicle weight rating) of 34,750 lbs. The length of the bus measured 32 feet 4.3 inches, the width was 8 feet, the front overhang was 7 feet 6 inches, and the wheelbase was 14 feet 11.5 inches. The bus was equipped with two halogen sealed beam low beam headlights. Using my measurements, I have prepared a scale drawing of the subject bus.

## Surveillance Video

I was provided with a CD-ROM, which contained video from two surveillance cameras, which recorded the accident. The locations of these two surveillance cameras are shown on Exhibit 1 (i.e. my scale drawing of the accident scene). The camera near the intersection of Congress Street and 13th Place continuously pivoted clockwise and counterclockwise so that it

recorded views looking easterly to westerly down Congress Street. The second camera was mounted on the face of a building and this camera was stationary (i.e., it did not pivot). The video was provided in a format that could only be viewed on a computer and a proprietary program was provided to view the video. I was informed by Scott Ulmer of Special Services Protection Division that these cameras recorded video at 3.75 frames per second (i.e. the time between frames on the video is 0.27 seconds). I have taken the video from both cameras and have prepared a split-screen video so that the video from both cameras could be viewed at the same time.

The video shows the WMATA bus traveling on Congress Street and shows Ms. Walters being struck by the bus. The Using the video and my scale drawing of the accident scene, I have determined the following:

| Video Frame Number | Description | Time relative to Frame 1959 (which is just before impact) a minus time is time before frame 1959 |
|---|---|---|
| 1678 | The Escalade parks on the South side of Congress St. | -74.93 seconds |
| 1830 | The bus is first visible and is at 13th Street. | -34.40 seconds |
| 1854 | A car going southwesterly passes the Escalade. | -28.00 seconds |
| 1915 | A car going northeasterly (same direction as the bus) passes the Escalade. | -11.73 seconds |
| 1922 | Front of the bus is adjacent a fire hydrant that is on the north side of Congress St. at the 13th Pl. intersection. The bus is approximately 225 feet from the rear of the Escalade. | -9.87 seconds |
| 1926 | Front of the bus is adjacent a tree and fence post that are on the north side of Congress St. near the 13th Pl. intersection. Bus is approximately 196 feet from the rear of the Escalade. | -8.80 seconds |
| 1930 | Ms. Walters starts to walk towards the area of impact. Rear axle of the bus is adjacent a fence post that is on the north side of Congress St. near the 13th Pl. intersection. The bus is approximately 167 feet from the rear of the Escalade. | -7.73 seconds |
| 1934 | Ms. Walters steps onto the non-ice portion of the street. Rear of the bus is adjacent a fence post and steps that are on the north side of Congress St. east of the 13th Pl. intersection. The bus is approximately 140 feet from the rear of the Escalade. | -6.67 seconds |
| 1939 | Ms. Walters pauses in the street. The bus is approximately 110 feet from the rear of the Escalade. | -5.33 seconds |

| Video Frame Number | Description | Time relative to Frame 1959 (which is just before impact) a positive time is time after frame 1959 |
|---|---|---|
| 1951 | The bus is approximately 45 feet from the rear of the Escalade. | -2.13 seconds |
| 1959 | This frame of video is immediately before impact. The front of the bus is approximately adjacent with the rear of the Escalade. | 0.00 seconds |
| 1960 | The front of the bus has struck Ms. Walters. In this frame the right front headlight of the bus is not visible and is being blocked by Ms. Walters and/or by the packages she was carrying. | 0.27 seconds |
| 1972 | The brake lights on rear of bus may be illuminated (i.e., the brakes may be applied). | 3.47 seconds |
| 1973 | The brake lights on rear of bus are illuminated (i.e., the brakes are applied). | 3.73 seconds |
| 1980 | The bus stops at its rest position and the bus has traveled approximately 139 feet from its position in frame 1959 (i.e., the front of the bus is approximately adjacent with the rear of the Escalade). | 5.60 seconds |

The surveillance video also shows that after the southwesterly traveling car passes the Escalade there are no other vehicles traveling southwesterly on Congress Street as the bus is approaching to area of impact. Each frame of the surveillance video is date and time stamped. The "pivoting" camera has a time stamp of 23:08:32 (i.e. 11:08 p.m.) for frame 1959 (i.e. the frame of video that is immediately before impact). The "stationary" camera has a time stamp of 23:07:00 (i.e. 11:07 p.m.) for frame 1959 (i.e. the frame of video that is immediately before impact).

## Analysis

From the surveillance video I have determined where the bus was located as it traveled northeasterly along Congress Street from 13th Place to the area of impact. These positions and times are shown in the above table. Using these positions and times, I have determined the approximate speed of the bus as it traveled along Congress Street. I have determined that the bus was traveling at between 15 to 20 mph (miles per hour) as it traveled northeasterly on Congress Street from 13th Place to the area of impact. I performed testing with the subject WMATA bus at the accident scene on November 7, 2007. A Part of this testing consisted of having the bus travel northeasterly along Congress Street at speeds between 15 and 25 mph. The bus was video taped from a position below the stationary surveillance camera. I have requested, but have not received yet, the surveillance video, which captured my testing. My video along with the

surveillance video, when obtained, will be used to bolster the methodology that I have used to determine the speed of the bus. Upon completion of this analysis, I will supplement my opinions.

As shown in the police photograph below, as the bus traveled from the area of impact to where it came to rest, the right side tires of the bus were traveling on wet pavement and the left side tires on dry pavement. The stopping distance of the bus is a function of the drag factor or deceleration rate that the bus can achieve on a roadway. Based on the literature and from testing that I have performed, the drag factor for this bus on a dry pavement will be 0.50 to 0.70 and wet pavement will be 0.40 to 0.50.[1][2] The WMATA bus is equipped with an air braking system. Such braking systems will have a brake response time (i.e. from when the brakes are applied to when the brakes are effectively stopping the vehicle) that is longer then that of an automobile. Based on testing that I have performed with similar air-brake vehicles, it is my opinion, to a reasonable degree of scientific certainty, that this response time will be less than 0.50 seconds. Using a response time for the braking system of the bus of 0.5 seconds and a drag factor of between 0.4 and 0.7 the distance that the bus will stop in once the brake pedal is applied will be 22 to 30 feet from 15 mph, 34 to 48 feet from 20 mph, and 48 to 71 feet from 25 mph. Therefore, Mr. Fairnot, upon applying his brake pedal would have stopped the bus in less than 30 feet from 15 mph, less than 48 feet from 20 mph, and less than 71 feet from 25 mph (the distance numbers represent maximum stopping distances on a totally wet roadway).



Attached to the end of this report is Exhibit 2. Exhibit 2 is a portion of my scale drawing of the accident scene overlaid over the aerial photograph. On Exhibit 2 I have placed the scale

[1] Radlinski, R.W., Williams, S.F., NHTSA Heavy Duty Vehicle Brake Research Program Report No. 1 – Stopping Capability of Air Braked Vehicles – Volume 1 – Technical Report, DOT HS 806 738, April 1985.
[2] Craig, V., Wet and Dry Surface School Bus Skid Tests, Accident Reconstruction Journal, July/August 1990.

drawings that I have prepared of the WMATA bus and of the 1999 Cadillac Escalade. Using the photographs and surveillance video, I have placed the Escalade where it parked. Using the police paint marks, which I measured, I have placed the WMATA bus at its rest position. I have also used the surveillance video to place the Bus where it was located just before the accident as shown in surveillance video frame 1959, which is shown below. In surveillance video frame 1960 (also shown below), which is just after impact, the rear left taillight and rear left corner of the Escalade are no longer visible (the bus is in front of this area).



Surveillance Video Frame 1959



Surveillance Video Frame 1960

On November 7, 2007 I met with Ms. Letitia Kirkland at the accident scene. Ms. Kirkland brought her 1999 Cadillac Escalade to the scene. I placed Ms. Kirkland's Escalade in the position it was in at the time of the accident. Ms. Kirkland informed me that she observed Ms. Walters in her side view mirror (the mirror on the driver's side of the Escalade) before the accident. With Ms. Kirkland in her driver's seat, I mapped out the visibility limits of Ms. Kirkland's view using her side view mirror. Using this information along with my scale drawings, the surveillance video, and the physical evidence from the accident, I have determined that the area of impact was approximately one foot in front of the bus location that is shown in Exhibit 2. Ms. Walters, at impact, was located in the street and was approximately 2 to 3 feet from the left side of the Escalade when she was struck by the front of the bus. Using my scale drawings and the surveillance video, I have determined that Ms. Walters was moved

approximately 34 feet from where she was struck by the front of the bus to where she came to rest. I have also determined that the bus traveled approximately 138 feet from the area of impact to where it came to a stop after the accident. I have also determined that the bus did not start braking until approximately 3.5 seconds after impact.

The surveillance video shows that there were no vehicles parked on north side of Congress Street (see surveillance frames above). The distance from the left side of the parked Escalade to the north curb of Congress Street was 24.7 feet (the WMATA bus is 8 feet wide). The section where there were no vehicles parked on the north side of Congress Street, extended for a least 100 feet. The north side of Congress Street was dry and Mr. Fairnot could have easily used this portion of the roadway and move away from the Escalade, which had pedestrians unloading packages from the rear of this vehicle at the time of the accident.

The area of the accident is well illuminated. Congress Street is lined with street lights that illuminate the roadway. Ms. Walters was standing in the roadway at a location that was between two street lights. The locations of these two street lights are shown in Exhibit 2. The distance between these street lights is 75 feet. These street lights were illuminated at the time of the accident as they are visible in the surveillance video (see above frames from video). I inspected the accident scene during nighttime on October 22, 2007. I drove multiple times northeasterly on Congress Street past the location of the accident. I observed that the area of impact was well illuminated by the street lights and the headlights on my automobile. According to both the Maryland and District of Columbia Commercial Driver's License Manuals, "With low beams you can see ahead about 250 feet and with high beams about 350-500 feet." On November 7, 2007 I performed testing with the subject WMATA bus at the accident scene. This testing was conducted during nighttime hours (i.e., it was dark). I had the Escalade parked in the same position as the night of the accident and had its headlight and taillight on during the testing. I positioned the front of the bus at 75 feet, 110 feet, 140 feet, 167 feet, and 196 feet from the rear of the Escalade. I had a 5-feet 2-inch tall pedestrian clothed in jeans, a black coat, sneakers, purple hat, and carrying two white shopping bags containing exemplar lamps stand at two positions during the testing. The two positions consisted of the area of impact and where Ms. Walters would have stepped from the ice onto the pavement of the roadway. I also had two other pedestrians stand at the rear of the Escalade with the rear hatch of the Escalade open. With the bus at the various positions, I observed the visibility from the driver's position of the bus and recorded the visibility with photographs. The testing showed that the Escalade and the area surrounding the Escalade were clearly visible when the bus was 196 feet away (this is slightly greater than 8.80 seconds before impact). The testing showed that the Escalade and the area surrounding the Escalade were clearly visible when the bus was 167 feet away (this is slightly greater than 7.73 seconds before impact). The testing showed that Ms. Walters (who was walking towards the area of impact) and the white bags she was carrying, the Escalade, and the area surrounding the Escalade were clearly visible when the bus was 140 feet away (this is slightly greater than 6.67 seconds before impact). The testing showed that Ms. Walters (who was stationary at the area of impact) and the white bags she was carrying, the Escalade, and the area surrounding the Escalade were clearly visible when the bus was 110 feet away (this is slightly greater than 5.33 seconds before impact). The testing showed that Ms. Walters (who was stationary at the area of impact) and the white bags she was carrying, the Escalade, and the area surrounding the Escalade were clearly visible when the bus was 75 feet away (this is slightly greater than 3.63 seconds before impact). It is my opinion that Ms. Walters carrying the white bags was clearly visible to the driver of the WMATA bus and should have been detected by Mr. Fairnot when the bus was located 110 feet away and closer. It is also my opinion that Mr.

Fairnot should have seen Ms. Walters as she was walking from the rear of the Escalade towards the area of impact.

Had Mr. Fairnot detected Ms. Walters, who was clearly visible, when the bus was located 110 feet from the rear of the Escalade, Mr. Fairnot had more than a sufficient amount of time and distance to have stopped the bus before striking Ms. Walters. This opinion is based on a speed of the bus of 20 mph or less and a driver response time of no more than 3 seconds. According to Olson and Farber "it is probable that something like 90 to 95% of perception-response times for such straight forward situations will be in a range of 0.75 to 1.5 seconds."[3] Furthermore, Olson and Farber state "If an allowance is to be made for routine diversions of the driver's visual attention from straight ahead, then the upper bound on this interval should be increased to 2.5 to 3.0 seconds." Therefore, Mr. Fairnot should have observed Ms. Walters, who was standing in the street at the area of impact for at least 5 seconds before impact and should have avoided striking Ms. Walters and causing her death. In fact, Mr. Fairnot stated in his deposition that he should have been able to see Ms. Walters has she been in the street for five seconds prior to the impact.[4]

# Conclusions

1.    At slightly greater than 9.87 seconds before the impact, the bus is approximately 225 feet from the area of impact.

2.    At slightly greater than 8.80 seconds before the impact, the bus is approximately 196 feet from the area of impact.

3.    At slightly greater than 7.73 seconds before the impact, Ms. Walters start to walk towards the area of impact and the bus is approximately 167 feet from the area of impact.

4.    At slightly greater than 6.67 seconds before the impact, Ms. Walters steps onto the non-ice portion of the street and the bus is approximately 140 feet from the area of impact.

5.    At slightly greater than 5.33 seconds before the impact, Ms. Walters pauses in the street at the area of impact and the bus is approximately 110 feet from the area of impact.

6.    After impact, the bus traveled approximately 138 feet to where it came to a stop in the roadway. The bus took approximately 5.6 seconds to travel from the area of impact to where it came to a stop.

7.    I have determined that the bus was traveling at between 15 to 20 mph (miles per hour) as it traveled northeasterly on Congress Street from 13th Place to the area of impact. I anticipate performing testing at the accident scene and obtaining the surveillance video that captures my testing to bolster the methodology that I have used to determine the speed of the bus.

---

[3] Olson, P.L. and Farber, E., Forensic Aspects of Driver Perception and Response, 2nd Edition, Lawyers & Judges Publishing Company, 2003.
[4] Brenton L. Fairnot videotaped deposition, October 9, 2007, page 198-line 20 through page 199-line 3.

8.  Mr. Fairnot, upon applying his brake pedal would have stopped the bus in less than 30 feet from 15 mph, less than 48 feet from 20 mph, and less than 71 feet from 25 mph (the distance numbers represent maximum stopping distances on a totally wet roadway).

9.  I have determined that Ms. Walters moved approximately 34 feet from where she was struck by the front of the bus to where she came to rest.

10. Ms. Walters carrying the white bags was clearly visible to the driver of the WMATA bus and should have been detected by Mr. Fairnot when the bus was located 110 feet away and closer.

11. Mr. Fairnot should have seen Ms. Walters as she was walking from the rear of the Escalade towards the area of impact.

12. Mr. Fairnot should have observed Ms. Walters, who was standing in the street at the area of impact for at least 5 seconds before impact and should have avoided striking Ms. Walters and causing her death.

All of the opinions I have presented above are to a reasonable degree of scientific certainty. In addition, not all of the fact witnesses have testified and I will reserve the right to supplement and/or amend my opinions upon receipt of this testimony. If additional information becomes available or other opinions are presented, I will provide additional analysis and conclusions if requested.

Report by:

David P. Plant, P.E., ACTAR



Exhibit 1



Exhibit 2

# EXHIBIT 3

1

1          UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF COLUMBIA

2

3   GLADYS SUTTON, As Mother    :

    and Next Kin of Deceased    :        ORIGINAL

4   Daughter, ANGEL WALTERS,    :

                                :

5              Plaintiff    : Case No. 1:07cv1197(JDB)

                                :

6            v.                 :

                                :

7   WASHINGTON METROPOLITAN     :

    AREA TRANSPORTATION         :

8   AUTHORITY,                  :

                                :

9            Defendant    :

10

11      Deposition of STEPHEN B. CHEWNING

             Richmond, Virginia

12         Friday, March 7, 2008

                12:56 p.m.

13

14

15

16

17

18

19

20

21  Job No. 1-122528

    Pages 1 - 46

22  Reported by Tracy E. Barksdale, RPR



L.A.D. REPORTING & DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

14

1    question about the driver's deposition stating that

2    he could not see the person because they weren't

3    visible.  I know the work that Mr. Plant did, I saw

4    all that, I just wanted to see it for myself.  It

5    was not really a quantitative test as much as it was

6    to satisfy myself.

7           Q    Do you agree that Mr. Fairnot is

8    incorrect in his deposition when he says that the

9    plaintiff Angel Walters was not visible that night?

10          A    I believe he's incorrect.

11          Q    So you would agree, then, that

12   Ms. Walters should have been seen by Mr. Fairnot as

13   he drove the bus on that night?

14          A    Yes.

15          Q    At what point should Mr. Fairnot have

16   been able to see her that night?

17          A    Again, that's going to depend somewhat

18   on his visual acuity, but I would say, I think

19   within, I think we put in here 130 to 150 feet.  Let

20   me take a look.  I think I've got in here that the

21   bus was approaching 116 to 155 feet.  She certainly

22   would have been visible during that distance.

DEPOSITION OF STEPHEN B. CHEWNING
CONDUCTED ON FRIDAY, MARCH 7, 2008

15

1    Q    That's at the point she was actually

2    standing in the roadway; is that correct?

3         A    Yes.  When she is standing.

4         Q    How about prior to her standing in the

5    roadway, should she have been visible to the bus

6    driver?

7         A    That's an approach issue as far as

8    timing.  I think the further you put her back in

9    time, the further you put the bus back, and the less

10   likely that is.  What I really focused on -- well,

11   Mr. Partenheimer was doing the work, but I was

12   directing him to do is to study the position that

13   the pedestrian was standing in, because that is the

14   critical position, and the time prior to that was

15   not nearly as important for either.

16        Q    All right.  Well, for my purposes, can

17   you tell me how far in advance of the point of

18   impact Ms. Walters started to walk from where she

19   was standing behind the vehicle to where she was

20   standing on the roadway.

21        A    I believe we indicated 7.7 seconds

22   before impact when she starts to walk towards the

16

1    location where she was struck.

2            Q    All right.

3            A    And the bus at that time would be

4    between 169 and 225 feet away.

5            Q    And my follow-up question then, is at

6    that point, 7.7 seconds prior to impact, should the

7    bus driver have been able to see her?

8            A    That's the outside edge of it.  As I

9    said, I think 200 feet is the number, the outside

10   number that you should use.  The 116 to 155 that we

11   used, you could definitely see.  If you're

12   stretching it to max, I'd say 200 feet is on the

13   outside of max.

14           Q    You would agree that the taillight was

15   on on the Escalade, would you not?

16           A    I seem to recall that from the video,

17   yes.

18           Q    At what point should the bus driver

19   have been able to see the taillights on the

20   Escalade?

21           A    Minimum 500 feet.

22           Q    The headlights were on on the Escalade

17

1    and shining into the vehicle ahead of it; do you

2    recall that?

3            A    Seem to recall that from the video.

4            Q    At what point should the bus driver

5    have been able to see that?

6            A    That's a reflection, not pointing

7    towards him.  The reflection on the other objects, I

8    didn't try to measure.  I have no idea.

9            Q    At what point should the bus driver

10   have been able to see the other two individuals

11   standing at the back of the Escalade?

12           A    I didn't measure anything about that

13   or study.  I have no idea.

14           Q    Should he have been able to see the

15   other two?

16           A    Depends where they were standing.  I

17   don't recall.

18           Q    Do you recall whether the hatch of the

19   Escalade was up?

20           A    I it had been up.  I don't recall it

21   being up at the time of the collision.

22           Q    Do you remember one way or the other?

DEPOSITION OF STEPHEN C. BROWN, III
CONDUCTED ON FRIDAY, MARCH 7, 2008

18

```
 1          A    I don't.

 2          Q    Let's assume it was up.  Would there

 3   have been an internal light in the vehicle?

 4          A    That would be either way.  There's a

 5   switch inside the vehicle that would control that.

 6          Q    Is that something Mr. Fairnot should

 7   have been able to see?

 8          A    If the light was on.  If it's on, I

 9   wouldn't say that would give him any more additional

10   visibility.

11          Q    Assuming it was on, at what point

12   should he have been able to see that?

13          A    I'd say 200 feet.

14          Q    All right.  Are you aware of the

15   clothing that Ms. Walters was wearing?

16          A    From the reports and things that I

17   saw, I saw it.  I didn't take separate note of it.

18          Q    All right.  Do you know what type of

19   shoes she was wearing, for example?

20          A    I don't recall.  I'd have to look at

21   the report.

22          Q    Do you know if the shoes had any
```

27

1          Q    But you can't verify that one way or

2     the?

3          A    I'm not a biomechanical person or a

4     doctor.

5          Q    Where was Ms. Walters standing

6     vis-a-vis the Escalade at the point of impact?

7          A    Behind it and slightly to the left of

8     it.  The Escalade is, I would say, close to six feet

9     wide, and I believe that we computed that she was

10    standing, I believe, approximately 9.3 feet into the

11    roadway.  So she would be, you know, slightly

12    outside the width of the Escalade.

13          Q    Was she standing on snow or ice at the

14    time at the point of impact?

15          A    It did not appear that was the case,

16    from what I saw.

17          Q    All right.  Was that an independent

18    assessment done by Mr. Partenheimer that you then

19    verified?

20          A    I looked at the pictures also.  We

21    talked about where the ice was in the pictures, and

22    where she ultimately was determined to be standing

# EXHIBIT 4

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLUMBIA

3

4    _____

)

5    GLADYS CLAUDETTE SUTTON,        )    Civil Action

Individually and as Personal )

6    Representative of the Estate )    No. 07-01197 (JDB)

and Next of Kin of ANGEL       )

7    CLAUDETTE WALTERS, Deceased, )    ORIGINAL

)

8         Plaintiff,              )

)

9    vs.                            )

)

10   WASHINGTON METROPOLITAN AREA )

TRANSIT AUTHORITY,             )

11                                  )

Defendant.               )

12   _____)

13

14

15            VIDEOTAPED DEPOSITION OF

16               BRENTON L. FAIRNOT

17                Washington, D.C.

18            Tuesday, October 9, 2007

19                 10:04 a.m.

20

21   Job No.:   112544

Pages 1 through 224

22   Reported by:  John L. Harmonson, RPR


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

115

| | | |
|---|---|---|
| 1 | the bus on the night in question? | 13:22:01 |
| 2 | A. No, sir. No, sir. I'd say it's just a | 13:22:12 |
| 3 | slight bend that bears to your left, but there are | 13:22:16 |
| 4 | no physical barriers along the pathway. | 13:22:20 |
| 5 | Q. Were there any cars that were in your | 13:22:28 |
| 6 | way going in the same direction as you were from | 13:22:30 |
| 7 | the intersection of 13th Place and Congress Street | 13:22:34 |
| 8 | until the time of the accident? | 13:22:37 |
| 9 | A. No, sir. Like I said, there are | 13:22:41 |
| 10 | vehicles lined up on both sides, so it's very | 13:22:43 |
| 11 | difficult for a bus and a vehicle to pass without | 13:22:48 |
| 12 | someone giving way, so... | 13:22:52 |
| 13 | Q. I understand that. But my question is: | 13:22:54 |
| 14 | Were there any vehicles going the same direction | 13:22:56 |
| 15 | that you were that were -- So these would have | 13:22:59 |
| 16 | been cars or any other kind of vehicle in front of | 13:23:01 |
| 17 | you prior to the point of the accident? | 13:23:04 |
| 18 | A. No, sir. None that I can recall. | 13:23:06 |
| 19 | Q. Okay. And that again is from the | 13:23:08 |
| 20 | intersection of 13th Place and Congress Street? | 13:23:10 |
| 21 | A. Correct. | 13:23:15 |
| 22 | Q. Okay. In the 150 feet before the time | 13:23:15 |

VIDEOTAPED DEPOSITION OF BRENTON J. FAIRNOT
CONDUCTED ON TUESDAY, OCTOBER 9, 2007

116

| | | |
|---|---|---|
| 1 | of the accident, was there any obstruction to your | 13:23:21 |
| 2 | view? | 13:23:24 |
| 3 | A. No, sir. | 13:23:27 |
| 4 | Q. In the 100 feet before the accident, | 13:23:27 |
| 5 | was there any obstruction to your view? | 13:23:30 |
| 6 | A. No, sir. | 13:23:32 |
| 7 | Q. In the 50 feet before the accident, | 13:23:33 |
| 8 | were there any obstructions to your view? | 13:23:35 |
| 9 | A. No, sir, there were no obstructions. | 13:23:38 |
| 10 | Like I said, I did observe a group of gentlemen | 13:23:40 |
| 11 | off to my right, but they were not in the road, | 13:23:43 |
| 12 | close to the road. They were off like on the | 13:23:46 |
| 13 | sidewalk area. | 13:23:50 |
| 14 | Q. Can you describe where these gentlemen | 13:23:53 |
| 15 | were? | 13:23:55 |
| 16 | A. After -- Just after I crossed the | 13:24:03 |
| 17 | intersection of Congress Street and 13th Street. | 13:24:09 |
| 18 | Q. So how close to that intersection were | 13:24:14 |
| 19 | they? | 13:24:17 |
| 20 | MR. SHAFFER: Which intersection? | 13:24:18 |
| 21 | MR. MALONEY: The one he just | 13:24:19 |
| 22 | described, Congress Street and 13th Street. | 13:24:20 |

174

| | | |
|---|---|---|
| 1 | Q.      You don't have page 1? | 14:35:26 |
| 2 | A.      It goes from the cover page to 2 and 3. | 14:35:29 |
| 3 | Q.      All right.  Let me see if I can -- | 14:35:33 |
| 4 | MR. MALONEY:  Let's go off the record | 14:35:49 |
| 5 | for just a minute. | 14:35:50 |
| 6 | THE VIDEOGRAPHER:  We are going off the | 14:35:53 |
| 7 | record.  The time is 2:35 p.m. | 14:35:53 |
| 8 | (A recess was then taken.) | |
| 9 | THE VIDEOGRAPHER:  We are back on the | 14:40:14 |
| 10 | record.  The time is 2:40 p.m. | 14:40:14 |
| 11 | BY MR. MALONEY: | 14:40:18 |
| 12 | Q.      Again, Mr. Fairnot, I think what we | 14:40:18 |
| 13 | have here are certain pages of what I believe may | 14:40:20 |
| 14 | be the standard operating procedure from 1998.  My | 14:40:22 |
| 15 | questions are going to deal with certain pages of | 14:40:27 |
| 16 | this document.  It's not a complete document, but | 14:40:30 |
| 17 | I believe that it is, at least at one point in | 14:40:32 |
| 18 | time reflected the standard operating procedures | 14:40:36 |
| 19 | for Metro.  And I've got a request to get the | 14:40:39 |
| 20 | updated one that you were trained on and that you | 14:40:42 |
| 21 | would have in your possession still. | 14:40:45 |
| 22 | Let's look at page 1, if we could.  It | 14:40:48 |

175

1   says:  "This handbook has been designed to prepare    14:40:53

2   and to provide the Metro employee with clearly    14:40:56

3   defined bus operating procedures.  These    14:40:59

4   procedures were developed by the Metrobus safety    14:41:01

5   and training staff at the Washington Metropolitan    14:41:03

6   Area Transit Authority's Department of Bus    14:41:05

7   Service.  They represent the product of research    14:41:08

8   and numerous years of bus operating experience."    14:41:11

9           Do you know if this kind of a foreword    14:41:17

10  was in the material that you had for standard    14:41:18

11  operating procedures for Metrobus?    14:41:19

12      A.    You're asking me if this was in it?    14:41:21

13      Q.    Yes, sir.    14:41:23

14      A.    Yes, sir.    14:41:24

15      Q.    The next paragraph says:  "As you    14:41:24

16  review this material, remember that your operating    14:41:26

17  career will depend upon retention of information    14:41:28

18  obtained from this handbook and your ability to    14:41:30

19  skillfully maneuver a Metrobus."    14:41:32

20          Do you know if that sentence was in the    14:41:38

21  standard operating procedures that you received    14:41:40

22  from Metrobus?    14:41:40

176

| | | |
|---|---|---|
| 1 | A.    Yes, sir. | 14:41:41 |
| 2 | Q.    And the next sentence says: | 14:41:41 |
| 3 | "Illustrated and explained in this manual are the | 14:41:43 |
| 4 | standards for Metrobus operations under normal | 14:41:46 |
| 5 | traffic conditions.  In unusual situations not | 14:41:48 |
| 6 | covered in this manual, operators must use their | 14:41:51 |
| 7 | best judgment to drive safely and provide our | 14:41:55 |
| 8 | patrons with the quality service they expect." | 14:41:57 |
| 9 | Do you know if that was in the standard | 14:42:01 |
| 10 | operating procedure manual that you received? | 14:42:03 |
| 11 | A.    Yes, sir. | 14:42:05 |
| 12 | Q.    Okay.  Now, as you sit here today, do | 14:42:06 |
| 13 | you have a good retention of the information that | 14:42:09 |
| 14 | was contained in the standard operating procedures | 14:42:13 |
| 15 | manual that you received from Metrobus? | 14:42:16 |
| 16 | A.    I believe so. | 14:42:20 |
| 17 | Q.    All right.  Let's go to the page 4 and | 14:42:20 |
| 18 | 5.  Do you have that? | 14:42:31 |
| 19 | No, you don't have that in the material | 14:42:33 |
| 20 | there, do you? | 14:42:37 |
| 21 | A.    No, sir. | 14:42:39 |
| 22 | Q.    All right.  Go to page 9, if you would, | 14:42:41 |

180

| | | |
|---|---|---|
| 1 | slower so you can stop within that 90 feet? | 14:45:55 |
| 2 | A. My interpretation is that because of | 14:45:59 |
| 3 | slippery conditions, you slow the bus down or you | 14:46:03 |
| 4 | brake the bus down as safely as possible. Now, | 14:46:09 |
| 5 | that may mean it may take a little bit longer for | 14:46:17 |
| 6 | you to stop the bus safely as to avoid hitting any | 14:46:21 |
| 7 | other objects. That's my interpretation. | 14:46:25 |
| 8 | Q. Did it take you the 89 feet to stop the | 14:46:29 |
| 9 | bus on the night of this accident because of the | 14:46:35 |
| 10 | slippery conditions of the street? | 14:46:38 |
| 11 | A. Yes. My concern was to stop the bus as | 14:46:47 |
| 12 | safely and as quickly as possible. I did not want | 14:46:50 |
| 13 | to skid. I did not want to hit anything else. So | 14:46:54 |
| 14 | however long it was going to take me to stop the | 14:47:04 |
| 15 | bus safely, that's how long it was going to take. | 14:47:07 |
| 16 | Q. Turn to page 38, if you would, please. | 14:47:24 |
| 17 | Now, did the manual that you reviewed have a | 14:47:32 |
| 18 | section dealing with observations that the bus | 14:47:35 |
| 19 | driver should engage in? | 14:47:38 |
| 20 | A. Yes, sir. | 14:47:39 |
| 21 | Q. Can you take just a quick look at | 14:47:40 |
| 22 | what's on page 38 there and see if you can tell me | 14:47:42 |

VIDEOTAPED DEPOSITION OF BRENTON D. FAIRNOT
CONDUCTED ON TUESDAY, OCTOBER 9, 2007

181

| | | |
|---|---|---|
| 1 | if that same information is contained in the | 14:47:46 |
| 2 | standard operating procedure manual that you were | 14:47:53 |
| 3 | trained on. | 14:47:56 |
| 4 | A.   Yes, sir. | 14:48:00 |
| 5 | Q.   All right.  So you were trained to look | 14:48:02 |
| 6 | 12 to 15 seconds ahead? | 14:48:05 |
| 7 | A.   Yes, sir.  And when possible, to look a | 14:48:08 |
| 8 | block ahead. | 14:48:12 |
| 9 | Q.   All right.  And it does say to "look at | 14:48:13 |
| 10 | least one block ahead in city traffic," correct? | 14:48:19 |
| 11 | A.   Yes, sir, No. 1. | 14:48:22 |
| 12 | Q.   And did you do that on the night of | 14:48:23 |
| 13 | this accident prior to the time of the accident? | 14:48:25 |
| 14 | A.   Yes, sir. | 14:48:29 |
| 15 | Q.   And as you approached the scene of the | 14:48:31 |
| 16 | accident, were you following what's on the bottom | 14:48:34 |
| 17 | part of page 38; that is, shifting your attention | 14:48:36 |
| 18 | back and forth, near and far? | 14:48:42 |
| 19 | A.   Yes, sir, scanning. | 14:48:44 |
| 20 | Q.   And you were not concentrating your | 14:48:46 |
| 21 | attention for a long period of time on any person, | 14:48:48 |
| 22 | place or thing? | 14:48:51 |

VIDEOTAPED DEPOSITION OF BRENTON J. FAIRNOT
CONDUCTED ON TUESDAY, OCTOBER 9, 2007

182

1     A.    Correct.  Not fixating.                    14:48:53

2     Q.    And you were not staring?                  14:48:54

3     A.    No, sir.                                    14:48:56

4     Q.    And you were using all areas of sight      14:48:56

5   to scan the road; is that correct?                 14:48:59

6     A.    Yes, sir.                                   14:49:02

7     Q.    Was there also a section in the            14:49:21

8   standard operating procedure manual that you       14:49:25

9   received and you received training on dealing with 14:49:28

10  defensive driving?                                  14:49:31

11    A.    Yes, sir.                                   14:49:33

12    Q.    And if you take a look at page 41 and      14:49:33

13  if you could read page 41, and then this goes over 14:49:36

14  to forty -- I think it ends at page 46.             14:49:39

15          Could you just take a look at that and     14:49:51

16  see if this is the same information that was        14:49:53

17  contained in your standard operating procedure      14:49:55

18  manual.                                             14:49:58

19    A.    You said to page 40 --                     14:50:52

20    Q.    Yeah, just up to page 40 -- I guess it     14:50:56

21  would be through page 45.                           14:50:56

22    A.    Okay.                                       14:50:58

183

| | |
|---|---|
| 1 | Q. All right. Does that look to be the | 14:50:59 |
| 2 | same as the information that was in the manual | 14:51:01 |
| 3 | that you were trained on? | 14:51:03 |
| 4 | A. Yes, sir. | 14:51:04 |
| 5 | Q. All right. Let's go back to page 41 if | 14:51:05 |
| 6 | we could. It says that "There are three major | 14:51:07 |
| 7 | concepts of defensive driving. No. 1, see the | 14:51:09 |
| 8 | danger. No. 2, understand the defense. And | 14:51:12 |
| 9 | No. 3, initiate immediate action." | 14:51:12 |
| 10 | Now, that information was contained in | 14:51:16 |
| 11 | the manual, is that correct, that you were trained | 14:51:18 |
| 12 | on? | 14:51:21 |
| 13 | A. Yes, sir. | 14:51:22 |
| 14 | Q. And here where it talks about seeing | 14:51:22 |
| 15 | the danger, it says: "Scan the road, observe all | 14:51:25 |
| 16 | hazards in the driving environment, evaluate the | 14:51:28 |
| 17 | accident potential, anticipate movement, be alert | 14:51:32 |
| 18 | to changes in the traffic patterns." | 14:51:33 |
| 19 | Did I read that correctly? | 14:51:36 |
| 20 | A. Yes, you did. | 14:51:38 |
| 21 | Q. All right. Now, if there were | 14:51:39 |
| 22 | pedestrians standing behind the Escalade at the | 14:51:41 |

VIDEOTAPED DEPOSITION OF BRENTON L. FAIRNOT
CONDUCTED ON TUESDAY, OCTOBER 9, 2007

184

| | | |
|---|---|---|
| 1 | point of this accident and they had packages in | 14:51:44 |
| 2 | their hand, would that be an indication of | 14:51:47 |
| 3 | potential danger to you as a bus driver | 14:51:49 |
| 4 | approaching the accident scene? | 14:51:52 |
| 5 | MR. SHAFFER:  Object to the form of the | 14:51:54 |
| 6 | question. | 14:51:55 |
| 7 | But you can answer. | 14:51:57 |
| 8 | THE WITNESS:  I'm sorry, ask again. | 14:51:58 |
| 9 | BY MR. MALONEY: | 14:51:59 |
| 10 | Q.    Sure.  If there were pedestrians | 14:52:00 |
| 11 | standing at the back of the Escalade and they | 14:52:01 |
| 12 | had -- and let me assume hypothetically that the | 14:52:04 |
| 13 | hatch of the Escalade was open and that there were | 14:52:08 |
| 14 | items that were in the hands of at least two | 14:52:12 |
| 15 | individuals that were standing there.  Would that | 14:52:16 |
| 16 | be an indication of potential danger for you as | 14:52:18 |
| 17 | you were driving your bus on the night of the | 14:52:21 |
| 18 | accident? | 14:52:24 |
| 19 | A.    Yes. | 14:52:24 |
| 20 | Q.    Why is that? | 14:52:28 |
| 21 | A.    Because they could turn and walk in the | 14:52:29 |
| 22 | path of the bus.  That's why.  And that's my | 14:52:32 |

185

| | | |
|---|---|---|
| 1 | answer. | 14:52:41 |
| 2 | Q.    All right.  No. 3, it says here: | 14:52:41 |
| 3 | "Initiate immediate action.  React to first | 14:52:48 |
| 4 | possible perceptions of danger." | 14:52:52 |
| 5 | Were you trained to do that? | 14:52:53 |
| 6 | A.    Yes, sir. | 14:52:55 |
| 7 | Q.    And were you trained to provide maximum | 14:52:57 |
| 8 | braking steering time and distance in times of | 14:53:00 |
| 9 | danger? | 14:53:04 |
| 10 | A.    Yes, sir, with regards to safety, as | 14:53:05 |
| 11 | always. | 14:53:07 |
| 12 | Q.    Let's turn now to page 44.  This | 14:53:12 |
| 13 | involves training with respect to pedestrian | 14:53:18 |
| 14 | accidents.  It has position of pedestrian.  It | 14:53:21 |
| 15 | says:  "Pedestrian ahead."  Then if you look in | 14:53:25 |
| 16 | the middle, it says:  "Possible action of | 14:53:28 |
| 17 | pedestrian."  And below that it says:  "Stand or | 14:53:31 |
| 18 | walk in front of moving bus." | 14:53:35 |
| 19 | So you were trained as you went through | 14:53:37 |
| 20 | your Metrobus training to watch out for | 14:53:39 |
| 21 | pedestrians who potentially would stand or walk in | 14:53:44 |
| 22 | front of a moving bus; is that correct? | 14:53:47 |

186

1    A.    That's correct.                              14:53:49

2    Q.    And the defensive action to take in          14:53:51

3  that situation that you were trained on was:  Slow   14:53:53

4  down or stop to prevent pedestrian to cross --       14:53:58

5  strike that.                                          14:54:00

6          It says:  "Slow down or stop to permit       14:54:02

7  pedestrian to cross.  Proceed only when certain      14:54:05

8  that pedestrian will stay clear of bus."             14:54:08

9          Is that the defensive action of the          14:54:11

10 operator that you were trained on, or that you       14:54:14

11 were trained to do?                                  14:54:17

12   A.    Yes, sir.                                    14:54:18

13   Q.    Okay.  Turn to page 46, if you would.        14:54:24

14 There is a reference here to "Adverse Driving         14:54:47

15 Conditions."                                          14:54:50

16         It says:  "Reduced visibility "-- and        14:54:51

17 this is at the top of the page there -- "Reduced     14:54:54

18 visibility or slippery streets can make driving      14:54:57

19 difficult.  Most accidents occur because operators   14:55:01

20 do not adjust to changes in driving conditions."     14:55:04

21         Did you receive that same training in        14:55:07

22 your standard operating procedure manual?            14:55:09

198

| | | |
|---|---|---|
| 1 | Q.   Okay.   Next sentence it says:   "It | 15:15:26 |
| 2 | appears clear that decedent attempted to cross the | 15:15:29 |
| 3 | street with her view of the oncoming bus blocked | 15:15:33 |
| 4 | by the numerous packages she was holding." | 15:15:37 |
| 5 | Do you know of any facts -- Do you | 15:15:41 |
| 6 | personally know of any facts that support that | 15:15:42 |
| 7 | contention? | 15:15:45 |
| 8 | A.   I don't.   I mean, all I know is that | 15:15:46 |
| 9 | contact was made.   I saw a light colored flash in | 15:15:49 |
| 10 | the lower region -- portion of the window. | 15:15:55 |
| 11 | Q.   Do you know of any facts that would | 15:15:58 |
| 12 | suggest that the packages she was holding were | 15:15:59 |
| 13 | held up around her eyes so that she could not see | 15:16:03 |
| 14 | an oncoming bus? | 15:16:07 |
| 15 | A.   No, sir. | 15:16:08 |
| 16 | Q.   Are you aware that the packages she was | 15:16:09 |
| 17 | holding were white? | 15:16:12 |
| 18 | A.   No, I'm not.   All I know is I saw a | 15:16:14 |
| 19 | light colored flash. | 15:16:18 |
| 20 | Q.   Okay.   If Ms. Walters had been in the | 15:16:19 |
| 21 | road five seconds prior to the bus striking her | 15:16:32 |
| 22 | and she was holding two white packages, one in | 15:16:37 |

VIDEOTAPED DEPOSITION OF BRENTON J. FAIRNOT
CONDUCTED ON TUESDAY, OCTOBER 9, 2007

199

| | | |
|---|---|---|
| 1 | either hand, would you have expected that you | 15:16:41 |
| 2 | would have been able to see her? | 15:16:43 |
| 3 | A.   Yes, sir. | 15:16:46 |
| 4 | Q.   Under response No. 4 there is a -- the | 15:16:57 |
| 5 | last line here says:  "WMATA further denies | 15:17:04 |
| 6 | Ms. Walters could be seen." | 15:17:08 |
| 7 | Do you know the facts that would | 15:17:12 |
| 8 | support the contention that -- where WMATA denies | 15:17:15 |
| 9 | that Ms. Walters could be seen? | 15:17:23 |
| 10 | A.   Could you rephrase the question? | 15:17:25 |
| 11 | Q.   Sure.  Do you know of any facts that | 15:17:27 |
| 12 | support a contention that Ms. Walters could not be | 15:17:29 |
| 13 | seen by you, the bus driver, on the night of the | 15:17:31 |
| 14 | accident? | 15:17:35 |
| 15 | A.   No, I do not.  All I know is that she | 15:17:39 |
| 16 | was not visible to me. | 15:17:42 |
| 17 | Q.   Okay, that's all I have for those. | 15:18:04 |
| 18 | Now go to the answers to | 15:18:11 |
| 19 | interrogatories. | 15:18:13 |
| 20 | A.   That's Exhibit 12? | 15:18:18 |
| 21 | Q.   Yes, sir. | 15:18:20 |
| 22 | In Answer to Interrogatory No. 7, I | 15:18:38 |

# EXHIBIT 5

# Washington Metropolitan Area Transit Authority



metrobus

# Metrobus
# Standard
# Operating
# Procedures

*1996*

EXHIBIT

9

10/9/07

FAIRNOT

PENGAD 800-631-6989

# FOREWARD

This handbook has been designed and prepared to provide the Metrobus employee with clearly defined bus operating procedures. These procedures were developed by the Metrobus Safety and Training Staff at the Washington Metropolitan Area Transit Authority's Department of Bus Service. They represent the product of research and numerous years of bus operating experience.

As you review this material, remember that your operating career will depend upon retention of information obtained from this handbook and your ability to skillfully maneuver a Metrobus.

Illustrated and explained in this manual are the standards for Metrobus operation under normal traffic conditions. In unusual situations not covered in this manual, operators must use their best judgment to drive safely and provide our patrons with the quality service they expect.

1

## OBSERVATIONS

Observations are critical to the safe operation of a bus. The way you drive is in direct response to what you see. Every person, object or vehicle within the traffic must be observed. The operator must survey the road, observe traffic conditions and identify all hazards in the driving environment. Complete observations must be conclusive. They must provide ample opportunity for the operator to make timely decisions and respond to constantly changing traffic conditions.

### LOOKING - 12 to 15 seconds ahead:

1. At least one block ahead in city traffic.
2. At least 1/4 mile ahead at highway speed.
3. Check mirrors regularly. Left side and rear should be observed at least every 5 seconds.



### SEEING - Keep an alert mind:

1. Shift your attention back and forth, near and far.
2. Never concentrate your attention more than four seconds on any person, place or thing.
3. Avoid staring.
4. Use all areas of sight to scan the road.

38

### VEHICLE BLIND SPOTS

These are areas of a vehicle that cannot be seen or inspected:

1. Observe traffic conditions for movement into blind areas.
2. Be alert for movement of traffic out of blind areas.

### ENVIRONMENTAL BLIND SPOTS

These are blind spots caused by vehicles or objects obstructing the line of sight:

1. Video following distance behind large vehicles.
2. Be alert for vehicles parked close to intersections, alleys and driveways.
3. Other blind spots can be caused by signs, bushes, trees, buildings and walls.



39

**REMEMBER:**

1. Look with your eyes but see with your mind.

2. A driver that stares cannot be a safe driver.

3. Curb lane operation improves observations:

   a. Reduces possibility of vehicle passing on the right.

   b. Majority of right side hazards will be observed in front or along the curb as bus approaches.

   c. Operator can devote more attention to left and left front observations.

This segment explains general observation techniques. Detailed observations are included in the specific procedures for each bus maneuver.

# DEFENSIVE DRIVING

Accident prevention is a major goal of professional operators. The professional operator drives to avoid all accidents in spite of the actions of others or the presence of adverse driving conditions.

Defensive Driving has three major concepts:

1. See the danger:

   a. Scan the road
   b. Observe all hazards in the driving environment
   c. Evaluate the accident potential

   o Anticipate movement
   o Be alert to changes in the traffic patterns

2. Understand the defense:

   a. Be prepared to stop smoothly
   b. Steer to avoid danger before emergency actions is required

3. Initiate immediate action:

   a. React to first possible perception of danger
   b. Provide maximum braking, steering time and distance
   c. Avoid passenger injury and vehicle abuse

The following guide outlines four types of accidents. Study the material carefully. It is designed to help the operator recognize dangerous situations and understand defensive actions required to avoid accidents.

## FIXED OBJECT ACCIDENTS

| POSITION OF FIXED OBJECT | DEFENSIVE ACTION OF OPERATOR |
|---|---|
| | CHECK CLEARANCE CAREFULLY. |
| AHEAD OR BEHIND OR ALONGSIDE OR OVERHEAD | IF IN DOUBT OF CLEARANCE, STOP BUS AND GET OUT TO CHECK. TURN AND BACK UP SLOWLY AND CAUTIOUSLY. |

## PEDESTRIAN ACCIDENTS

| POSITION OF PEDESTRIAN | POSSIBLE ACTION OF PEDESTRIAN | DEFENSIVE ACTION OF OPERATOR |
|---|---|---|
| Pedestrian Ahead | Stand or walk in front of standing bus | Observe all directions before proceeding when moving bus. Make certain that pedestrians will stay clear of moving bus. |
| Pedestrian Ahead | Stand or walk in front of moving bus | Slow down or stop to permit pedestrian to cross. Proceed only when certain that pedestrian will stay clear of bus. |
| Pedestrian Behind | Stand or walk behind standing bus | Observe in all directions before backing bus. Make certain that no pedestrians are in danger. |
| Pedestrian Behind | Stand or walk behind backing bus | Stop to allow pedestrians to get in clear. Back slowly and cautiously when certain pedestrians will stay clear of bus. |
| Pedestrians Alongside | Stand or walk in overhang area of bus | Warn pedestrian in overhang area. Turn slowly and cautiously. |

## PASSENGER ACCIDENTS

| POSITION OF PEDESTRIAN | POSSIBLE ACTION OF PEDESTRIAN | DEFENSIVE ACTION OF OPERATOR |
|---|---|---|
| Boarding or Alighting | Approaching or leave bus without watching where they step | Stop where it is safe for passengers to board and alight. |
| Boarding or Alighting | Attempt to board or alight while bus is in motion | Open doors after making stop. Close doors before moving bus. |
| Boarding or Alighting | Is not clear of closing door | Be sure that passengers are clear before closing doors. If necessary, hold rear door open with rear door open emergency switch. |
| On Board | Stand or walk without holding on to seats or stanchions | Start gradually, stop smoothly, turn slowly. |
| On Board | Put arm or elbow out of open window | Warn passenger of danger. Maintain sufficient clearance with fixed objects and other vehicles. |
| On Board | Place bundles or packages where other passengers may trip over them | Request passenger to move bundles or packages. |

# EXHIBIT 6



Photo 1 196 Feet.jpg



Photo 2  269 feet.jpg



Photo 3   1140 feet.jpg



Photo 1  1.10 feet jpg



photo 5  75 Feet.jpg

# EXHIBIT 7



exhibits

1

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA

2

3    GLADYS SUTTON, As Mother       :
     and Next Kin of Deceased       :        ORIGINAL
4    Daughter, ANGEL WALTERS,       :
                                    :
5                    Plaintiff      : Case No. 1:07cv1197(JDB)
                                    :
6               v.                  :
                                    :
7    WASHINGTON METROPOLITAN        :
     AREA TRANSPORTATION            :
8    AUTHORITY,                     :
                                    :
9               Defendant           :

10

11          Deposition of WILL PARTENHEIMER
                 Richmond, Virginia
12              Friday, March 7, 2008
                    11:13 a.m.

13

14

15

16

17

18

19

20

21   Job No. 1-122528
     Pages 1 - 78
22   Reported by Tracy E. Barksdale, RPR


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

9

1         Q   So the inside lights or weather should

2 not have caused the driver a problem on the night of

3 the accident; is that what you're saying?

4         A   That's what I'm saying.

5         Q   Are you saying the driver should have

6 been able to see the pedestrian on the night of the

7 accident?

8         A   Yes, sir.

9         Q   Okay.  And in fact, the driver

10 admitted to that in his deposition, you would agree,

11 would you not?

12         A   I don't remember the exact wording.

13 If you wanted to point out a line, I'll read it.

14 But I don't specifically recall the exact wording

15 what he said.

16         Q   Do you remember the substance of that

17 being included in his deposition?

18         A   I'd have to review it.

19         Q   At what point should the driver have

20 seen the pedestrian on the night of the accident?

21         A   Well, when she got to the position

22 that she was in when she was struck.  He may have

22

1        Q    What did he tell you it was in DC?

2        A    I don't think he told me what it was

3  in DC, and I don't recall asking.

4        Q    Did he ask you what your opinions were

5  with respect to last clear chance at all?

6        A    I think the discussion was that she

7  would have had the opportunity to move, and that was

8  the extent of it.

9        Q    Is that what he said, or is that what

10  you said?

11        A    No.  That's what I said in response to

12  talking about it.

13        Q    Anything else?

14        A    Not that I recall, no, sir.

15        Q    Did you discuss whether the bus driver

16  would have had the opportunity to either stop or to

17  drive around her?

18        A    Yes.

19        Q    And what was your conclusion with

20  respect to that?

21        A    My opinion is he could have stopped or

22  gone around her.

46

1    impact?

2         A    It's gonna be more difficult for him

3    to see them in the beginning, because they're not

4    luminescent themselves.  But yes, sir, he would have

5    been able to see them too.

6         Q    At what point?

7         A    Certainly as soon as he should have

8    been able to see Ms. Walters, I think.  It's a well

9    illuminated area.

10        Q    The third conclusion is that

11   Ms. Walters would have had a better opportunity to

12   view the large illuminated bus than Mr. Fairnot

13   would have had to observe a non-illuminated

14   pedestrian and could have moved to a position out of

15   danger.

16        Now, where was she positioned at the point

17   of impact?

18        A    Approximately 9 feet -- 9.3 feet into

19   the roadway.

20        Q    How wide is the roadway?

21        A    Approximately 34 feet, curb to curb.

22        Q    So if I've got my math right, then,

47

1     there was approximately 25, maybe just a hair less

2     than 25 feet from the point where she was standing

3     to the curb on the other side of the road; is that

4     correct?

5          A     That's correct.

6          Q     There were no vehicles parked on the

7     other side of the road; isn't that correct?

8          A     Not appearing -- correct, there do not

9     appear to be in the video.

10         Q     There were none that were parked there

11    for a period of at least a hundred feet; you would

12    agree, would you not?

13         A     From what I can see from the edge of

14    the building, that's correct.

15         Q     And in fact, from looking at the

16    video, you're able to tell there was not even snow

17    or ice on the ground on the far side of the street

18    like there was where the Escalade was parked, were

19    you not?

20         A     I'd have to review there was none, but

21    there was none significant.

22         Q     All right.  That's fair enough.  So I

49

```
 1    time it's making it's turn up the road.  As she's

 2    standing there for 5.3 seconds while the bus is

 3    coming, all she has to do is step back out of the

 4    road.

 5             Q    If she stepped back out of the road,

 6    where would she have stepped?

 7             A    Back towards the Escalade.

 8             Q    Was the Escalade between her and the

 9    curb at that point?

10             A    Yes.

11             Q    How many feet was she away from the

12    Escalade?

13             A    She was approximately 1.5 feet.

14             Q    And what point of the Escalade would

15    she have backed into if she had backed up 1.5 feet?

16             A    Well, if you're saying she's right on

17    the exact rear corner, I think she's a little behind

18    it.  If she backs up, she's going to back to the

19    left corner of the Escalade.

20             Q    Okay.  And where did the snow and ice

21    start vis-a-vis where she was standing at point of

22    impact?
```

50

1          A    That 1.5 feet was the snow.

2          Q    So she was standing off the snow and

3     ice; is that correct?

4          A    Yes.

5          Q    So if she backed up six inches, would

6     she be standing on the snow and ice?

7          A    Yes, sir, she would be on the snow and

8     ice.

9          Q    If she backed up two inches, would she

10    have been standing on the snow and ice?

11         A    Yes.

12         Q    If she backed up an inch, she would

13    stand on the snow and ice?

14         A    Assuming she's exactly off the snow

15    and ice.  I mean, it appears when she gets out at

16    that point, she is not standing on the ice.  So the

17    ice is 1.5 feet.  So using that distance.  The

18    answer to all those questions would be yes.

19         Q    What kind of traction did her shoes

20    have?

21         A    I have no idea.

22         Q    Is that of any significance to your

# EXHIBIT 8

exhibits

# metro WEEKLY

volume 10, issue 7    february 16, 2007

# Bus accident prompts immediate focus on pedestrian safety

General Manager John Catoe announced a more aggressive emphasis on pedestrian safety following the Feb. 14 fatal Metrobus/pedestrian accident.

"Today we began face-to-face, one-on-one and group sessions with our bus operators to reemphasize the requirement to wait for and yield to pedestrians in crosswalks," Catoe said the day after the accident.

Before starting work, bus operators received a handout reminding them to give particular care to pedestrians crossing streets. Posters with similar reminders have been placed at all bus facilities and an official notice to bus operators focusing on pedestrian safety issues is being drafted.

Additionally, Metro began developing a new course for operators that emphasizes pedestrian safety. Bus operators will take the retraining course annually.

"We are shifting into a new training mode. Our entry training is good. We need annual retraining," Catoe said.

Metro has implemented several actions to improve bus and pedestrian safety, including:

- Assessing high accident routes and locations to reduce the risk of accidents;

- Observing driver performance at key locations;

- Establishing a mentor program for new bus operators;

- Installing a collision avoidance system on 50 buses as a pilot program; and

- Installing flashing amber lights atop 100 Metrobuses in the District of Columbia to make buses more visible at night.

For the past four years, Metrobus accidents have held relatively steady, despite ridership and mileage increases. Metro averages 3.83 accidents per 100,000 miles with 61 percent of those accidents classified as non-preventable.

## Stations to close for weekend switch project

Cheverly, Landover and New Carrollton stations will be closed this weekend as track and structures workers replace a switch at the Cheverly station. The work begins at 10 p.m. Friday, Feb. 16, and runs through midnight on Monday, Feb. 19. All stations are scheduled to reopen at 5 a.m. Tuesday, Feb. 20.

Throughout the Presidents' Day holiday weekend the Orange Line will run between Vienna/Fairfax-GMU and Deanwood, and Metrobus will run free shuttle buses that will stop at New Carrollton, Landover, Cheverly and Deanwood.

To inform riders about the work, Metro has placed signs and banners in stations, will make system announcements and post information on the Web site.

## Outdoor signs provide system information

Over the next two weeks Metro will roll out two different kinds of outdoor information signs at several stations that will give passengers service information before they enter the system, including train arrival times, rail system disruptions, nearby bus routes, and the times for the first and last trains through the station.

Cylindrical information kiosks that are 31.5 inches in diameter and 6.5 feet high with a wraparound screen have been placed at the entrances to Gallery Pl-Chinatown (7th and F Street), Shady Grove and Vienna/Fairfax-GMU. Later this month, we will install 46-inch LCD flat screens at Gallery Place (two screens), Silver Spring and Rosslyn.

"The new display screens at station entrances will give riders the information they need to make decisions about their travel plans before they even get into the station," said Ray Feldmann, acting assistant general manager for communications.

The cylindrical signs and flat screens are a pilot project that will run through the end of the year and is being paid for with advertising revenue that had been designated for customer service and information improvements.



One cylindrical sign is at 7th and F Street.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLADYS CLAUDETTE SUTTON,                    :
Individually and as Personal                :
Representative of the Estate and Next of Kin of   :
ANGEL CLAUDETTE WALTERS, Deceased           :
                                            :
        Plaintiff,                          :        Case No.:07- 01197 (JDB)
                                            :
    v.                                      :
                                            :
WASHINGTON METROPOLITAN AREA                 :
TRANSIT AUTHORITY,                           :
                                            :
        Defendant.                          :

**O R D E R**

UPON CONSIDERATION OF Defendant's Motion for Summary Judgment, Plaintiff's

Opposition thereto, and Defendant's Reply, and the entire record herein, it is by this Honorable

Court on this ___ day of _____, 2008

        ORDERED, that Defendant's Motion be, and the same hereby is DENIED in its entirety.


_____
Judge John D. Bates

cc:    Paul J. Maloney, Esquire
       Kelly M. Lippincott, Esquire
       Carr Maloney P.C.
       1615 L Street, N.W., Suite 500
       Washington, D.C.  20036

       Fredric H. Schuster, Esq.
       David J. Shaffer, Esq.
       Assistant General Counsel
       Washington Metropolitan Area
        Transit Authority
       600 Fifth Street, N.W.
       Washington, D.C. 20001

20080815-NOG-4 (proposed order re oppo to msj)